**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | |
|---|---|
| **In Re: Rare Breed Triggers Patent Litigation** | **4:26-md-03176-ALM<br>MDL 3176** |
| ABC IP, LLC, and RARE BREED TRIGGERS, INC.,<br><br>  Plaintiffs,<br><br>v.<br><br>80MILLS LLC, d/b/a TACTICAL TITAN SUPPLY, and PEARSON GARDNER,<br><br>  Defendants. | Civil Action No. 4:26-cv-00380-ALM |
| ABC IP, LLC, and RARE BREED TRIGGERS, INC.,<br><br>  Plaintiffs,<br><br>v.<br><br>CHRISTOPHER COPE,<br><br>  Defendant. | Civil Action No. 2:26-cv-00033-ALM |
| ABC IP, LLC, and RARE BREED TRIGGERS, INC.,<br><br>  Plaintiffs,<br><br>v.<br><br>DNT LLC, d/b/a DEEZ NUTZ TACTICAL, and ZACH MORROW,<br><br>  Defendants. | Civil Action No. 4:26-cv-00377-ALM |

| | |
|---|---|
| ABC IP, LLC, and RARE BREED TRIGGERS, INC.,<br><br>    Plaintiffs,<br><br>v.<br><br>HANES TACTICAL, LLC, and DAMION TERRELL BENNETT,<br><br>    Defendants. | Civil Action No. 4:26-cv-00369-ALM |
| ABC IP, LLC, and RARE BREED TRIGGERS, INC.,<br><br>    Plaintiffs,<br><br>v.<br><br>HARRISON GUNWORKS LLC, and TYLER HARRISON,<br><br>    Defendants. | Civil Action No. 4:26-cv-00379-ALM |
| ABC IP, LLC, and RARE BREED TRIGGERS, INC.,<br><br>    Plaintiffs,<br><br>v.<br><br>MARS TRIGGER, LLC, and PETER BRENNEN,<br><br>    Defendants. | Civil Action No. 2:26-cv-00030-ALM |
| ABC IP, LLC, and RARE BREED TRIGGERS, INC.,<br><br>    Plaintiffs,<br><br>v.<br><br>MISTER GUNS, LLC, THOMAS CARTER II, and BRANDI CARTER | Civil Action No. 2:26-cv-00056-ALM |

|  |  |
|---|---|
| Defendants. | |
| ABC IP, LLC, and RARE BREED TRIGGERS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> STEVEN THANH NGUYEN, d/b/a POLYMER PEW, <br><br> Defendant. | Civil Action No. 4:26-cv-00425-ALM |
| ABC IP, LLC, and RARE BREED TRIGGERS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> OPTICS PLANET, INC., d/b/a ECENTRIA, <br><br> Defendant. | Civil Action No. 4:26-cv-00521-ALM |
| ABC IP, LLC, and RARE BREED TRIGGERS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> PISTOLCAP LIMITED COMPANY, d/b/a FRISCO GUNS, and MORDEKHAI HARROCH, <br><br> Defendants. | Civil Action No. 2:26-cv-00053-ALM |
| ABC IP, LLC, and RARE BREED TRIGGERS, INC., <br><br> Plaintiffs, | Civil Action No. 2:26-cv-00055-ALM |

v.

PROSOURCE FIREARMS, LLC,

      Defendant.

---

ABC IP, LLC, and RARE BREED TRIGGERS, INC.,

      Plaintiffs,

v.

SUPERIOR FIREARMS OF TEXAS, LLC,

      Defendant.

Civil Action No. 2:26-cv-00058-ALM

---

ABC IP, LLC, and RARE BREED TRIGGERS, INC.,

      Plaintiffs,

v.

Z3 PRODUCTIONS, LLC, d/b/a Z3PRO,

      Defendant.

Civil Action No. 4:26-cv-00367-ALM

**DECLARATION OF BRIAN LUETTKE IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

I, Brian Luettke, declare as follows:

## I.    QUALIFICATIONS AND ASSIGNMENT

1.    I am over eighteen years of age, and I am an employee of Luettke Firearms Consulting, Inc., located in Grand Rapids, Michigan, and am competent to make these statements.

2.    I have been retained as an expert for Plaintiffs Rare Breed Triggers, Inc. ("Rare Breed") and ABC IP, LLC to examine the accused Super Safety products, the ARC-Fire trigger, the Atrius Forced Reset Selector, the MARC Selector, and the Super Selektor, together with the related platform-extension and bundled components — including slip-trip components, and standalone parts such as cams, levers, pre-cut triggers, detents, and selector assemblies sold as upgrade or replacement parts (collectively, the "Accused Products") and to compare their structure and operation to U.S. Patent No. 12,038,247 (the "'247 Patent"), U.S. Patent No. 12,031,784 (the "'784 Patent"), U.S. Patent No. 12,529,538 (the "'538 Patent"), U.S. Patent No. 12,578,159 (the "'159 Patent"), and U.S. Patent No. 12,636,403 (the "'403 Patent") (collectively, "the Asserted Patents"). I understand that U.S. Patent No. 7,398,723 is also asserted in the operative pleadings in this MDL but is not part of my analysis for purposes of this Motion.

3.    I am being compensated at my standard hourly rate for my time in this matter. I have no financial interest in any party to this case.

4.    I have more than twenty-five years of experience in firearms identification, investigation, and classification.

5.    I hold a Bachelor of Arts degree in Criminal Justice from the University of Michigan – Flint and a Master's Degree in Security and Safety Leadership from The George Washington University.

6.    I was employed by the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) as a Special Agent for 22 years. I have received training from firearm manufacturers located

throughout the United States and in South Africa, Austria, Germany, Hungary, Czech Republic, and Canada.  I have also completed at least nine armorer classes, ranging from military firearms, revolvers, semi-automatic pistols, rifles, shotguns, and machineguns.

7.    I have testified as an expert and/or opinion witness 39 times in federal District Courts in Michigan, New York, Florida, California, Maryland, Tennessee, and Wyoming and twice in Michigan state courts. I have testified as to firearms and ammunition identification, firearms and ammunition Interstate Nexus, training and tactics, machineguns, silencers, firearms operability, firearms technology, trigger systems, fire control groups, and the mechanical operation and classification of forced reset triggers. I testified on January 28, 2026 at a three-day evidentiary hearing in *ABC IP, LLC v. Hoffman*, No. 1:25-cv-00389-CLC-CHS (E.D. Tenn.), where the court found, based in part on my testimony, that the Super Safety likely satisfies every limitation of claim 15 of the '247 Patent and claim 1 of the '784 Patent.

8.    I have been employed as a firearm consultant and trainer for at least the last five years, working as a firearms expert and trainer in firearms identification.

9.    A person of ordinary skill in the art (POSITA) with respect to the Asserted Patents would have at least a bachelor's degree in mechanical engineering or a related engineering discipline, together with at least one year of professional experience in design or testing of firearm fire control components. In the alternative, a POSITA would have at least three to five years of substantive, hands-on experience designing or testing of firearm fire control components. Additional education may substitute for experience, and additional experience may substitute for formal education.

10.    I am a person of at least ordinary skill in the field of firearm trigger designs and function.

2

## II.    COMPARISON OF STANDARD SEMI-AUTOMATIC AND FORCED RESET TRIGGER OPERATION

11.    In a standard AR-15 pattern semi-automatic trigger mechanism, when a user pulls the trigger, the trigger sear releases the hammer to fire a single round. As the firearm cycles, the bolt carrier moves rearward and re-cocks the hammer, which is temporarily held by the disconnector while the trigger remains depressed. The trigger must then be manually released by the user so that the trigger sear can re-engage the hammer before another shot can be fired.

12.    In a forced reset trigger mechanism, the firearm's own cycling motion is used to mechanically force the trigger forward to its reset position as the bolt carrier cycles. This eliminates the need for the user to manually release the trigger. Importantly, the trigger must still be pulled again by the user for each shot, and the mechanism prevents the trigger from being pulled again until the firearm is safe to fire again.

13.    Each of the Accused Products — the Super Safety, the ARC-Fire, the Atrius Forced Reset Selector, the MARC Selector, and the Super Selektor — operates on these forced-reset principles. In at least one selectable mode, each uses a cam-based structure that interacts with the trigger and bolt carrier during cycling to (a) force the trigger to reset and (b) block trigger movement until the firearm is safe to fire again.

## III.    RARE BREED TRIGGERS' FORCED-RESET TRIGGER PRODUCTS

14.    I am familiar with the construction and operation of the Rare Breed Triggers' FRT-15L3® (including the FRT-15L3® Flat variant), FRT-MR3™ (including the FRT-MR3™ Flat variant), FRT-RD3™ (in both SEF and AMBI variants), and FRT-15C3™ semi-automatic triggers. Unlike standard semi-automatic triggers, the trigger described in the Asserted Patents and the Rare Breed Triggers operate by the trigger being forcibly pushed into the reset position, with

3

the sear engaging the hammer, each time the action cycles (i.e., each time a shot is fired).  Another shot cannot be fired until the firearm is safe to fire again.

## IV.    THE ACCUSED PRODUCTS

15.    In forming the opinions set forth in this declaration, I reviewed and relied upon publicly available technical documentation, product listings, installation instructions, diagrams, photographs, and videos describing each of the Accused Products and the related platform-extension and bundled components. I also physically examined representative samples of the Super Safety and the ARC-Fire. For the Atrius Forced Reset Selector, the MARC Selector, and the Super Selektor, my analysis is based on my review of publicly available product materials and product imagery. My opinions are based on this review and examination, as well as my experience with firearm trigger mechanisms.

### A.    The Super Safety

16.    I understand the Super Safety is sold by multiple Defendants in this MDL—including 80Mills, DNT, Harrison Gunworks, Polymer Pew, Z3 Productions, and AS Designs — sometimes as a complete kit, sometimes as a standalone device, and sometimes as individual replacement or upgrade components such as cams, levers, and pre-cut triggers. Based on my examination of representative samples and review of publicly available materials for the variants offered by these Defendants, each Defendant's Super Safety product operates in the manner described below.

17.    Super Safety is sold as a set of components designed to be installed in an AR-15 pattern firearm in place of the standard safety selector. As described in publicly available documentation, product materials, and personal experience, the Super Safety includes a cam and lever assembly that occupies the safety-selector location within the lower receiver.

4

18.     The Super Safety is a three-position cam-based selector and locking structure that operates alongside the other existing trigger component, consisting of safe, standard semi-automatic, and forced-reset semi-automatic. When assembled and installed as instructed, the Super Safety operates in two modes: a standard semi-automatic mode that permits conventional disconnector operation and a forced-reset semi-automatic mode. In the forced-reset mode, as the firearm cycles, the cam and lever interact mechanically with the trigger components and bolt carrier such that the trigger is driven to its reset position during cycling, rather than requiring the user to manually release the trigger.

19.     The Super Safety is offered for sale as a complete kit consisting of a pre-cut trigger, cam, reset lever, hammer, centering block, and detent. The parts can also be individually purchased. When assembled as instructed, these components operate together to provide the forced-reset functionality described above.

### B.     The ARC-Fire

20.     The ARC-Fire is also sold as a set of components intended to be installed in an AR-15 pattern firearm.  The ARC-Fire installs within the firearm's fire-control mechanism pocket and their kit includes a pre-cut trigger, transfer (reset) lever, detent, cam, primary selector, ambidextrous selector, two screws, and mil-spec detent.  The ARC-Fire is a three-position cam-based selector and locking structure that operates alongside the other existing trigger components.

21.     As reflected in publicly available materials, when assembled and installed as instructed, the ARC-Fire's cam and locking components interact mechanically with the trigger and the bolt carrier during the firing cycle. In at least one selectable mode, this interaction causes the trigger to be driven to its reset position during cycling and controls when the trigger can be pulled again, consistent with forced-reset operation.

5

22.     The ARC-Fire is sold as a component kit intended to be assembled and installed by the user or qualified gunsmith in combination with other firearm components and the ARC-Fire package states "Installation and troubleshooting guides available on our website." When assembled as directed, the ARC-Fire components operate together with the firearm's other trigger components to provide the functionality described above.

### C.     The Atrius Forced Reset Selector

23.     The Atrius Forced Reset Selector is manufactured by Atrius Development Group Corporation and offered in two variants — a single-sided variant and an ambidextrous variant. I understand the Atrius Selector is sold directly through Atrius's website (atrius.dev) and through resellers, including Defendants Optics Planet, Mister Guns, Pistolcap, Prosource Firearms, and Superior Firearms.

24.     Like the Super Safety, the Atrius Selector is designed to be installed in an AR-15 pattern firearm in place of the standard safety selector. It is a three-position cam-based selector and locking structure that operates alongside the firearm's other existing trigger components, providing three selector positions: Safe, Semi (traditional semi-automatic), and Full-Semi (forced reset). When assembled and installed as instructed, the Atrius Selector, in its Full-Semi mode, forces the trigger member to its reset position and prevents the trigger from being pulled again until the firearm is safe to fire again.

25.     Based on my review of publicly available product materials and product imagery, the mechanical operation of the Atrius Selector is consistent with my analysis of how the device practices the asserted claims, which I detail in the claim charts attached as Exhibits C, F, J, and M to this declaration.

### E.    The MARC Selector and Super Selektor

26.    I understand the MARC Selector is manufactured by non-party Cornfire Arsenal and sold by Defendant Harrison Gunworks. I understand the Super Selektor is sold by Defendant DNT. Based on my review of publicly available product materials and product imagery, both are substantially identical to the Atrius Selector in geometry, three-position operation, and function. Like the Atrius Selector, the MARC Selector and Super Selektor replace the AR-15 standard safety selector, provide three selector positions (Safe, Semi, and Full-Semi), and in the Full-Semi mode the MARC Selector's and Super Selektor's cam mechanically resets the trigger as the bolt carrier cycles, preventing the trigger from being pulled again until the firearm is safe to fire again.

27.    Because the MARC Selector and Super Selektor are substantially identical to the Atrius Selector in structure, geometry, and function, the element-by-element claim charts for the Atrius Selector attached as Exhibits C, F, J, and M to this declaration apply equally to the MARC Selector and Super Selektor. It is my opinion that the MARC Selector and Super Selektor practice the same asserted claims of the '247, '784, '159, and '403 Patents as the Atrius Selector, in the same manner as set out in those claim charts.

### F.    Platform Extension Products for Non-AR Firearms

28.    I understand multiple Defendants sell additional products intended to allow these Accused Products to be used in firearm platforms other than standard AR-15 pattern rifles. These additional products fall into two categories: (i) trip components — sold standalone as a single part — that coordinate the timing of the Super Safety's or ARC-Fire's interaction with the bolt carrier on a non-AR platform; and (ii) platform-specific kits, which bundle a trip component with the additional platform-specific parts (such as levers, pre-cut triggers, detents, and springs) needed to install a Super Safety on the target non-AR platform. I understand the Defendants selling these products include Deez Nutz Tactical ("DNT"), Mars Trigger, and Z3 Productions. The targeted

7

non-AR platforms include the DB9 platform, the AR-22 platform, the MCX platform, the MPX platform, and the MP5 platform (including HK MP5 and clones such as the MKE AP5K).

29.    The trip components are designed to coordinate the timing of the Super Safety's or ARC-Fire's forced-reset mechanism with the cycling of the firearm's action in non-AR platforms. In an AR-15 pattern rifle, the bolt carrier directly interacts with the cam and lever components of the Accused Product during cycling. In a non-AR platform — for example, the MP5, DB9, AR-22, MCX, or MPX platforms — the bolt carrier has different geometry, mass, and travel than on an AR-15. Based on my review of the publicly available product materials and my experience with firearm trigger mechanisms, each of the trip components identified below bridges that difference for its target platform by translating the movement of the non-AR bolt carrier into the mechanical inputs required for the Accused Product's cam-based forced-reset system to operate as designed. The trip components are:

| Defendant | Product | Target Platform |
|---|---|---|
| DNT | DB9 Titanium Trip Bar | DB9 |
| DNT | AR-22 Lightweight Trip/Weight Carrier | AR-22 |
| DNT | AR-22 Standard Trip/Weight Carrier | AR-22 |
| DNT | AS Designs MCX Slip Trip (V2) | MCX |
| DNT | AS Designs MPX Slip Trip (V2) | MPX |
| Mars Trigger | MP5 Super Safety Trip | MP5 |
| Z3 Productions | V5M MP5 Super Safety Trip | MP5 |

30.    I understand several Defendants also sell platform-specific kits that bundle a trip component with the additional platform-specific parts needed to install a Super Safety on the target non-AR platform. The bundled parts include items such as levers, pre-cut triggers, detents, and spring components — dimensioned and shaped for the specific non-AR platform — that, when combined with a Super Safety, allow the trigger mechanism to operate in that platform. Some kits

8

also include the Super Safety cam itself; others assume the user supplies a Super Safety separately. The platform-specific kits are:

| Defendant | Product | Target Platform |
|---|---|---|
| DNT | DB9 Super Safety Curved Kit | DB9 |
| DNT | DB9 Super Safety Flat Kit | DB9 |
| Z3 Productions | .22LR Super Safety Kit | .22 LR |

31.     When an Accused Product (Super Safety or ARC-Fire) is combined with the appropriate trip component described above, or installed via a platform-specific kit described above, and installed as instructed, the resulting installation allows the same core forced-reset and trigger-locking mechanism described in Section II to be used in the non-AR platforms identified above — including the DB9, AR-22, MCX, MPX, and MP5 platforms — in a manner analogous to the operation of the Accused Product in an AR-15 pattern rifle. Based on my review of the publicly available product materials and my experience with firearm trigger mechanisms, the trip components and platform-specific kits identified above are purpose-designed for use with the Super Safety or ARC-Fire and, in my opinion, have no substantial non-infringing use. The infringement analysis applicable to these combined installations is set forth in Section V below.

## V.    INFRINGEMENT OF THE ASSERTED PATENTS

32.     I have been provided copies of and have studied the Asserted Patents.

33.     The '247 Patent relates to a semi-automatic trigger mechanism that supports at least two modes of operation: (1) a standard semi-automatic mode in which a disconnector catches and holds the hammer until the user manually releases the trigger to reset, and (2) a forced reset semi-automatic mode in which a cam forces the trigger member to its set (reset) position during the

cycling of the bolt carrier and prevents the trigger member from being pulled again until the firearm is safe to fire again.

34.    The '784 Patent relates to an extended trigger member locking device in a forced reset trigger mechanism, including a locking member movable between a first position that locks the trigger member against pulling movement and a second position that permits pulling movement, and having an upward extension portion configured to make actuating contact with a surface of the bolt carrier.

35.    The '538 Patent relates to the structural design of a cam selector that replaces the standard safety selector in a firearm. The cam selector has a longitudinal slot configured to receive a lever and dual recesses on its bottom side that interact with a modified trigger tail to provide three selectable modes: safe, standard semi-automatic, and forced reset.

36.    The '159 Patent relates to a firearm trigger mechanism with a safety selector operable in at least three modes: (1) safe; (2) standard semi-automatic, in which a disconnector catches and holds the hammer until the user manually releases the trigger to reset; and (3) forced reset semi-automatic, in which the cam forces the trigger to reset such that the disconnector does not catch and hold the hammer.

37.    The '403 Patent relates to a firearm trigger mechanism operable in at least two modes selected by a safety selector: (1) a standard semi-automatic mode, in which a disconnector catches and holds the hammer until the user manually reduces pressure on the trigger to reset; and (2) a forced reset semi-automatic mode, in which the disconnector is prevented from holding the hammer and the trigger member is forced to its set position during cycling.

10

38.     I have been asked to compare the structure and operation of the Super Safety, the ARC-Fire, the Atrius Forced Reset Selector, the MARC Selector, and the Super Selektor to the elements specified in the following claims of the Asserted Patents:

| Patent | Claims |
|--------|--------|
| '247 | 15 |
| '784 | 1, 3, 4 |
| '159 | 1, 3, 6, 7, 9-11, 14-17 |
| '403 | 14, 15, 17, 29, 30, 32, 38, 39 |

39.     I have also been asked to compare the structure and operation of the accused Super Safety to the elements specified in the following claims of the '538 Patent:

| Patent | Claims |
|--------|--------|
| '538 | 1-5, 8-13 |

40.     I am not a patent attorney, nor have I independently researched the law on patent validity.  Rare Breed's counsel explained certain legal principles to me, set forth below, that I have relied on and followed in forming my opinions set forth in this declaration.

41.     I have been instructed that a determination of patent infringement requires a two-step analysis: first, the patent claims must be properly construed; and second, a determination must be made as to whether the claims "read on" the accused product.

42.     To determine the meaning of the patent terms (construing claim terms), I looked primarily to the claim language and the specifications of the Asserted Patents.

43.     For purposes of my evaluation, I applied the plain and ordinary meaning of the terms of the asserted claims as they would be understood by a person of ordinary skill in this field in the context of the patent document as a whole. Based on my training, education, and over twenty-five years of professional experience with firearms and firearm trigger mechanisms, it is my opinion that the terms used in the asserted claims of the '247, '784, '538, '159, and '403

11

Patents—including "trigger" "hammer," "sear," "sear catch," "disconnector," "cam," "bolt carrier," "in-battery position," "fire control mechanism pocket," and "safety selector"—are standard terms widely used and well understood in the firearms industry. These terms have well-established meanings to persons of ordinary skill in this field. They are used consistently in firearms reference materials, armorer training manuals, manufacturer manuals, the firearms industry, and the existing body of firearms-related patents. The asserted claims use these terms in a manner consistent with their ordinary and customary meaning in the field, and I am not aware of any instance in which the Asserted Patents assign a specialized or idiosyncratic meaning to any of these terms.

44. As a person of at least ordinary skill in this field, I understand these terms as they would be understood by others with similar training and experience in firearm trigger design and function.

45. For the second step of the inquiry, I compared the language of the claim to the accused product.

46. As described in Section IV above, I understand the Super Safety, the ARC-Fire, the Atrius Forced Reset Selector, the MARC Selector, and the Super Selektor are each sold as a component kit or, in some configurations, as standalone devices and individual replacement or upgrade components. Installation instructions for each product are available from the manufacturer or seller — typically on the manufacturer's or seller's website, or accompanying the product.

47. It is my opinion, based on my examination of representative samples, review of publicly available product materials, and product imagery of the Accused Products, that each Accused Product is designed and intended to be assembled and installed in a single specific configuration — the configuration described in the manufacturer's installation instructions. That

12

configuration results in the forced-reset trigger functionality described in my analysis below. The individual components of each kit — including the cams, levers, pre-cut triggers, detents, and selector assemblies — are purpose-designed parts that are dimensioned and shaped to fit together in the manner described in the instructions. I am not aware of any alternative assembly configuration for these components that would result in a different or non-infringing mode of operation. In other words, when a user follows the manufacturer's assembly and installation instructions — which is the only intended use of these kits — the result is a trigger system that operates in the manner I describe in the claim charts attached as Exhibits A-M to this declaration.

48.    It is my opinion, based on the analysis presented in the claim charts attached as Exhibits A-M to this declaration, that when assembled and used as intended and instructed:

(a) The Super Safety literally infringes the asserted claims of the '247, '784, '538, '159, and '403 Patents.

(b) The ARC-Fire literally infringes the asserted claims of the '247, '784, '159, and '403 Patents.

(c) The Atrius Forced Reset Selector literally infringes the asserted claims of the '247, '784, '159, and '403 Patents.

(d) The MARC Selector literally infringes the asserted claims of the '247, '784, '159, and '403 Patents.

(e) The Super Selektor literally infringes the asserted claims of the '247, '784, '159, and '403 Patents.

### A.    Sale Configurations

49.    I understand that the Defendants in this MDL sell the Accused Products in three different sale configurations: (i) as installed devices in a complete rifle or fire-control assembly, (ii) as standalone devices or in bundled kits combining the device with additional fire-control parts,

13

and (iii) as individual replacement or upgrade components. My opinions on each configuration are as follows.

50.   *Installed devices.* When an Accused Product is installed in an AR-15 pattern firearm (or, where applicable, in a non-AR platform with the appropriate trip component or platform-specific kit identified in Section IV) as instructed, the resulting rifle contains every limitation of the asserted claims of the Asserted Patents that map to that Accused Product, as set out in the claim charts attached as Exhibits A-M to this declaration.

51.   *Standalone devices and bundled kits.* Each Accused Product, sold as a standalone device or in a bundled kit, is a material part of the patented invention. Each Accused Product is purpose-designed and dimensioned for installation in an AR-platform fire-control group (or, with the appropriate trip component or platform-specific kit identified in Section IV, in a non-AR-platform fire-control group) to perform the forced-reset and trigger-locking function described in the asserted claims. Based on my examination of representative samples of the Accused Products and review of publicly available materials, I am not aware of any substantial non-infringing use for these devices apart from installation in the configuration that practices the asserted claims. The additional fire-control parts included in bundled kits are standard AR-pattern components, but their bundling with an Accused Product reflects assembly and marketing for the infringing configuration described in the claim charts.

52.   *Individual components.* I understand that certain Defendants sell individual cams, levers, pre-cut triggers, detents, and similar parts as replacement or upgrade components. Based on my examination and review, each such component is a material part of the patented invention, purpose-designed and dimensioned for use in an infringing forced-reset trigger configuration, and has no substantial non-infringing use. These components are not general-purpose AR-15 parts;

14

they are purpose-built replacements or upgrades for components within the Super Safety design. The cams and levers are specifically shaped to interact with the bolt carrier and the trigger components in the manner I describe in the claim charts; the pre-cut triggers are modified in a specific manner to engage with the cam-based reset mechanism. I am not aware of any substantial use for these components other than enabling the operation of the Super Safety or another Accused Product trigger system.

**B.      Infringement When Used in Non-AR Platforms**

53.      As described in Section IV above, I understand multiple Defendants sell trip components and platform-specific kits intended to allow Accused Products to be installed and used in firearm platforms other than standard AR-15 pattern rifles, including the DB9, AR-22, MCX, MPX, and MP5 platforms. I have reviewed the publicly available product materials for each of the trip components and platform-specific kits identified in Section IV and applied the analysis below.

54.      In an AR-15 pattern rifle, the bolt carrier directly interacts with the cam and lever components of the Accused Product during cycling to produce the forced-reset and trigger-locking functionality I describe in the claim charts attached as Exhibits A-M to this declaration. In each of the non-AR platforms identified above, the bolt carrier has different geometry, mass, and travel than on an AR-15. Based on my review of the publicly available product materials and my experience with firearm trigger mechanisms, the trip component for each platform — whether sold standalone or as part of a platform-specific kit — bridges that difference by translating the movement of the non-AR bolt carrier into the mechanical inputs required for the Accused Product's cam-based forced-reset system to operate as designed.

55.      It is my opinion that when an Accused Product is combined with the appropriate trip component or platform-specific kit identified in Section IV and installed in the target non-AR platform as instructed, the resulting trigger system operates in a manner functionally analogous to

15

the operation I describe in the claim charts attached as Exhibits A-M to this declaration for AR-15 pattern firearms.

56.     Based on my analysis of the Accused Products combined with the trip components and platform-specific kits identified in Section IV and installed in the corresponding non-AR platform as instructed, the limitations of the asserted claims of the '247, '784, '159, and '403 Patents map to the Accused Products in the same manner set out in the claim charts attached as Exhibits A-M to this declaration. As to the '784 Patent specifically, the locking member's upward extension portion makes actuating contact either with a surface of the non-AR bolt carrier or with a surface that moves in coordination with the non-AR bolt carrier via the trip component, causing the locking member to move between its first and second positions in the manner claimed. The trip components and platform-specific kits do not alter the structure or function of the Accused Products; they enable the same cam-and-lever interaction with a bolt-carrier-driven input to occur in a different firearm platform. It is therefore my opinion that use of any Accused Product combined with these trip components or platform-specific kits as instructed infringes the asserted claims of the '247, '784, '159, and '403 Patents.

57.     Based on my analysis of the Super Safety combined with the trip components and platform-specific kits identified in Section IV and installed in the corresponding non-AR platform as instructed, the cam selector's three-mode operation — safe, standard semi-automatic, and forced reset — and the interaction between the cam selector's recesses and the trigger tail portion remain the same as described in the claim chart for the '538 Patent attached as Exhibit G to this declaration. The trip components and platform-specific kits do not alter the cam selector's structure or its mode-selection functionality; they enable the same cam-and-trigger-tail interaction to occur in a different firearm platform. It is therefore my opinion that use of the Super Safety combined

16

with these trip components or platform-specific kits as instructed infringes the asserted claims of the '538 Patent.

58.    Based on my review of the publicly available product materials and my experience with firearm trigger mechanisms, the trip components and platform-specific kits identified in Section IV are specifically and exclusively designed to enable the Super Safety or ARC-Fire to function in non-AR platforms. The product documentation for these components confirms this: the AS Designs MCX Slip Trip (V2) and MPX Slip Trip (V2) listings expressly state that those products are compatible with the Super Safety or ARC-Fire but not with any other forced-reset trigger or selector; the Mars Trigger MP5 Super Safety Trip listing describes the product as a trip "for making an MP5 super safe" that "requires… a super safety"; the Z3 Productions V5M MP5 Super Safety Trip and .22LR Super Safety Kit are sold and marketed expressly as Super Safety trip products; and the DNT DB9 Super Safety Curved and Flat Kits include the Super Safety cam itself and are expressly stated to be "NOT INTENDED FOR THE AR15 or AR9." These trip components and platform-specific kits have no function apart from adapting the Super Safety or ARC-Fire for use in firearms that are not designed to accept AR-pattern trigger assemblies. They are not general-purpose firearm components; they are purpose-built to enable the specific forced-reset and trigger-locking operation that I have identified as practicing the limitations of the asserted claims. I am not aware of any substantial use for these trip components or platform-specific kits other than enabling the operation of the Super Safety or ARC-Fire trigger systems in non-AR platforms.

VI.    **NON-INFRINGING ALTERNATIVES**

59.    I am not aware of any alternatives that provide the same functionality, durability, and ease of installation as the Accused Products and Rare Breed's FRT® triggers without infringing the asserted claims.

17

60.     Based on my review of the Asserted Patents, my examination of the Accused Products, review of publicly available product materials, product imagery, and the Rare Breed Triggers FRT® products, and my experience with firearm trigger mechanisms, I am not aware of any design that achieves the same combination of forced-reset functionality, trigger-locking safety mechanism, and multi-mode operation (i.e., selectable standard semi-automatic and forced-reset semi-automatic modes) without practicing the limitations of the asserted claims.

61.     In forming this opinion, I have considered the following. The core innovation described in the '247 Patent is a cam-based mechanism that both forces the trigger to reset during cycling and prevents the trigger from being pulled again until the firearm is safe to fire again, with the additional feature of a selectable mode allowing conventional semi-automatic operation. This combination of functions—forced reset, trigger lockout until safe to fire, and mode selectability— is integral to the claimed invention. I am not aware of an alternative mechanical arrangement that achieves the same function without incorporating the structural features described in the claims of the '247 Patent.

62.     Similarly, the '784 Patent's claimed locking device—with its upward extension portion that makes actuating contact with the bolt carrier to move the locking member between locked and unlocked positions, and its separately deflectable portion—describes a specific mechanical solution for controlling trigger timing in a forced-reset system. I am not aware of an alternative mechanical arrangement that achieves the same trigger-locking and timing-control function without incorporating the structural features described in the claims of the '784 Patent.

63.     The '538 Patent's claimed cam selector—with its longitudinal slot configured to receive a lever, its first and second recesses on the bottom side interacting with a trigger tail portion, and its three selectable modes (safe, standard semi-automatic, and forced reset)—

describes a specific structural solution for providing selectable forced-reset and standard semi-automatic operation through a component that replaces the firearm's standard safety selector. I am not aware of any alternative cam-selector design that achieves the same three-mode functionality—including both forced-reset operation and a safe mode that prevents the trigger from being pulled—without incorporating the structural features described in Claim 1. A safety-selector replacement that omitted the dual-recess cam structure, the longitudinal slot and lever arrangement, or the three-mode selectability would not provide the combination of forced-reset functionality and safe-mode lockout that the '538 Patent claims and that the Super Safety delivers.

64.    Other devices—such as binary triggers (which fire one round on pull and one on release), bump stocks, assisted reset triggers, or crank-operated trigger actuators—operate on fundamentally different mechanical principles and do not provide the same functionality as a forced-reset trigger. These devices do not force the trigger to reset mechanically during the cycling of the action, and they do not include the trigger-locking safety mechanism that prevents firing until the firearm is safe to fire again. They are not functional substitutes for the patented forced-reset trigger technology.

## VII.    DURABILITY AND USEFUL LIFE OF THE ACCUSED PRODUCTS

65.    Based on my examination of the Accused Products and my experience with firearm trigger mechanisms, I have formed opinions regarding the durability and expected useful life of these products. The Accused Products are mechanical trigger components manufactured from durable materials, including metal. Firearm trigger components of this type are not consumable goods; they are designed to withstand repeated use over the functional life of the firearm. In my experience, a well-manufactured trigger mechanism or fire-control component installed in an AR-15 pattern rifle can be expected to function reliably for tens of thousands of rounds—which, for a typical firearm owner, represents many years of use, if not the life of the firearm. I would expect

19

the Accused Products, when properly installed and maintained, to have a comparable useful life. Unless made from substandard materials, these are not products that wear out quickly or need frequent replacement.

66.     In addition, the Accused Products are designed to be installed and removed by the end user. The installation process involves replacing or supplementing existing components within the firearm's lower receiver using standard tools and the manufacturer's instructions. Because the installation is user-serviceable and does not require permanent modification to the firearm, a single Accused Product can be removed from one AR-15 pattern rifle and installed in another. A firearm owner who possesses multiple AR-15 pattern rifles could use a single Accused Product across those rifles by transferring it as needed.

67.     A firearm owner who purchases one of these products is unlikely to need to purchase a replacement or additional unit for the same rifle.

68.     Based on my examination of the Accused Products and the Rare Breed FRT$^®$ triggers, the Accused Products deliver substantially similar forced-reset trigger functionality to the Rare Breed products. In at least one selectable mode, each Accused Product mechanically forces the trigger to its reset position during cycling and prevents the trigger from being pulled again until the firearm is safe to fire again—the same core operating cycle as all Rare Breed's FRT$^®$ products. While there are differences in form factor and installation method, the functional result for the end user is comparable: enabling follow-up shots via mechanical resetting of the trigger, while also maintaining semi-automatic, one-pull-per-shot operation. A firearm owner who purchases any of the Accused Products obtains a product that performs the same essential function as a Rare Breed Triggers FRT$^®$.

20

69.     I reserve the right to supplement, amend, or modify the opinions expressed in this declaration based on additional information, discovery, claim construction proceedings, testing, or analysis that may become available, including but not limited to additional documents, deposition testimony, expert reports, or court rulings.

Under penalty of perjury, I declare that the foregoing statements and facts stated herein are true and correct to the best of my knowledge and belief.


Date: May 28, 2026                          Respectfully submitted,

                                            Brian Luettke

21