**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | |
|---|---|
| **In Re: Rare Breed Triggers Patent Litigation** | **4:26-MD-03176-ALM**<br>**MDL 3176** |
| ABC IP, LLC, and RARE BREED TRIGGERS, INC., <br><br>   *Plaintiffs,* <br><br>       v. <br><br>MISTER GUNS, LLC, THOMAS CARTER II, and BRANDI CARTER, <br><br>   *Defendants.* | Civil No. 2:26-CV-00056-ALM |
| ABC IP, LLC, and RARE BREED TRIGGERS, INC., <br><br>   *Plaintiffs,* <br>v. <br>PISTOLCAP LIMITED COMPANY, d/b/a FRISCO GUNS, and MORDEKHAI HARROCH, <br><br>   *Defendants.* | Civil No. 2:26-CV-00053-ALM |
| ABC IP, LLC, and RARE BREED TRIGGERS, INC., <br><br>   *Plaintiffs,* <br>v. <br>PROSOURCE FIREARMS, LLC, <br><br>   *Defendant.* | Civil No. 2:26-CV-00055-ALM |
| ABC IP, LLC, and RARE BREED TRIGGERS, INC., <br><br>   *Plaintiffs,* <br>v. | |

**CERTAIN DEFENDANTS' CONSOLIDATED RESPONSE IN OPPOSITION TO**
**PLAINTIFFS' CONSOLIDATED MOTION FOR PRELIMINARY INJUNCTION**

███████

| | |
|---|---|
| SUPERIOR FIREARMS OF TEXAS, LLC, | Civil No. 2:26-CV-00058-ALM |
| *Defendant.* | |

---

### CERTAIN DEFENDANTS' CONSOLIDATED RESPONSE IN OPPOSITION TO PLAINTIFFS' CONSOLIDATED MOTION FOR PRELIMINARY INJUNCTION[1]

---

[1] This consolidated Response is brought jointly by defendants Mister Guns, LLC, Thomas Carter II, Brandi Carter, PistolCap Limited Company, Frisco Guns, Mordekhai Harroch, ProSource Firearms, LLC, and Superior Firearms of Texas, LLC subject to Plaintiffs' May 29, 2026 Consolidated Motion for Preliminary Injunction. *In re Rare Breed Triggers Patent Litigation*, No. 4:26-md-03176 (E.D. Tex.), Dkt. 7, in the four above-captioned actions. This Response is one of a set of four substantively identical responses. Unless otherwise noted, all citations to Plaintiffs' motion and exhibits are to the Court's MDL docket, where Plaintiffs initially filed their motion.

## TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................................. *i*

TABLE OF AUTHORITIES ......................................................................................... *iii*

TABLE OF EXHIBITS .................................................................................................. *vi*

TABLE OF CLAIMS ................................................................................................... *viii*

I.      INTRODUCTION ..................................................................................................1

II.     ARGUMENT ...........................................................................................................3

    A.  **Plaintiffs Fail to Show Irreparable Harm** .................................................3

        1.  **Plaintiffs Do Not Allege—Let Alone Establish–Irreparable Harm By These Defendants**.................................................................3

        2.  **Plaintiffs Fail to Prove a Nexus Between Infringement and Their Alleged Harms** ........................................................................5

        3.  **Plaintiffs' Irreparable Harm Case is Weaker Than in *Peak Tactical*— Where the Court Found No Irreparable Harm** ....................................6

        4.  **Plaintiffs' Delay and Litigation Conduct Reinforces There is No Irreparable Harm**..................................................................8

    B.  **Plaintiffs' Asserted Injuries Are Measurable and Compensable Through Money Damages.** ........................................................................10

    C.  **Plaintiffs Have Not Shown a Likelihood of Success on the Merits** .......12

        1.  **Rare Breed Does Not Establish a Likelihood of Success** ...............13

        2.  **U.S. Patent No. 12,038,247** ..............................................................14

            a.  **The Atrius Forced Reset Selector Does Not Infringe Claim 15 of the '247 Patent** ...................................................14

            b.  **Claim 15 of the '247 Patent is Invalid** ...................................15

            c.  **Claim 15 of the '247 Patent is Unenforceable due to Rare Breed's Inequitable Conduct**.........................................18

3. U.S. Patent No. 12,578,159 ..................................................................20

  a. The Atrius Forced Reset Selector Does Not Infringe the '159 Patent...............................................................20

  b. The Claims of the '159 Patent are Invalid ............................................22

  c. The Claims of the '159 Patent are Unenforceable due to Rare Breed's Inequitable Conduct.......................................................23

4. U.S. Patent No. 12,636,403 ..................................................................24

  a. The Atrius Forced Reset Selector Does Not Infringe the '403 Patent...............................................................24

  b. The Claims of the '403 Patent are Invalid.............................................26

5. U.S. Patent No. 12,031,784 ..................................................................30

  a. The Atrius Forced Reset Selector Does Not Infringe the '784 Patent...............................................................30

  b. The Claims of the '784 Patent are Invalid ............................................31

D. The Balance of Hardships Favors the Atrius Customer Defendants...................34

E. The Public Interest and Tailoring Requirements Do Not Support Plaintiffs' Requested Relief....................................................................36

1. The Public Interest Does Not Favor the Requested Injunction......................36

2. Any Injunction Must Be Narrowly Tailored and Defendant-Specific............37

F. Plaintiffs' No-Bond Request Should Be Rejected ...................................................38

III. CONCLUSION .............................................................................................38

# TABLE OF AUTHORITIES

## Cases

*ABC IP, LLC v. Peak Tactical, LLC*,
   2026 WL 713000 (D. Wyo. Feb. 13, 2026) ....................................................2, 6, 11, 13, 15

*Acumed LLC v. Stryker Corp.*,
   551 F.3d 1323 (Fed. Cir. 2008) .......................................................................................3

*Additive Controls & Measurement Sys., Inc. v. Flowdata, Inc.*,
   96 F.3d 1390 (Fed. Cir. 1996) .......................................................................................16

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
   694 F.3d 1312 (Fed. Cir. 2012) .....................................................................................11

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,
   239 F.3d 1343 (Fed. Cir. 2001) .....................................................................................12

*Automated Merch Sys., Inc. v. Crane Co.*,
   357 F. App'x 297 (Fed. Cir. 2009) .................................................................................11

*Apple Inc. v. Samsung Elecs. Co.*,
   695 F.3d 1370 (Fed. Cir. 2012) .......................................................................................3

*Apple Inc. v. Samsung Elecs. Co.*,
   809 F.3d 633 (Fed. Cir. 2015)..................................................................................1, 3, 5

*Ariad Pharms., Inc. v. Eli Lilly & Co.*,
   598 F.3d 1336 (Fed. Cir. 2010) ................................................................................26, 27

*Auto. Techs. Int'l, Inc. v. BMW of N. Am., Inc.*,
   501 F.3d 1274 (Fed. Cir. 2007) .....................................................................................27

*Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*,
   616 F.3d 1249 (Fed. Cir. 2010) ..........................................................................20, 26, 29

*Bettcher Indus., Inc. v. Bunzl USA, Inc.*,
   692 F. Supp. 2d 805 (N.D. Ohio 2010) ...........................................................................9

*BIC Leisure Prods., Inc. v. Windsurfing Int'l, Inc.*,
   1 F.3d 1214 (Fed. Cir. 1993)............................................................................................6

*Celsis In Vitro, Inc. v. CellzDirect, Inc.*,
   664 F.3d 922 (Fed. Cir. 2012) .......................................................................................13

*eBay Inc. v. MercExchange, L.L.C.*,
      547 U.S. 388 (2006) .................................................................................................10, 12

*EcoNova Inc. v. DPS Utah*,
      2012 WL 5944257 (D. Utah Nov. 28, 2012) ..................................................................9

*Genband US LLC v. Metaswitch Networks Corp.*,
      861 F.3d 1378 (Fed. Cir. 2017)......................................................................................5

*Gentry Gallery, Inc. v. Berkline Corp.*,
      134 F.3d 1473 (Fed. Cir. 1998) ....................................................................................27

*High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*,
      49 F.3d 1551 (Fed. Cir. 1995)........................................................................................8

*ICU Med., Inc. v. Alaris Med. Sys., Inc.*,
      558 F.3d 1368 (Fed. Cir. 2009) ....................................................................................27

*Irdeto Access, Inc. v. Echostar Satellite Corp.*,
      383 F.3d 1295 (Fed. Cir. 2004) ....................................................................................24

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
      481 F.3d 1371 (Fed. Cir. 2007) ...............................................................................26, 27

*Martinez v. Mathews*,
      544 F.2d 1233 (5th Cir. 1976) ......................................................................................37

*Metalcraft of Mayville, Inc. v. Toro Co.*,
      848 F.3d 1358 (Fed. Cir. 2017)......................................................................................5

*Natera, Inc. v. NeoGenomics Lab'ys, Inc.*,
      106 F.4th 1369, 1375 (Fed. Cir. 2024) ..........................................................................3

*Nutrition 21 v. United States*,
      930 F.2d 867 (Fed. Cir. 1991)........................................................................................9

*O'Reilly v. Morse*,
      56 U.S. 62 (1853) ..........................................................................................................27

*Phillips v. AWH Corp.*,
      415 F.3d 1303 (Fed. Cir. 2005) ....................................................................................24

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
      711 F.3d 1348 (Fed. Cir. 2013) ....................................................................................11

*Robert Bosch LLC v. Pylon Mfg. Corp.*,

659 F.3d 1142 (Fed. Cir. 2011)..............................................................................3

*Smith Int'l, Inc. v. Hughes Tool* Co.,
718 F.2d 1573 (Fed. Cir. 1983) ..........................................................................13

*The Incandescent Lamp Patent*,
159 U.S. 465 (1895) ...........................................................................................27

*Therasense, Inc. v. Becton, Dickinson & Co.*,
649 F.3d 1276 (Fed. Cir. 2011) ..............................................................18, 20, 24

*Titan Tire Corp. v. Case New Holland, Inc.*,
566 F.3d 1372 (Fed. Cir. 2009) ...........................................................................12

*Trustees of Columbia University v. Symantec Corp.*,
811 F.3d 1359 (Fed. Cir. 2016) ...........................................................................24

*United States v. Rare Breed Triggers, LLC*,
No. 1:23-cv-00369-NRM-RML, ECF No. 13 (E.D.N.Y. Sept. 5, 2023)..........................10

*Valley v. Rapides Parish Sch. Bd.*,
118 F.3d 1047 (5th Cir. 1997) .............................................................................12

*Vitronics Corp. v. Conceptronic, Inc.*,
90 F.3d 1576 (Fed. Cir. 1996) .............................................................................24

*Windsurfing Int'l v. AMF, Inc.*,
782 F.2d 995 (Fed. Cir. 1986) .............................................................................13

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008).................................................................................................3

### Statutes & Rules

35 U.S.C. § 112.........................................................................................22, 26, 27

35 U.S.C. § 284.................................................................................................10

Fed. R. Civ. P. 65......................................................................................... 4, 15-17

## TABLE OF EXHIBITS

| Ex. | Description |
|-----|-------------|
| A | Declaration of Mordekhai Harroch (PistolCap Limited Company; Frisco Guns) (June 24, 2026) |
| B | Declaration of Roland Feldman (ProSource Firearms, LLC) (June 24, 2026) |
| C | Declaration of Thomas Carter II (Mister Guns, LLC) (June 24, 2026) |
| D | Declaration of Austin Rohr (Superior Firearms of Texas, LLC) (June 24, 2026) |
| E | [SEALED] Declaration of Paul Benoit (June 26, 2026) |
| F | Declaration of Malcolm Brown (Atrius Development Group Corp.) (June 24, 2026) |
| G | Declaration of Ryan Cook (June 26, 2026) |
| G-1 | Invalidity Claim Chart for U.S. Patent No. 12,038,247 |
| G-2 | Invalidity Claim Chart for U.S. Patent No. 12,578,159 |
| G-3 | Invalidity Claim Chart for U.S. Patent No. 12,031,784 |
| G-4 | Invalidity Claim Chart for U.S. Patent No. 12,636,403 |
| G-5 | Video Demonstrating Operation of Atrius Forced Reset Selector ("FRS"), prepared by Ryan Cook<br><br>** Defendants will provide the Court a copy of the cited video. |
| H | Screen captures of Instagram posts by Atrius Development Group (@atriusdev) (May 14 and 16, 2025) |
| I | Timeline of Key Events Demonstrating Plaintiffs' Delay in Seeking Preliminary Injunctive Relief Against Atrius Customer Defendants |
| J | U.S. Patent No. 7,398,723 ("Blakley '723") |
| K | Excerpts of the Prosecution History for U.S. Patent No. 12,038,247 |
| L | Original Complaint in *Rare Breed Triggers, LLC, et al. v. Strbac d/b/a Tommy Triggers*, No. 1:22-cv-00280, Dkt. 1 (N.D. Ohio Feb. 21, 2022) ("Strbac Complaint") |
| M | U.S. Provisional Patent Application No. 63/297,884 ("Strbac '003 Provisional") |

████████████████

| N | U.S. Patent Application No. 18/048,572 ("Strbac '003 Non-Provisional") |
|---|---|
| O | Excerpts of the Prosecution History for U.S. Patent No. 12,578,159 |
| P | U.S. Patent No. 3,045,555 ("Stoner '555") |
| Q | U.S. Patent No. 10,514,223 ("Rounds '223") |
| R | U.S. Patent No. 9,267,751 ("Ruiz '751") |
| S | Tac-Con 3MR ATF Approval Letter (October 31, 2013) |

## TABLE OF CLAIMS – '247 PATENT

| Claim No. | Claim Language |
|---|---|
| **[15Pre]** | A firearm trigger mechanism comprising: |
| **[15a]** | a hammer having a sear catch and a hook for engaging a disconnector and adapted to be mounted in a fire control mechanism pocket of a receiver to pivot on a transverse hammer pivot axis between set and released positions, said hammer adapted to be pivoted rearward by rearward movement of a bolt carrier, |
| **[15b]** | a trigger member having a sear and adapted to be mounted in the fire control mechanism pocket to pivot on a transverse trigger member pivot axis between set and released positions, |
| **[15c]** | wherein said sear and sear catch are in engagement in said set positions of said hammer and trigger member and are out of engagement in said released positions of said hammer and trigger member, |
| **[15d]** | said disconnector having a hook for engaging said hammer and adapted to be mounted in the fire control mechanism pocket to pivot on a transverse disconnector pivot axis, and |
| **[15e]** | a cam having a cam lobe and adapted to be movably mounted in the fire control mechanism pocket, said cam being movable between a first position and a second position, in said second position said cam lobe forces said trigger member towards said set position, |
| **[15f]** | whereupon in a standard semi-automatic mode, said cam is in said first position, rearward movement of the bolt carrier causes rearward pivoting of said hammer such that said disconnector hook catches said hammer hook, and thereafter the bolt carrier moves forward into battery, at which time a user must manually release said trigger member to free said hammer from said disconnector to permit said hammer and trigger member to pivot to said set positions so that the user can pull said trigger member to fire the firearm, and |
| **[15g]** | whereupon in a forced reset semi-automatic mode, said cam is in said second position, rearward movement of the bolt carrier causes rearward pivoting of said hammer such that said disconnector hook is prevented from catching said hammer hook, and thereafter the bolt carrier moves forward into battery, at which time the user can pull said trigger member to fire the firearm. |
| | |

### TABLE OF CLAIMS – '159 PATENT

| Claim No. | Claim Language |
|---|---|
| **[1Pre]** | A firearm trigger mechanism for a firearm having a fire control mechanism pocket and a reciprocating bolt means, the trigger mechanism operable in a first, standard semiautomatic mode and in a second, forced reset semi-automatic mode, the mechanism comprising: |
| **[1a]** | a hammer having a hammer sear surface and a hook for engaging a disconnector and adapted to be mounted in the fire control mechanism pocket to pivot on a transverse hammer pivot axis between set and released positions, the hammer adapted to be pivoted rearward by rearward movement of the bolt means, |
| **[1b]** | a trigger member having a trigger sear surface and adapted to be mounted in the fire control mechanism pocket to pivot on a transverse trigger member pivot axis between set and released positions, |
| **[1c]** | wherein the trigger member sear surface and hammer sear catch surface are in engagement in the set positions of the hammer and trigger member and are out of engagement in the released positions of the hammer and trigger member, |
| **[1d]** | the disconnector having a hook for engaging the hammer and adapted to be mounted in the fire control mechanism pocket to pivot on a transverse disconnector pivot axis, and |
| **[1e]** | a cam having a cam lobe and adapted to be movably mounted in the fire control mechanism pocket, the cam being movable between a first position and a second position, in the second position the cam lobe forces the trigger member toward the set position, |
| **[1f]** | whereupon in the first mode, rearward movement of the bolt means causes rearward pivoting of the hammer such that the disconnector hook catches the hammer hook, and thereafter the bolt means moves forward into battery, at which time a user must manually reduce pressure on the trigger member to free the hammer from the disconnector to permit the hammer and trigger member to pivot to the set positions so that the user can pull the trigger member to fire the firearm, and |
| **[1g]** | whereupon in the second mode, rearward movement of the bolt means causes rearward pivoting of the hammer such that the disconnector hook is prevented from holding the hammer, and thereafter the bolt means moves forward into battery, at which time the user can pull the trigger member to fire the firearm. |
| **[3]** | The trigger mechanism of claim **1,** further comprising a spring which biases the trigger member toward the set position. |
| **[6Pre]** | A firearm trigger mechanism for a firearm having a fire control mechanism pocket and a reciprocating bolt means, the trigger mechanism operable in a first, standard semiautomatic mode and in a second, forced reset semi-automatic mode, the mechanism comprising: |

| Claim No. | Claim Language |
|-----------|----------------|
| [6a] | a hammer having a sear surface and a hook for engaging a disconnector and adapted to be mounted in the fire control mechanism pocket to pivot on a transverse hammer pivot axis between set and released positions, the hammer adapted to be pivoted rearward by rearward movement of the bolt means, |
| [6b] | a trigger member having a sear surface and adapted to be mounted in the fire control mechanism pocket to move between set and released positions, |
| [6c] | wherein the hammer sear surface and trigger member sear surface are in engagement in the set positions of the hammer and trigger member and are out of engagement in the released positions of the hammer and trigger member, |
| [6d] | the disconnector having a hook for engaging the hammer and adapted to be mounted in the fire control mechanism pocket to pivot on a transverse disconnector pivot axis, and |
| [6e] | a cam having a cam lobe and adapted to be movably mounted in the fire control mechanism pocket, the cam being movable between a first position and a second position, in the second position the cam prevents the trigger member from moving from the set position to the released position, |
| [6f] | whereupon in the first mode, rearward movement of the bolt means causes rearward pivoting of the hammer such that the disconnector hook catches the hammer hook, and thereafter the bolt means moves forward into battery, at which time a user must manually reduce pressure on the trigger member to free the hammer from the disconnector to permit the hammer and trigger member to move to the set positions so that the user can pull the trigger member to fire the firearm again, and |
| [6g] | whereupon in the second mode, rearward movement of the bolt means causes rearward pivoting of the hammer, movement of the trigger member to the set position, and the disconnector hook is prevented from holding the hammer, and thereafter the bolt means moves forward into battery, at which time the user can pull the trigger member to fire the firearm. |
| [7] | The trigger mechanism of claim **6,** further comprising a spring which biases the trigger member toward the set position. |
| [9] | The trigger mechanism of claim **6,** wherein the trigger member pivots on a transverse trigger axis between set and released positions. |
| [10Pre] | A firearm trigger mechanism for a firearm having a fire control mechanism pocket and a reciprocating bolt means, the trigger mechanism operable in a first, standard semiautomatic mode and in a second, forced reset semi-automatic mode, the mechanism comprising: |
| [10a] | a hammer having a sear surface and a hook for engaging a disconnector and adapted to be mounted in the fire control mechanism pocket to pivot on a transverse hammer pivot axis between set and released positions, the hammer adapted to be pivoted rearward by rearward movement of the bolt means, |
| [10b] | a trigger member having a sear surface and adapted to be mounted in the fire control mechanism pocket to move between set and released positions, |

| Claim No. | Claim Language |
|---|---|
| [10c] | wherein the hammer sear surface and trigger member sear surface are in engagement in the set positions of the hammer and trigger member and are out of engagement in the released positions of the hammer and trigger member, |
| [10d] | the disconnector having a hook for engaging the hammer and adapted to be mounted in the fire control mechanism pocket to pivot on a transverse disconnector pivot axis, and |
| [10e] | a cam having a cam lobe and adapted to be movably mounted in the fire control mechanism pocket, the cam being movable between a first position and a second position, movement of the cam to the second position causing the trigger member to move from the released position toward the set position, |
| [10f] | whereupon in the first mode, rearward movement of the bolt means causes rearward pivoting of the hammer such that the disconnector hook catches the hammer hook, and thereafter the bolt means moves forward into battery, at which time a user must manually reduce pressure on the trigger member to free the hammer from the disconnector to permit the hammer and trigger member to move to the set positions so that the user can pull the trigger member to fire the firearm again, and |
| [10g] | whereupon in the second mode, rearward movement of the bolt means causes rearward pivoting of the hammer and causes movement of the trigger member to the set position, and wherein the disconnector hook is prevented from holding the hammer, and thereafter the bolt means moves forward into battery, at which time the cam is moved to the first position and the user can pull the trigger member to fire the firearm again. |
| [11] | The trigger mechanism of claim 10, further comprising a spring which biases the trigger member toward the set position. |
| [14Pre] | A firearm trigger mechanism comprising: |
| [14a] | a hammer having a sear surface and a hook for engaging a disconnector and adapted to be mounted in a fire control mechanism pocket of a receiver to move between set and released positions the hammer adapted to be moved to the set position by rearward movement of a bolt means, |
| [14b] | a trigger member having a sear surface and adapted to be mounted in the fire control mechanism pocket to move between set and released positions, |
| [14c] | wherein the hammer sear surface and trigger member sear surface are in position to engage in the set positions of the hammer and trigger member and are out of engagement in the released positions of the hammer and trigger member, |
| [14d] | the disconnector having a hook for engaging the hammer, and |
| [14e] | a cam having a cam lobe and adapted to be movably mounted in the fire control mechanism pocket, the cam being movable between a first position and a second position, in the second position the cam lobe forces the trigger member toward the set position, |

| Claim No. | Claim Language |
|---|---|
| [14f] | when in a standard semi-automatic mode, rearward movement of the bolt carrier causes movement of the hammer such that the disconnector hook catches the hammer hook, and thereafter the bolt means moves forward into battery, at which time a user must manually reduce pressure on the trigger member to free the hammer from the disconnector to permit the hammer sear surface and trigger member sear surface to move into engagement so that the user can pull the trigger member to fire the firearm, and |
| [14g] | when in a forced reset semi-automatic mode, rearward movement of the bolt means causes movement of the hammer and the disconnector hook is prevented from holding the hammer, and thereafter the bolt means moves forward into battery, at which time the user can pull the trigger member to fire the firearm. |
| [15Pre] | A firearm trigger mechanism comprising: |
| [15a] | a hammer having a sear surface and a hook means for engaging a disconnector and adapted to move between set and released positions, the hammer adapted to be moved to the set position by rearward movement of a bolt means, |
| [15b] | a trigger means having a sear surface and adapted to move between set and released positions, |
| [15c] | wherein the hammer sear surface and trigger means sear surface are positioned to engage when the hammer and trigger means are in their set positions and are out of engagement in the hammer and trigger means are in their released positions, |
| [15d] | the disconnector having a disconnector hook means for engaging the hammer hook means, |
| [15e] | a cam adapted to be movable between a first position at which the cam does not force the trigger member into the set position and a second position, in the second position at which the cam does force the trigger member into the set position, and |
| [15f] | a means for selecting between at least standard semiautomatic and forced reset semi-automatic modes, |
| [15g] | when in the standard semi-automatic position, rearward movement of the bolt means causes movement of the hammer such that the disconnector hook means catches the hammer hook means, and thereafter the bolt means moves forward into battery, at which time a user must manually reduce pressure on the trigger means to free the hammer from the disconnector to permit the hammer and trigger means to move to the set positions so that the user can pull the trigger means to fire the firearm, and |
| [15h] | when in the forced reset semi-automatic position, rearward movement of the bolt means causes movement of the hammer, the disconnector is prevented from holding the hammer, and thereafter the bolt means moves forward into battery, at which time the user can pull the trigger means to fire the firearm. |

| Claim No. | Claim Language |
|---|---|
| **[16Pre]** | A firearm trigger mechanism comprising: |
| **[16a]** | a hammer having a sear engagement surface and a hook means for engaging a disconnector and adapted to move between set and released positions, the hammer adapted to be moved to the set position by rearward movement of a bolt means, |
| **[16b]** | a trigger means having a sear engagement surface and adapted to move between set and released positions, |
| **[16c]** | wherein the trigger means and hammer sear engagement surfaces are in position to engage in the set positions of the hammer and trigger means and will not engage in the released positions of the hammer and trigger means, |
| **[16d]** | the disconnector having a hook means for engaging the hammer hook means, and |
| **[16e]** | a cam movable between a first position and a second position, in the second position the cam forces the trigger member toward the set position, |
| **[16f]** | when in a standard semi-automatic mode, rearward movement of the bolt means causes movement of the hammer and the disconnector hook means catches the hammer hook means, and thereafter the bolt means moves forward into battery, at which time a user must manually reduce pressure on the trigger means to free the hammer from the disconnector to permit the hammer and trigger means to move to their set positions so that the user can pull the trigger means to fire the firearm, and |
| **[16g]** | when in a forced reset semi-automatic mode, upon rearward movement of the bolt means, the disconnector is prevented from holding the hammer, and thereafter the bolt means moves forward into battery, at which time the user can pull the trigger means to fire the firearm. |
| **[17Pre]** | A firearm trigger mechanism comprising: |
| **[17a]** | a hammer movable between a set position and a released position, and having a sear engagement surface; |
| **[17b]** | a trigger member having a sear engagement surface, the trigger member being movable between a set position and a released position; |
| **[17c]** | a cam configured to move during cycling of the firearm's action and to contact the trigger member to bias it toward the set position; |
| **[17d]** | a movable blocking means configured to selectively prevent the hammer sear catch surface from engaging with the sear in the set position; |
| **[17e]** | a mode selector operable by the user to select between at least two modes of operation of the trigger mechanism, including: |
| **[17f]** | a semi-automatic mode, in which the hammer and trigger member sear engagement surfaces are not able engage in the set position during cycling of the firearm's action until the user manually reduces pressure from the trigger member to disengage the blocking means before firing again, regardless of whether the cam moves the trigger member to the set position; and |

| Claim No. | Claim Language |
|---|---|
| [17g] | a forced reset mode, in which the cam moves during cycling and forcibly biases the trigger member into the set position with the hammer and trigger member sear engagement surfaces engaged, permitting the user to immediately fire again without the user manually releasing pressure on the trigger member; |
| [17h] | wherein if the cam moves in both modes, the difference in operation between modes is determined by movable selection of the blocking means, thereby selectively either permitting or preventing the hammer and trigger member sear engagement surfaces from engaging when the trigger member is biased by the cam. |

## TABLE OF CLAIMS – '403 PATENT

| Claim No. | Claim Language |
|---|---|
| [14Pre] | A trigger mechanism for a firearm operable in at least a standard semi-automatic mode and a forced reset semi-automatic mode, comprising: |
| [14a] | a hammer having a hammer sear catch and a hammer hook and adapted to pivot on a transverse hammer pivot axis between a set position and a released position, the hammer adapted to be pivoted rearward by rearward movement of a bolt means; |
| [14b] | a trigger member having a trigger member sear and adapted to move between a set position and a released position, the trigger member being forced to the set position as a result of cycling action of the bolt means, such that the trigger member sear and the hammer sear catch are in engagement in the set position of the hammer and the set position of the trigger member and are out of engagement in the released position of the hammer and the released position of the trigger member; |
| [14c] | wherein the trigger member sear and the hammer sear catch are in engagement in the set position of the hammer and the set position of the trigger member and are out of engagement in the released position of the hammer and the released position of the trigger member, |
| [14d] | a disconnector having a disconnector hook for engaging the hammer hook and adapted to pivot on a transverse disconnector pivot axis; and |
| [14e] | a locking member adapted to be movably mounted, the locking member being movable between a first position at which the locking member mechanically blocks the trigger member from moving to the released position and a second position at which the locking member does not mechanically block the trigger member allowing the trigger member to be moved to the released position and adapted to be moved to the second position by forward movement of the bolt means, |

| Claim No. | Claim Language |
|---|---|
| [14f] | wherein in the standard semi-automatic mode, rearward movement of the bolt means causes rearward pivoting of the hammer such that the disconnector hook holds the hammer hook, at which time a user must manually reduce pressure on the trigger member to free the hammer from the disconnector to permit the hammer and the trigger member to pivot to the set positions so that the user can pull the trigger member to fire the firearm again; and |
| [14g] | wherein in the forced reset semi-automatic mode, rearward movement of the bolt means causes the trigger member to be forced to the set position, and the disconnector hook is prevented from holding the hammer hook, and thereafter when the bolt means reaches a substantially in-battery position or an in-battery position the user can actuate the trigger member to fire the firearm again. |
| [15] | The trigger mechanism of claim **14**, further comprising a safety selector, movement of which selects between at least standard semi-automatic mode and forced reset semi-automatic mode. |
| [17Pre] | A trigger mechanism for a semi-automatic firearm, comprising: |
| [17a] | a hammer comprising a hammer hook; |
| [17b] | a disconnector comprising a disconnector hook for holding the hammer hook; |
| [17c] | a trigger member, wherein the trigger member can be is forced into a trigger set position responsive to rearward motion of a cyclic semi-automatic action of the semi-automatic firearm; and |
| [17d] | a locking member configured to move between a block position and a non-block position, wherein the block position mechanically blocks the trigger member from moving from the trigger set position to a trigger released position, wherein the non-block position permits the trigger member to be moved from the trigger set position to the trigger released position, wherein the locking member is moved into the block position during rearward motion of the cyclic semi-automatic action and moved into the non-block position during forward motion of the cyclic semi-automatic action, and wherein: |
| [17e] | in a standard semi-automatic mode, after cycling of the action and while the trigger member is in the trigger released position, the trigger mechanism is configured such that the disconnector hook holds the hammer hook, at which point, rearward pressure on the trigger member must be reduced before the trigger member can be actuated, and |
| [17f] | in a forced reset semi-automatic mode, the disconnector hook is prevented from holding the hammer hook, and the trigger member can be actuated when the cyclic semi-automatic action reaches a substantially in-battery position or an in-battery position. |
| [29] | The trigger mechanism of claim **17**, comprising a safety selector, wherein the safety selector is selectable between at least the standard semi-automatic mode and the forced reset semi-automatic mode. |

| Claim No. | Claim Language |
|---|---|
| [30] | The trigger mechanism of claim **17**, comprising a safety selector that is separate from the locking member. |
| [32Pre] | A trigger mechanism for a semi-automatic firearm operable in at least a standard semi-automatic mode and a forced reset semi-automatic mode, comprising: |
| [32a] | a disconnector; |
| [32b] | a trigger member, wherein the trigger member is forced into a trigger set position responsive to rearward motion of a cyclic semi-automatic action of the semi-automatic firearm; and |
| [32c] | a locking member configured to move between a block position and a non-block position, wherein the block position mechanically blocks the trigger member from moving from the trigger set position to a trigger released position, wherein the non-block position permits the trigger member to be moved from the trigger set position to the trigger released position, wherein the locking member is moved into the block position during rearward motion of the cyclic semi-automatic action and moved into the non-block position during forward motion of the cyclic semi-automatic action; |
| [32d] | a safety selector, wherein the safety selector is selectable between at least the standard semi-automatic mode and the forced reset semi-automatic mode; and wherein: |
| [32e] | in the standard semi-automatic mode, rearward pressure on the trigger member must be reduced to disengage a hammer from the disconnector before the trigger member can again be actuated; and |
| [32f] | in the forced reset semi-automatic mode, the trigger member is forced to the trigger set position and can be actuated without reducing pressure on the trigger member to fire another round when the cyclic semi-automatic action reaches a substantially in-battery position or an in-battery position. |
| [38Pre] | A forced reset trigger mechanism, comprising: |
| [38a] | a hammer having a hammer hook and adapted to pivot on a transverse hammer pivot axis; |
| [38b] | a disconnector having a disconnector hook and adapted to pivot on a transverse disconnector pivot axis; |
| [38c] | a trigger member; and |
| [38d] | a safety selector adapted to be movable between a standard semi-automatic position and a forced reset semi-automatic position, |
| [38e] | wherein when the safety selector is in the standard semi-automatic position and the trigger member is rearwardly actuated, and after the hammer pivots rearward to a position where the hammer hook is past the disconnector hook, rearward pressure on the trigger member must be reduced to permit the trigger member to then be actuated to fire a firearm. |

| Claim No. | Claim Language |
|---|---|
| [39Pre] | A forced reset trigger mechanism, comprising: |
| [39a] | a hammer having a hammer hook and adapted to pivot on a transverse hammer pivot axis; |
| [39b] | a disconnector having a disconnector hook and adapted to pivot on a transverse disconnector pivot axis; |
| [39c] | a trigger member; and |
| [39d] | a safety selector adapted to be movable between a standard semi-automatic position and a forced reset semi-automatic position, |
| [39e] | wherein, when in either position, when the trigger member is pulled rearward, cycling of a firearm action rearwardly pivots the hammer to a position where the hammer hook is past the disconnector hook, |
| [39f] | wherein if the safety selector is in the standard semi-automatic position, rearward pressure on the trigger member must be reduced to permit the trigger member to then be actuated to fire a firearm, and |
| [39g] | wherein, if the safety selector is in the forced reset semi-automatic position, the trigger member is forced to move to a full reset position against rearward pressure on the trigger member and the rearward pressure on the trigger member does not need to be reduced to actuate the trigger to fire the firearm. |

## TABLE OF CLAIMS – '784 PATENT

| Claim No. | Claim Language |
|---|---|
| [1Pre] | In a forced rest trigger mechanism, an extended trigger member locking device, comprising: |
| [1a] | a locking member that is movable between a first position in which it locks a trigger member against pulling movement and |
| [1b] | a second position where it does not restrict movement of the trigger member, |
| [1c] | the locking member configured to be movably supported by a frame and |
| [1d] | including a generally upward extension portion configured to make actuating contact with a surface of a bolt carrier, |
| [1e] | such actuating contact causing the locking member to move from the first position to the second position, |
| [1f] | the locking member having a body portion that is movably supported and |
| [1g] | an upwardly extending deflectable portion that is separately movable relative to the body portion between an extended position and a deflected position. |

| Claim No. | Claim Language |
|-----------|----------------|
| **[3]** | The device of claim **1**, wherein the locking member body portion pivots between the first and second positions. |
| **[4]** | The device of claim **1**, wherein the locking member deflectable portion pivots relative to the body portion. |

Defendants Mister Guns, LLC, Thomas Carter II, Brandi Carter, PistolCap Limited Company, Frisco Guns, Mordekhai Harroch, ProSource Firearms, LLC, and Superior Firearms of Texas, LLC (collectively, "**Atrius Customer Defendants**") in the four above-captioned cases, via several concurrently-filed substantively-identical motions, jointly submit the following:

## I. INTRODUCTION

A preliminary injunction is extraordinary relief, and Plaintiffs do not show that it is warranted here. First, Plaintiffs fail to analyze irreparable harm and the balance of harms for these defendants—which is fatal to Plaintiffs' Motion. It is established law that "an injunction is only entered against a defendant on account of a harm resulting from the defendant's wrongful conduct, not some other reason." *Apple Inc. v. Samsung Elecs. Co.*, 809 F.3d 633, 640 (Fed. Cir. 2015) (emphasis added). Here, it is undisputed that these defendants have not harmed Plaintiff in a way that damages cannot compensate.

- Defendant PistolCap did not purchase, possess, advertise, offer, sell, ship, invoice, receive payment for, or otherwise participate in the sale of any Atrius FRS. Ex. A (Harroch Decl.) ¶¶ 3–6, 17–18.

- Defendant ProSource acquired two units for evaluation, but completed no customer sales. Ex. B (Feldman Decl.) ¶¶ 10–16.

- Mister Guns, Frisco Guns, and Superior are downstream retailers—not designers, manufacturers, modifiers, installers, or assemblers—who offered the Atrius FRS, if at all, only as a standalone component. Ex. C (Carter Decl.) ¶¶ 8–14; Ex. A ¶¶ 10–16; Ex. D (Rohr Decl.) ¶¶ 8–14. Plaintiffs' patents require the full firearm assembly, which no Defendant has made, sold, or offered for sale.

- Mister Guns stopped stocking, listing, and offering the product in January 2026 after approximately 17 historical sales, and Frisco Guns, a business separate from PistolCap, sold approximately 15 units. Ex. A ¶¶ 3-6, 19; Ex. C. ¶ 15.

Against these Defendants, Plaintiffs identify no lost sale, dealer-network displacement, price effect, reputational injury, or other noncompensable harm.

Second, Plaintiffs provide a weaker irreparable harm, balance of harm, and public interest

case than they did in *Peak Tactical*—where the Court denied Plaintiffs' motion for a preliminary injunction. There, Plaintiffs sought preliminary relief on the same lost-sales, price-erosion, market-displacement, and reputational-harm theories. *ABC IP, LLC v. Peak Tactical, LLC*, 2026 WL 713000, at *4–8, *13–15 (D. Wyo. Feb. 13, 2026). The Court denied the requested relief after briefing and a hearing—finding no adequate evidence of forced price reductions, sales or market-share effects, dealer-network displacement, or non-speculative reputational injury. *Id.* And the Court rejected the same balance of harm and public interest arguments Plaintiffs raise here. *Id.*

Here, Plaintiffs' evidence is even weaker. For example, Plaintiffs' damages expert, Richard Eichmann, opines merely that the Defendants' alleged conduct "*can* cause" harm, not that it is *likely* to cause irreparable harm—failing to meet the preliminary injunction standard. Dkt. 7-1 (Eichmann Decl.) ¶ 36; *see* Ex. E (Benoit Decl.) ¶ 5. Plaintiffs' asserted injuries are economic, yet Mr. Eichmann offers no reliable analysis of sales trends, but-for demand, customer preferences, price elasticity, channel-specific effects, or defendant-specific causation. Ex. E ¶¶ 8–13. He only offers general descriptions of potential market effects without tying them to the specific facts of this case. *Id*. ¶¶ 5, 14. He also does not analyze whether money damages would be inadequate to remedy any injury allegedly caused by any particular Atrius Customer Defendant.

Third, Plaintiffs fail to show a substantial likelihood of success on the merits, on infringement, invalidity, and enforceability. Their expert never examined, installed, or tested an Atrius FRS; he relied on public product materials, screenshots, and Plaintiff-generated renderings while extrapolating from testing of other products. As explained in Part II.C, Plaintiffs cannot carry their burden to prove infringement, and the record independently raises substantial questions of noninfringement, invalidity, and unenforceability as to each asserted claim.

Plaintiffs' motion thus fails on every factor and should be denied.

## II. ARGUMENT

A preliminary injunction is "an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Plaintiffs must establish likely success, likely irreparable harm, inadequacy of legal remedies, favorable equities, and public interest. *Id*. at 20, 22, 24; *Natera, Inc. v. NeoGenomics Lab'ys, Inc.*, 106 F.4th 1369, 1375 (Fed. Cir. 2024). And that showing must be made defendant by defendant: the evidence supporting every factor must rest on what the enjoined defendant did, not on conduct Plaintiffs attribute to manufacturers, design-file distributors, other sellers, or nonparties. Plaintiffs did not make that showing for the reasons below.

### A.  Plaintiffs Fail to Show Irreparable Harm

A patentee seeking a preliminary injunction must make "a clear showing" that it is "likely"—not merely possible—to suffer "substantial and immediate irreparable injury," and that this factor, like the others, must be proven as to each enjoined defendant. *Winter*, 555 U.S. at 22; *Apple Inc. v. Samsung Elecs. Co.*, 695 F.3d 1370, 1374 (Fed. Cir. 2012). After *eBay*, no presumption of irreparable harm survives; Plaintiffs must affirmatively prove it. *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1149 (Fed. Cir. 2011). Plaintiffs do not carry that burden.

#### 1. Plaintiffs Do Not Allege—Let Alone Establish–Irreparable Harm <u>By These Defendants</u>

Plaintiffs' Motion fails for a fundamental reason: it never analyzes the alleged harm <u>caused by these Defendants</u>. *Apple*, 809 F.3d at 640 (requiring irreparable harm "resulting from the defendant's wrongful conduct, not some other reason"); *Acumed LLC v. Stryker Corp.*, 551 F.3d 1323, 1330 (Fed. Cir. 2008) (holding that the balance of harms "considered is only between a plaintiff and a defendant, and thus the effect on [third parties] is irrelevant under this prong of the injunction test"). Plaintiffs instead seek consolidated relief against defendants with different roles, products, and sales records, treating all the products—the Atrius FRS, Super Safety, ARC-Fire, MARC Selector, and Super Selektor—and all the resellers as a single entity. Mot. 1, 18–20. This

---

is improper under Rule 65, which requires a defendant-by-defendant analysis for an injunction to issue. And the record shows that these Defendants have not irreparably harmed Plaintiffs.

Two of these Defendants have not even sold the accused product. PistolCap participated in no Atrius FRS sale, Ex. A ¶¶ 3–6, 17–18; ProSource evaluated two units but completed no customer sale, Ex. B ¶¶ 10–16. The remaining Defendants do not make, use, or sell the products accused of infringement—completed firearms with the Atrius FRS installed. They are standalone product resellers, not designers, manufacturers, assemblers, modifiers, or installers. Ex. C ¶¶ 10–14; Ex. A ¶¶ 12–16; Ex. D ¶¶ 10–14. And they simply resold the FRS as Atrius built it: Atrius, not these retailers, controls the device's specifications, documentation, and internal mechanics, which the resellers did not alter. Ex. F (Brown Decl.) ¶¶ 3–4.

Recognizing this lack of proof, Plaintiffs invoke lost market share, "patent-earned lead time," lower prices, premium-brand injury, new entrants, distribution-channel disruption, and alleged uncollectibility, Mot. 29–35—but every one is a market-wide assertion. Plaintiffs provide no evidence of a likely, noncompensable injury caused by any Atrius Customer Defendant.

Plaintiffs identify no lost sale, dealer loss, retailer-specific price effect, market-share displacement, reputational injury, or other harm attributable to an individual Defendant. The proposed injunction would impose separate restraints on separate retailers, yet Plaintiffs infer harm from aggregate competition rather than from any Defendant's actual conduct. The defendant-specific records refute that inference, and each differs from the next: PistolCap had no Atrius FRS transactions at all; ProSource completed no customer sale; Mister Guns stopped stocking, listing, and offering the product in January 2026 after selling approximately 17 units; and Frisco Guns, a separate business from PistolCap, sold approximately 15 Atrius FRS units. Ex. A ¶¶ 3–6, 17–19; Ex. B ¶¶ 14–16; Ex. C ¶ 15. There is simply insufficient evidence of irreparable harm by these

Defendants to warrant an injunction.

### 2. Plaintiffs Fail to Prove a Nexus Between Infringement and Their Alleged Harms

Plaintiffs' harm theory fails for the further reason that they never connect any alleged injury to the patented feature, as the causal-nexus requirement demands. Sales lost to lawful competition—driven by price, configuration, or the simple availability of a cheaper alternative—cannot support an injunction. The patented feature must be at least a driver of the purchasing decisions Plaintiffs claim to be losing, and potential lost sales alone do not establish that nexus. *Apple,* 809 F.3d at 641–42; *Genband US LLC v. Metaswitch Networks Corp.,* 861 F.3d 1378, 1383–84 (Fed. Cir. 2017); *Metalcraft of Mayville, Inc. v. Toro Co.*, 848 F.3d 1358, 1368 (Fed. Cir. 2017). Plaintiffs offer no evidence that an asserted patented feature of the Atrius FRS drives demand. They do not distinguish demand allegedly arising from patented functionality from demand arising from configuration, price, compatibility with an existing trigger, installation preference, or other non-patented characteristics.

Those non-patented drivers are concrete here, not hypothetical. The Atrius FRS works with the firearm owner's existing trigger, while RBT's FRT products require trigger replacement—a configuration difference that gives buyers a reason to choose the FRS wholly apart from any patented reset feature. Ex. E ¶¶ 11–13. And these retailers sold the FRS only as a standalone component; they did not pre-install it in firearms, package it with firearms, combine it with a fire-control group, or bundle it with a trigger assembly. Ex. C ¶¶ 12, 14; Ex. A ¶¶ 14, 16; Ex. D ¶¶ 12, 14. Plaintiffs supply no survey, switching analysis, or sales data showing that FRS purchasers would otherwise have bought an RBT product—the only evidence that could close the gap between a lost FRS sale and a lost RBT sale.

RBT's own history recognizes that configuration and installation affect demand. DeMonico considered the functionally similar AR-1 commercially unviable because its

installation required "clumsy modified parts" and was "unfriendly to the average consumer," even though its firing operation was functionally indistinguishable from that of the later FRT-15. Ex. E ¶ 22. Functional overlap does not establish substitution. Significant price differences further undercut Plaintiffs' assumption of close substitutability: RBT's FRT products are typically priced at least 130.5% and up to 462.5% higher than the accused products. *Id*. ¶ 10, 24; *BIC Leisure Prods., Inc. v. Windsurfing Int'l, Inc.*, 1 F.3d 1214, 1218–19 (Fed. Cir. 1993).

Plaintiffs likewise cannot aggregate the Super Safety, ARC-Fire, Atrius FRS, MARC Selector, alleged Super Selektor products, design files, nonparty sellers, and alleged counterfeits into one market force and attribute the result to Atrius resellers. Mot. 1, 18–20. Their reputation theory fails for the same reason: no customer perception, retailer communication, lost sale, or survey ties alleged harm to an Atrius Customer Defendant. *Id*. 32-33; Ex. E ¶¶ 52–54.

### 3. Plaintiffs' Irreparable Harm Case is Weaker Than in *Peak Tactical*—Where the Court Found No Irreparable Harm

Plaintiffs present largely the same irreparable harm theories that they lost in *Peak Tactical*: lost sales from durable goods, price erosion, market displacement, and reputational harm. In *Peak Tactical*, the Plaintiffs sought preliminary relief against the Partisan Disruptor, a lower-priced product they characterized as a direct copy of the FRT-15L3. After briefing and an evidentiary hearing, the court denied relief on every PI factor. 2026 WL 713000, at *2, *4, *15. It rejected the same theories advanced here: lost sales from durable goods, price erosion, market displacement, and reputational harm. The court held that "lost sales standing alone are insufficient to prove irreparable harm"; found RBT's price theory unsupported by evidence of forced price reductions, sales effects, or quantified harm; found market displacement "increasingly attenuated" without sales statistics or dealer-network proof; and rejected speculative reputational harm untethered to the alleged tort. *Id*. at *4-8.

---

Plaintiffs have a weaker case here. Mr. Eichmann does not analyze actual sales by period, channel, or region; compare actual sales to a supported but-for forecast; evaluate retailer-specific sales; or isolate any Atrius Customer Defendant's alleged effect from other products, sellers, and market conditions. Ex. E ¶¶ 8–9. Without those analyses, Mr. Eichmann cannot determine whether Plaintiffs experienced an actual sales disruption, much less whether any shortfall was caused by these retailers rather than another product, seller, regulatory controversy, pricing decision, ordinary market development, or customer preference.

Mr. Eichmann's stated assignment confirms the deficiency. He opines only that alleged conduct "***can*** cause immediate, ongoing, and compounding economic harm" and that he evaluated whether conduct is "***capable of*** causing immediate, ongoing, and irreparable economic harm." Dkt. 7-1 ¶¶ 3, 56 (emphases added). Mr. Eichmann offers no opinion on the likelihood that Plaintiffs will suffer irreparable harm caused by these Defendants. Ex. E ¶ 5.

Plaintiffs also rely on their dependence on FRT products, their stated no-discount policy, their assertion that more than ▮▮▮▮ customers have purchased more than one reset trigger, and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Dkt. 7-2 (DeMonico Decl.) ¶¶ 24, 60, 71, 74, 77. But those allegations do not identify a lost customer, a dealer defection, or a noncompensable injury caused by these retailers. Nor does Plaintiffs' market-share estimate (*id*. ¶ 75) rest on a market study, sales data, unit-volume analysis, channel data, or a defined market denominator. *Id.*; Ex. E ¶ 21. They instead describe it as a good-faith estimate based on day-to-day observations of competing products online and at gun shows. Dkt. 7-2 ¶ 75. Observing competitors online or at gun shows does not establish actual sales share or defendant-specific causation.

Plaintiffs' "entire business" narrative does not bridge that gap in proof. That Plaintiffs only sell FRT products may bear on the commercial importance of its business. But it does not establish

████████████

that any Atrius Customer Defendant likely caused a loss that cannot be measured or compensated monetarily—particularly where Plaintiffs provide no retailer-specific analysis of current or historical sales, substitution, or alleged downstream effects. The same is true of Plaintiffs' no-license policy, claimed ████ customer base, and ████████████████████ Plaintiffs do not identify a customer who stopped buying from Plaintiffs because of a sale by one of these retailer Defendants; a dealer that declined to carry Plaintiffs because of an Atrius FRS; a ███████████████████████████████████████████

████████████████████████████████

Nor do Plaintiffs establish that their customer relationships are uniquely vulnerable to the conduct challenged here. Plaintiffs sell multiple FRT models across two firearm platforms, and they identify more than ████ customers who have purchased more than one reset trigger. Dkt. 7-2 ¶¶ 18–20, 74. But Plaintiffs provide no churn analysis, repeat-purchase analysis, customer survey, dealer testimony, or account-specific evidence tying any relationship loss to an Atrius Customer Defendant. General assertions that durable goods may create long-term customer relationships do not substitute for proof that a particular retailer's limited sales are likely to cause noncompensable harm.

### 4. Plaintiffs' Delay and Litigation Conduct Reinforces There is No Irreparable Harm

A party facing immediate, irreparable harm moves quickly; delay in seeking relief is itself evidence that the claimed urgency is overstated. *High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*, 49 F.3d 1551, 1557 (Fed. Cir. 1995). Plaintiffs waited more than a year after the Atrius FRS launched, and more than four months after suing these very Defendants, before seeking emergency relief—a timeline incompatible with the immediate, noncompensable injury an injunction requires.

---

Atrius released the FRS on May 16, 2025. *See* Ex. H. Plaintiffs filed their first lawsuits the following month and at least fifteen more through January 7, 2026, without alleging FRS infringement or seeking preliminary relief—first asserting FRS claims nearly eight months after launch. *See* Ex. I (Timeline Demonstrating Plaintiffs' Delay). They sued the Atrius Customer Defendants on January 22, 2026, yet sought no PI relief on the FRS until May 29, 2026. *Id*. 1-2, 4–5. A 17-month delay "militates against the issuance of a [PI] by demonstrating that there is no apparent urgency," *High Tech Med.*, 49 F.3d at 1557, and even seven months is "a substantial period of time" suggesting the status quo did not irreparably damage the movant, *Nutrition 21 v. United States*, 930 F.2d 867, 872 (Fed. Cir. 1991). Plaintiffs' year-long delay exceeds the latter.

Nor can Plaintiffs excuse that delay by invoking the breadth of their campaign or the pending JPML proceedings. Courts excuse delay supported by a reasonable explanation*, see Bettcher Indus., Inc. v. Bunzl USA, Inc.*, 692 F. Supp. 2d 805, 821–22 (N.D. Ohio 2010); *EcoNova Inc. v. DPS Utah*, 2012 WL 5944257, at *14 (D. Utah Nov. 28, 2012)—not a movant that sought expedited relief against the same technology while sitting on its claim against these Defendants. Plaintiffs obtained a TRO and preliminary injunction against the Hoffman Defendants and moved for one against AS Designs in April 2026, on the same patents and theories pressed here. Mot. 21. They knew how to seek emergency relief but waited more than a year after the FRS launched, and more than four months after suing these retailers, before seeking preliminary relief. That selective urgency, not docket size, is what the timeline reveals.

Plaintiffs' claimed "patent-earned lead time" fares no better. Mr. Eichmann identifies no defined window for RBT to establish exclusivity and never explains why the close of regulatory litigation marked its start. Ex. E ¶ 27. The premise is also wrong on the facts: before the EDNY injunction, RBT had already sold roughly 100,000 FRT-15 products, earned about $39 million,

and achieved near-national distribution. *Id*. ¶¶ 28–29. RBT thus already captured the first-mover advantage it says it must be protected to earn; a patentee with that record is not a new entrant whose window is only now opening, and the later DOJ injunction neither resets that clock nor converts realized success into a fragile head start.

Plaintiffs separately invoke the EDNY DOJ action to excuse the delay. Mot. 20–21. But that order restrained sales of specified products and required document preservation; Plaintiffs identify no provision barring patent notices, suits, or even a request to clarify permitted enforcement. *United States v. Rare Breed Triggers, LLC*, No. 1:23-cv-00369-NRM-RML, ECF No. 139, at 128–29 (E.D.N.Y. Sept. 5, 2023). It cannot explain Plaintiffs' delay after the FRS launched, after they accused it, or after they sued these retailers.

## B. Plaintiffs' Asserted Injuries Are Measurable and Compensable Through Money Damages.

A preliminary injunction is unavailable where money damages can make the patentee whole—the premise of *eBay's* requirement that legal remedies be inadequate before equity intervenes. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Every injury Plaintiffs assert is a textbook money-damages injury, and Plaintiffs say as much, quantifying their loss to the dollar. The Patent Act supplies the remedy: damages "adequate to compensate for the infringement," and no less than a reasonable royalty. 35 U.S.C. § 284. Plaintiffs' alleged injuries— lost sales, price erosion, lost market share, and dealer-margin and channel effects—are all recoverable under that standard.

Lost profits, price erosion, reasonable royalties, and related theories are conventional remedies for the harms Eichmann describes. Ex. E ¶¶ 6–7. The Federal Circuit treats quantifiable lost revenue as "straight-forward monetary harm" that is "certainly not irreparable." *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1338 (Fed. Cir. 2012). Plaintiffs' own

alleged per-unit loss—approximately ▮▮▮▮▮▮▮—confirms it conceptualizes the injury in monetary terms. Dkt. 7-2 ¶ 59. Their durable-goods theory does not change that: in *Peak Tactical*, Plaintiffs argued that every competitor sale was a permanent loss because a firearm owner buys only one trigger per rifle. The Court rejected that theory: "lost sales standing alone are insufficient to prove irreparable harm." 2026 WL 713000, at *5 (quoting *Automated Merch Sys., Inc. v. Crane Co.*, 357 F. App'x 297, 300 (Fed. Cir. 2009)).

Plaintiffs' price-erosion theory is likewise unproven and compensable. They cite one FRT-15L3 reduction—from $499 to $450—and contend that lower-priced products permanently reset expectations. Mot. 2, 32; Dkt. 7-2 ¶ 61. But they must show that the challenged conduct of *these* Atrius Customer Defendants caused that reduction and reduced overall profit. *Peak Tactical* rejected RBT's identical reference-price theory for lack of any proof of a forced reduction, sales data, or projections quantifying harm. 2026 WL 713000, at *5–6. And price erosion is compensable regardless: "Lost revenue caused by a reduction in the market price of a patented good due to infringement is a legitimate element of compensatory damages." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1378 (Fed. Cir. 2013). Plaintiffs' own history undermines that mechanism. The Wide Open Trigger—a lower-priced, cassette-style trigger a court found "was plainly copied from the FRT-15"—competed directly with the FRT-15, yet the record shows no resulting FRT-15 price cut. Ex. E ¶¶ 39–42. If cheaper copycat competition reliably produced the durable reference-price effects Mr. Eichmann posits, this is where they would appear; they do not, foreclosing Plaintiffs' assumption that a price differential alone permanently resets expectations.

The presence of numerous sellers creates an ordinary allocation-and-causation question, not irreparable harm. Ex. E ¶¶ 8–9, 48. So does alleged channel disruption: Mr. Eichmann does

not quantify dealer losses, switching costs, inventory burdens, or any dealer's refusal to carry Plaintiffs' products, *id.* ¶¶ 30–33, and his enforcement-signaling theory rests largely on Hoffman design files already "widely disseminated," *id*. ¶¶ 46–48.

Finally, Plaintiffs' collectability theory fails. Mr. Eichmann does not estimate likely damages, assess Defendants' assets or revenues, analyze financing capacity, or calculate an expected recovery. Ex. E ¶ 57. Comparing Plaintiffs' asserted per-unit loss to a reseller's hypothetical per-unit profit proves nothing about solvency, assets, or ability to satisfy a judgment, and the absence of public financials for private companies is not evidence of uncollectibility. Indeed, Plaintiffs' model also ignores the retailer-specific record. Even assuming historical sales by certain retailers, Mr. Eichmann offers no defendant-specific estimate of damages, assets, revenues, insurance, financing capacity, or ability to satisfy a judgment.

## C. Plaintiffs Have Not Shown a Likelihood of Success on the Merits.

Plaintiffs do not show a likelihood of success.  It is Plaintiff's burden to show that it will likely prove infringement and withstand a challenge to the patents' validity and enforceability. *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1376 (Fed. Cir. 2009).  That includes showing that any defenses lack substantial merit. *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350–51 (Fed. Cir. 2001). Here, there is substantial evidence that Defendants do not infringe and that the asserted claims are invalid and unenforceable. Indeed, the *Peak Tactical* court found that many of Plaintiffs' patents were of questionable validity—and denied Plaintiffs' injunction request. *Peak Tactical*, 2026 WL 539471, at *8.

Plaintiffs' liability case is even weaker here.  Like *Peak Tactical*, Defendants have strong invalidity defenses—including defenses based on the same prior art reference at issue in *Peak Tactical*: Blakley '723. Further, the Atrius Forced Reset Selector ("FRS") product is highly

---

dissimilar to these Patents, which are directed to complete firearms. Atrius's product is only the safety portion of the fire-control assembly. As a result, the patents simply do not cover the FRS. Indeed, Plaintiffs' expert did not even purchase or install an Atrius FRS. Had he done so, he would have realized that the resulting firearm did not infringe, including for the reasons below.

## 1. Rare Breed Does Not Establish a Likelihood of Success

To prevail, Plaintiffs must rest on evidence that the accused device—not an idealized illustration of it—practices each claim limitation. Plaintiff's own expert defeats that showing. Mr. Luettke swears that he "physically examined representative samples of the Super Safety and the ARC-Fire" (two products unrelated to the Atrius FRS) but that "[f]or the Atrius Forced Reset Selector . . . my analysis is based on my review of publicly available product materials and product imagery." 2:26-cv-00058, Dkt. 38 at ¶ 15. He never handled the accused device, installed it in a fire control group, or observed it operate. *Id.* at ¶ 25. The claims recite elements of assembled firearms (*e.g.*, a bolt carrier), and Plaintiffs provide no evidence that the accused devices were installed or tested in a firearm. The infringement charts confirm this deficiency: they depict "Plaintiff-generated renderings of the Atrius Forced Reset Selector" and website screenshots "captured [on] 3/24/2026"—not evidence that a physical device performs the claimed functions when installed. *See* Dkt. 28 at 7 (Complaint's infringement chart depicting figures characterized as "[p]laintiff-generated renderings"); Dkt. 38-6 at 1, 9 (Exhibit to Luettke's declaration showing the same plaintiff-rendered figure and the same website screenshots).

This failure of proof is dispositive. The Atrius FRS is a physical device that—as Plaintiff itself has repeatedly asserted—can be purchased through various channels. Plaintiff knew how to acquire and test a device: it did that for the Super Safety. Dkt. 38 at ¶ 15; Dkt. 38-5. For the Atrius FRS, Plaintiff offers only the argument that the device "operates on the same core mechanical

principle" as the separately tested Super Safety. Dkt. 38 at ¶ 15; 4:26-md-03176, Dkt. 13 at 25. But that inference is not proof of infringement by the Atrius FRS, and Plaintiffs cannot satisfy their burden as to one product by pointing to testing of another. Plaintiffs simply chose not to meet their burden—an omission fatal to the preliminary injunction their moved for.

Beyond this failure of proof, Mr. Luettke's assumptions are demonstrably false, as demonstrated below. *See e.g. infra* Section II.C.2.a. In addition, all asserted claims of the Patents-in-Suit have, at minimum, serious questions of infringement, validity, and/or enforceability.

## 2.   U.S. Patent No. 12,038,247

Plaintiff asserts only claim 15 of U.S. Patent No. 12,038,247 (the "'247 Patent"). As shown below, the Atrius FRS does not infringe that claim, the claim is invalid as obvious under Section 103, and the claim is unenforceable due to inequitable conduct.

### a.    The Atrius Forced Reset Selector Does Not Infringe Claim 15 of the '247 Patent

▪ Claim 15 recites a negative limitation that the Atrius FRS does not practice: when in the forced reset mode, claim requires that the "disconnector hook is prevented from catching [the] hammer hook." '247 Patent at 14:67-15:1 (emphasis added). Using the Atrius FRS, the disconnector hook *will* catch the hammer hook when the selector is in the forced reset mode. Ex. G-5 at [00:37-00:38]. Specifically, during the rearward traverse of the bolt carrier group, the bolt carrier will press down on the hammer. *Id.* at [00:36-00:37]. Once the bolt carrier presses down the hammer, the disconnector hook will engage the hammer hook (as circled). *Id.* at [00:37-00:38].

---



It is only after this engagement that the FRS's arm will later cause disengagement of the disconnector. *Id.* at [00:39-00:40]. Atrius deliberately designed the FRS in this manner. Ex. F. Thus, the disconnector hook is not prevented from catching the hammer hook, and there is no infringement. *Lacks Inds., Inc. v. McKechnie Vehicle Components USA, Inc.*, 322 F.3d 1335, 1344 (Fed. Cir. 2003) (upholding summary judgment of noninfringement where "it is undisputed that the accused product covers at least part of the axial peripheral lip as construed and therefore cannot satisfy the 'not cover said axial peripheral lip' limitation in the asserted claims").

### b.    Claim 15 of the '247 Patent is Invalid

Claim 15 is also invalid as obvious under Section 103 in view of U.S. Patent No. 7,398,723 ("Blakley '723") and the Tommy Triggers FRT-15-3MD ("FRT-15-3MD"). The references combined disclose each element. And it would have been obvious to a person of ordinary skill in the art ("POSITA") to combine the two references. Ex. G at §§ 12.1-12.1.9.

Turning to claim 15 itself: Blakley '723 discloses a forced reset trigger for use in an AR-15 (limitation [15Pre]; Blakley '723 at 1:56–64, 3:46–50, 6:33–36, FIG. 5), and its conventional components satisfy limitations [15Pre] through [15e]. Specifically, Blakley '723 teaches: a hammer with a sear catch and hook, mounted in a fire control pocket and pivoting about a transverse axis (limitation [15a]; *id.* at FIG. 5, 2:23–26, 8:1–11); a trigger member with a sear,

mounted in a fire control pocket and pivoting on a transverse axis between set and released positions (limitation [15b]; *id.* at 5:13–27, 5:35–38, FIGS. 1-2, 5); sear and sear-catch engagement in set positions and disengagement in released positions (limitation [15c]; *id.* at 5:44–50, 7:4–12, FIG. 3A); a disconnector having a hook for engaging the hammer and pivoting on the transverse trigger member axis (limitation [15d]; *id.* at FIGS. 1, 2, 5); and a cam with a cam lobe, movably mounted between a first position in which it does not force a trigger reset and a second position in which it does (limitation [15e]; *id.* at 7:19–38, 10:34–46, FIGS. 2, 3A). Full charting appears in the Cook Declaration. Ex. G at § 12.1.5; Ex. G-1.

The FRT-15-3MD fills in the remaining limitations [15f] and [15g].

**[15f]**: The FRT-15-3MD discloses all elements of the '247's semiautomatic mode limitation. '247 Patent at 14:54-63. For example, it is well-known to a POSITA and inherent in FRT-15-3MD that in semi-automatic mode, after a round is fired, the bolt carrier moves rearward, striking the hammer and causing it to pivot back and latch on the disconnector hook. https://www.youtube.com/watch?v=Kj2S8gfTWew (available via the Wayback Machine at https://web.archive.org/web/20260212143437/https://www.youtube.com/watch?v=Kj2S8gfTWew (Demonstrating how to convert a standard 2-position selector switch into a 3-position selector switch for use with an FRT, thus enabling standard semiautomatic functionality as well as forced reset functionality)); https://www.youtube.com/watch?v=00mQ2mfjqfU (Demonstrating how a 3-position selector switch works in conjunction with an FRT, including standard semiautomatic functionality as well as forced reset functionality); https://www.youtube.com/watch?v=PSvjkaUGJ3Q (Demonstrating the installation of a 3-position

selector in an FRT) (the "FRT YouTube Videos").[2] As the bolt carrier continues rearward, it strikes the cam, which is rotated rearward; however, because the disconnector is engaged, the trigger cannot reset. *Id.* As the bolt carrier reverses direction and moves forward, it again strikes the cam resetting it back to its original position. *Id.* The bolt carrier moves into battery. *Id.* The shooter must release the trigger to free the hammer from the disconnector, but before the hammer can fall, it resets itself when the hammer sear catch mates with the sear on the trigger. *Id.*

Thus, combining Blakley '723 with FRT-15-3MD would have resulted in an FRT which, when operating in semi-auto mode, would have resulted in rearward movement of the bolt carrier after firing a round, which would cause rearward pivoting of the hammer, followed by rearward pivoting of the cam from the first position to the second position. The cam lobe would force the trigger member towards the set position; but prior to reaching the set position, the disconnector hook would catch the hammer hook. As the bolt carrier reversed direction and moved forward, it would strike the cam, causing it to pivot back to the first position. At that time, the shooter would need to manually release the trigger, thus freeing the hammer from the disconnector and allowing the hammer and trigger member to pivot back to their set positions to fire another round.

**[15g]**: Blakley '723 and the FRT-15-3MD collectively disclose all elements of the '247's forced reset mode limitation. '247 Patent at 14:64-15:3. For example, in FRT mode, Blakley '723 teaches that, after the trigger is pulled (FIG. 1), the bolt carrier 20 moves rearward, striking the face 56 of the hammer, causing it to pivot rearward (FIG. 2). Blakley '723 at 8:12–19, FIGS. 1-2. The disconnector catches the hammer briefly because it is not disabled. As bolt carrier 20 continues rearward, it strikes the forward face of the cam 66, causing it to pivot from a first position (shown

---

[2] Further, all videos were published before the '247 Patent's claimed priority date, as can be seen in their respective video description boxes once expanded (June 5, June 29, and August 1 of 2022).

in FIG. 1) to a second position (shown in FIG. 2). *Id.* As the cam 66 rotates, the cam lobe 69 pushes down on trigger extender 90, causing the trigger member 22/90 to reset. *Id.* Once the bolt carrier 20 reverses directions and moves forward, it strikes the rearward surface of the cam 66, causing it to pivot back to its first position (FIG. 3A), allowing another trigger pull. *Id.* at 8:20–26, FIG. 3A. Because the disconnector catches the hammer, Blakley '723 does not disclose a "safety selector preventing said disconnector hook from catching said hammer hook."  As discussed above (*see supra* [15f]), combining Blakley '723 with FRT-15-3MD would meet this element. In FRT mode, a narrow semi-circular portion of the FRT-15-3MD safety selector allows the tail portion of the trigger member to rotate, thus allowing the trigger to be pulled. *See* FRT YouTube Videos. However, the narrow portion contacts the tail of the disconnector, which is sticking out of the housing, thus preventing the disconnector hook from engaging the hammer hook. *Id.*

Thus, combining the FRT of Blakley '723 with a three-position selector switch using the teachings of FRT-15-3MD, would have resulted in the disconnector being disabled in FRT mode, so that the hammer would not engage the disconnector when it is struck by the bolt carrier. Instead, the cam would serve the role of the disconnector holding the hammer back until the bolt carrier moved forward far enough to strike the cam again, thus, releasing the hammer.

c.     **Claim 15 of the '247 Patent is Unenforceable due to Rare Breed's Inequitable Conduct**

Claim 15 is also unenforceable due to inequitable conduct.  Plaintiffs withheld FRT-15-3MD from the Patent Office, which, for the reasons above, invalidates the claim. Inequitable conduct requires clear and convincing evidence that the applicant misrepresented or omitted material information with the specific intent to deceive the PTO. *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1287 (Fed. Cir. 2011) (en banc). For a nondisclosure theory, the accused infringer must show that the applicant knew of the reference, knew it was material, and deliberately

decided to withhold it. *Id.* at 1290. Intent may be inferred from circumstantial evidence so long as deceptive intent is "the single most reasonable inference able to be drawn from the evidence." *Id.* The record at least raises a substantial question as to enforceability.

The Examiner allowed the '247 Patent on the first action after identifying Blakley '723 as the closest prior art and expressly finding that Blakley lacked: (1) a three-position selector with safe, standard semi-automatic, and forced-reset semi-automatic positions; (2) standard semi-automatic operation in which the disconnector catches the hammer and the user must manually release the trigger; and (3) forced-reset operation in which the selector prevents the disconnector from catching the hammer. Ex. K ('247 File History) at 9 (Notice of Allowance). Plaintiffs submitted to the Patent Office 148 references (Ex. K at 12-28 (Applicant's Information Disclosure Statement)), but did not disclose the FRT-15-3MD—even though Plaintiff knew of it. *See generally Rare Breed Triggers, LLC et al v. Strbac*, No. 1-22-cv-00280 (N.D. Ohio 2022), Dkt. No. 1 (alleging infringement of FRT-15-3MD). The Cook Declaration confirms that the omitted FRT-15-3MD embodied the exact three-position selector and dual-mode operation the Examiner found absent from Blakley. Ex. G at §§ 12.2.2.2-3.

### i.    The Record Supports a Specific Intent to Deceive the PTO

The record does not permit a plausible innocent explanation. Plaintiffs knew how to disclose prior art—it submitted a 148-reference IDS. Ex. K at 12-28 (Applicant's Information Disclosure Statement). Plaintiffs knew the Examiner allowed the claims because Blakley lacked the three limitations described above. Ex. K at 9 (Notice of Allowance). And Plaintiffs knew of and had access to FRT-15-3MD, which existed before the '247 priority date and which expert testimony shows discloses those same limitations. *See* Ex. G at §§ 12.1.2, 12.1.5; *see generally* Ex. *Rare Breed Triggers, LLC et al v. Strbac*, No. 1-22-cv-00280 (N.D. Ohio 2022), Dkt. 1.

(alleging infringement of FRT-15-3MD). The most reasonable inference is that Plaintiff used the IDS to appear forthcoming while shielding the Examiner from the substance of the FRT-15-3MD. Plaintiff's specific intent to deceive follows from its knowledge and the materiality of the omitted information.

### ii.    The Omitted Tommy Trigger Device was But-For Material

The FRT-15-3MD is material. Under *Therasense*, undisclosed prior art satisfies but-for materiality if "the PTO would not have allowed a claim had it been aware of the undisclosed prior art." 649 F.3d at 1291. The Court applies the PTO's preponderance standard with the claims given their broadest reasonable construction. *Id.* at 1291-92. Here, the Examiner allowed the '247 claims solely because Blakley lacked the three-position selector and dual operating modes. Ex. K at 9 (Notice of Allowance). The FRT-15-3MD device included those same features. Exhibit G at §§ 12.2.2.2-3. Had the Examiner known of this device, the claims would not have been allowed.

### 3.  U.S. Patent No. 12,578,159

Plaintiff asserts claims 1, 3, 6-7, 9-11, and 14-17 of U.S. Patent No. 12,578,159 (the "'159 Patent"), which is a continuation of the '247 Patent ('159 Patent at INID 63) and shares the same specification (*see id.*; *compare* '247 Patent). As shown below, the Atrius FRS does not infringe, the claims are invalid as obvious, and the claims are unenforceable due to inequitable conduct.

### a.    The Atrius Forced Reset Selector Does Not Infringe the '159 Patent

The Atrius FRS does not infringe the asserted claims of the '159 Patent because, by Plaintiff's own assertion, the cam and selector are a singular composite structure, whereas the '159 Patent requires that they be distinct, separate elements.   Each independent claim of the '159 Patent separately requires a "cam" and a "safety selector." *E.g.*, '159 Patent, claim 1.   When a claim separately recites two distinct components, the law presumes that those components are separate structures or instrumentalities. *Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d

1249, 1254 (Fed. Cir. 2010).  The intrinsic record reinforces this presumption.  <u>First</u>, the cam and safety selector separately listed structures within each of the '159 Patent's independent claims. <u>Second</u>, the specification discloses them as separate parts.  Nothing in the intrinsic record treats these elements as being the same or otherwise being comingled into a singular composite structure. Far more critically, however, is the confirmation of separateness in the consistent depiction of the cam, 72, being a physically separate element from the safety selector, 110, as seen throughout the figures. '159 Patent at FIGS. 3-9D.  Accordingly, for the claims of the '159 Patent to read on the Atrius FRS, the FRS must possess a separate "cam" and "selector."

Here, Plaintiffs assert that the "cam" and "selector" are in a singular composite structure. *ABC IP, LLC et al v. Superior Firearms of Texas*, 2:26-cv-00058-ALM, Dkt. No. 38-6 at pp. 18-19 (depicting the cam as being a sub-component of the fire selector; picture on the left.). This is materially different from the separate "cam" and "selector" disclosed and claimed in the '159 Patent (picture on the right).




Consequently, for at least the above reasons, the Atrius FRS does not meet the limitations of the asserted claims of the '159 Patent, and therefore does not infringe.

b.      **The Claims of the '159 Patent are Invalid**

i.      **Independent Claims**

All asserted claims of the '159 Patent are invalid as obvious in view of the Blakley '723 and FRT-15-3MD references. Ex. G at §§ 12.3-12.3.6; Ex. G-2. Claim 15 of the '247 Patent is representative of the claims of the '159 Patent, as the '159 Patent is a continuation and claims the same subject matter.  For brevity, only limitations unique to the '159 independent claims are discussed below; full charting appears in the Cook Declaration. *Id.*

Claim 6 adds that "in the second position the cam prevents the trigger member from moving from the set position to the released position."[3] '159 Patent at 11:43-45. Blakley '723 teaches this: in its second position, the cam prevents actuation of the trigger such that it cannot disengage from the trigger sear, thereby locking the trigger in the set position. Blakley '723 at 10:34-11:5. Claim 6 also requires the cam to be moved to its first position upon forward travel of the bolt in forced-reset mode ('159 Patent at 11:60-61), which Blakley '723 discloses at 8:20–26, FIG. 3A (bolt carrier 20 reversing direction and striking the cam 66 back to its first position).

Claim 15 adds "a means for selecting between at least standard semiautomatic and forced reset semi-automatic modes." '159 Patent at 13:44-45. As a means-plus-function limitation subject to 35 U.S.C. § 112(f), it is restricted to the corresponding structure disclosed in the specification (a fire selector). *See generally* '159 Patent. As discussed above, combining Blakley '723 and FRT-15-3MD discloses a three-position fire selector enabling switching between forced reset and standard semiautomatic modes. *See supra* pp. 16-18 (discussion of limitations **[15f]** and **[15g]**).

Claim 17 adds two interconnected limitations: "a movable blocking means configured to selectively prevent the hammer sear catch surface from engaging with the sear in the set position"

---

[3] Claim 10 contains this same additional element. To prevent needless repetition, these additional elements unique to the '159 Patent will only be discussed the first time they appear.

and a second limitation providing that "if the cam moves in both modes, the difference in operation between modes is determined by movable selection of the blocking means, thereby selectively either permitting or preventing the hammer and trigger member sear engagement surfaces from engaging when the trigger member is biased by the cam." '159 Patent at 14:37-39, 57-62. The first is another means-plus-function limitation, in this case restricted to a disconnector—which Blakley discloses. *See supra* p. 15-16 (discussion of disconnector element). The second is satisfied because combining Blakley '723 with FRT-15-3MD results in a mechanism where the cam moves during cycling in both modes, but the user's positioning of the fire selector determines whether the disconnector engages the hammer (standard mode) or is prevented from doing so (forced reset mode). *See supra* pp. 16-18 (discussion of limitations **[15f]** and **[15g]**).

### ii.     Dependent Claims

Plaintiff asserts claims 3, 7, and 11, which merely add a spring that biases the trigger toward the set position. *See e.g.* '159 Patent at claim 3. Blakley '723 discloses a trigger disconnector spring, which couples the trigger and disconnector and biases the disconnector's hammer hook towards a forward position. Blakley '723 at 5:39–43, FIG. 1. By virtue of spring compression resulting in an equal force acting upon the trigger member, this spring also pushes the rear portion of the trigger member downward (ergo, towards the set position). *Id.*

Finally, Plaintiff asserts claim 9, which adds that the trigger member of claim 6 (from which it depends) pivots on a transverse trigger axis between set and released positions. '159 Patent at claim 9. This is, again, disclosed in Blakley '723 which teaches a trigger member 22/90 pivots on a pin 46, and thus, pivots on a transverse axis between set (FIG. 2) and released (FIG. 1) positions. Blakley '723 at 5:13–27, 5:35–38, FIGS. 1-2, 5.

### c.     The Claims of the '159 Patent are Unenforceable due to Rare Breed's Inequitable Conduct

The same inequitable conduct that applies to the '247 Patent also applies to the '159 Patent, as it is a continuation of the '247 Patent and enforcement of the latter bears an immediate and necessary relation to the misconduct in the prosecution of the '247 Patent. *Therasense*, 649 F.3d at 1288 ("[T]he taint of a finding of inequitable conduct can spread from a single patent to render unenforceable other related patents and applications in the same technology family.").

### 4. U.S. Patent No. 12,636,403

Plaintiff asserts claims 14, 15, 17, 29, 30, 32, 38, and 39 of U.S. Patent No. 12,636,403 (the "'403 Patent"). The Atrius FRS does not infringe, and these claims are invalid.

#### a. The Atrius Forced Reset Selector Does Not Infringe the '403 Patent

The Atrius FRS does not contain the claimed "trigger member" and "locking member."

##### i. The Atrius FRS Lacks a "Trigger Member"

The asserted claims recite a "trigger member," which is not an established term of art. As Mr. Cook explains, persons of ordinary skill in the firearms field do not use "trigger member" to denote any conventional AR-pattern trigger; instead, the '403 patent employs the term to identify a particular trigger structure. Ex. G § 11.4.4.

When construing a term, the specification "is always highly relevant ... [and] is the single best guide to the meaning of a disputed term." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (en banc) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). Indeed, "[t]he only meaning that matters in claim construction is the meaning in the context of the patent." *Trustees of Columbia University v. Symantec Corp.*, 811 F.3d 1359, 1363 (Fed. Cir. 2016); *Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295, 1300 (Fed. Cir. 2004) (construing terms "only as broadly as provided for by the patent itself").

Here, the specification defines "trigger member" in a specific way: it is the configured trigger structure through which the patent's reset operation is carried out, not any generic AR-

pattern trigger. The specification describes trigger member 38 as having a convex contact surface 58 that cooperates with the hammer's concave surface 51, and a further contact surface 69 through which the locking member acts. '403 Patent at 8:10–22, FIG. 3. The disclosed reset is accomplished through that configured structure: during cycling, "surface 51 contacts surface 58 of trigger member 38 forcing trigger member 38 to pivot" to its set position. *Id.* at 9:54–57, FIGS. 8C, 9C. The record thus uses "trigger member" to denote the structure that participates in the disclosed forced-reset operation.

The Atrius FRS, in contrast, supplies a conventional trigger reset through annular rotation of the selector-bar/safety-selector assembly, not the configured trigger structure the '403 Patent describes. Ex. G § 11.4.4.2. Because the claimed "trigger member" appears in every asserted claim, its absence in the FRS defeats Plaintiff's infringement showing as to all of claims 14, 15, 17, 29, 30, 32, 38, and 39. Further, Plaintiff cannot avoid this result by reducing "trigger member" to any AR-15 trigger component because that ignores the structural definition in the specification. Consequently, for at least the above reasons, the Atrius FRS does not satisfy the "trigger member" limitation common to all asserted claims and, therefore, does not infringe.

### ii.    The Atrius FRS Lacks a "Locking Member"

Claims 14, 15, 17, 29, 30, and 32 additionally require a "locking member" that "mechanically blocks the trigger member from moving to the released position." '403 Patent at claims 14, 17, 32. The specification defines that limitation as a discrete structure—locking member 72—whose contact surface 80 bears against surface 69 of the configured trigger member to hold it in its set position and preclude hammer follow as the bolt returns to battery. '403 Patent at 8:33–49, Fig. 3. The Atrius FRS has no such member: it works with a conventional mil-spec trigger that lacks surface 69, and Plaintiffs cannot identify any FRS structure that blocks the claimed trigger

member without collapsing the separately recited "locking member" and "safety selector" into the single annular selector-bar structure. Ex. G § 11.4.6; *Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1254 (Fed. Cir. 2010). Claim 15 depends from claim 14, and claims 29 and 30 depend from claim 17, so each fails for the same reason.

### b. The Claims of the '403 Patent are Invalid

#### i. The Asserted Claims of the '403 Patent are Invalid Under 35 U.S.C. § 112

Plaintiffs have, for infringement, stretched the claims beyond their support in the specification—raising substantial questions of invalidity under the written-description and enablement requirements of 35 U.S.C. § 112(a). This defeats Plaintiffs' Motion.

The specification must describe and enable "the full scope of the claimed invention," *Liebel-Flarsheim Co. v. Medrad, Inc.*, 481 F.3d 1371, 1379–80 (Fed. Cir. 2007), and must show that the inventor possessed what is claimed, *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc). It does neither here.

The '403 Patent discloses one trigger member and one means of forcing it to reset. Trigger member 38 has a convex contact surface 58 that "interacts with concave surface 51 on hammer 36" and a further contact surface 69; the sole disclosed reset occurs when, during cycling, "surface 51 contacts surface 58 of trigger member 38 forcing trigger member 38 to pivot" to its set position. '403 Patent at 8:19–22, 9:54–57, Figs. 3, 8C, 9C. The specification likewise treats the locking member as integral to forced-reset operation: because the disconnector is "disabled" in forced-reset mode, *id.* at 9:35–39, Figs. 6A–6B, the locking member is the only disclosed structure that holds the trigger member and "preclud[es] early hammer release or 'hammer follow' ... as the bolt carrier assembly 92 is returning to battery," *id.* at 10:32–38, Figs. 9C–9D. Ex. G § 12.5.2.

Claims 38 and 39—the broad, later-added claims—are not supported by that disclosure.

Claim 39 recites that "the trigger member is forced to move to a full reset position," claiming a result without any means of achieving it, while the specification discloses only the single hammer-driven mechanism and never uses the phrase "full reset position"; that the companion claim 40 recites the mechanism expressly ("the hammer contacts the trigger member and forces the trigger member to move to a full reset position") confirms the omission. '403 Patent at claims 39, 40. A patentee may not claim a result while disclosing only one means of accomplishing it. *O'Reilly v. Morse, 56 U.S. 62*, 112–13 (1853); *The Incandescent Lamp Patent*, 159 U.S. 465, 472–77 (1895); *Liebel-Flarsheim*, 481 F.3d at 1379–80; *Auto. Techs. Int'l, Inc. v. BMW of N. Am., Inc.*, 501 F.3d 1274, 1282–85 (Fed. Cir. 2007). Claims 38 and 39 separately omit the locking member that independent claims 14, 17, and 32 require and that the specification describes as necessary to safe forced-reset operation—indeed, the very structure shown above to be absent from the accused Atrius FRS. A claim broadened to drop a structure the specification treats as essential does not satisfy § 112(a), because the inventor has not shown possession of, and the disclosure does not enable, the structure-less invention claimed. *Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473, 1479–80 (Fed. Cir. 1998); *ICU Med., Inc. v. Alaris Med. Sys., Inc.*, 558 F.3d 1368, 1377–78 (Fed. Cir. 2009); *Ariad*, 598 F.3d at 1351; Ex. G §§ 12.5.2.3–4.

The remaining asserted claims fail under the same construction Plaintiffs assert for infringement. Each asserted claim recites a "trigger member," and the specification describes and enables only the configured trigger member 38. For infringement, Plaintiffs construe "trigger member" broadly enough to capture structures the inventor never described possessing and never taught how to make or use in the claimed mechanism—rendering the claims invalid. This creates a substantial question on the merits however the limitation is construed: read narrowly, the FRS does not infringe; read broadly enough to reach the FRS, the asserted claims are invalid. Plaintiff

therefore cannot establish a likelihood of success on the merits as to the '403 Patent.

### ii. The '403 Patent Claims are Invalid as Obvious Over Stoner '555 in View of Rounds '223

The asserted claims are also invalid as obvious U.S. Patent No. 3,045,555 ("Stoner '555") and U.S. Patent No. 10,514,223 ("Rounds '223")—both Section 102(a)(1) prior art—together disclose every limitation of the asserted claims. *See* Ex. G §§ 12.5.3, 12.5.5; Ex. 4 (charts incorporated by reference). A POSITA would be motivated to combine Stoner '555 and Rounds '223, and that combination shows that the claims of the '403 patent are obvious.

Both references address the same problem on the same platform: managing hammer and trigger reset in a standard AR/M16 fire-control pocket to increase the rate of semi-automatic fire. Ex. G §§ 12.5.6, 12.5.9. Rounds recognizes that "shooters desire to increase the rate of semiautomatic fire," echoing the '403 specification. Rounds is a forced reset trigger that is single-mode, with only a safe/fire selector—though its specification expressly invites combination with select-fire architecture. Ex. G §§ 12.5.6, 12.5.6.1. A POSITA seeking safe, standard semi-automatic, and forced-reset operation would turn to Stoner—the canonical selectable AR/M16 group—whose rotatable control member sets "safety, semi-automatic or automatic condition" and, in its third position, disables the disconnector. Ex. G §§ 12.5.7, 12.5.8. A POSITA would use that architecture to toggle Rounds' forced-reset feature on and off, retaining Rounds' anti-hammer-follow locking bar (not Stoner's automatic sear) so the third mode stays semi-automatic. Ex. G § 12.5.11; *KSR*, 550 U.S. at 415–21.

Every component is a standard AR/M16 part on transverse pivot pins, and each interface—hammer/disconnector, selector-cam/disconnector, and bolt-carrier/locking-bar—was already individually known. The combination thus uses known elements for their established functions to yield the predictable result of selectable standard-semi/forced-reset operation. Ex. G § 12.5.11.

As the charts show (Ex. 4), Rounds discloses the trigger member "forced to the set position" by the cycling hammer and the spring-biased locking member blocking the trigger until substantially in-battery, without reducing pressure on the trigger member, while Stoner discloses the hammer hook, the disconnector and its hook, the standard semi-automatic mode, and the three-position, disconnector-disabling selector—covering claims 14, 17, 32, 38, and 39. Ex. G § 12.5.5; Ex. 4. Stoner's nomenclature maps directly onto the claims: its "intermediate sear" (with hook 74) is the claimed "disconnector"/"disconnector hook," its "intermediate sear abutment 76" the claimed "hammer hook," and its "sear abutment 64" the claimed "hammer sear catch." Ex. G §§ 7.1.1, 12.5.10.

This holds under the only construction reaching the accused product. Rare Breed seeks "plain and ordinary meaning," which must govern validity and infringement alike, and under that reading the claims read onto Stoner in view of Rounds; under Atrius's narrower construction they are not infringed but remain obvious. Either way, Rare Breed cannot prevail. *Amazon.com*, 239 F.3d at 1351.

Claims 15 and 29 add only a selector choosing between the two modes—Stoner's control member 120. Claim 30 adds that the selector is "separate from the locking member"; in the combination, Stoner's selector cam and Rounds' locking bar are necessarily distinct parts on different pivots, consistent with the separateness construction applied above. *Becton, Dickinson & Co.*, 616 F.3d at 1254.

Though unnecessary to satisfy any limitation, the TAC-CON 3MR—sold and ATF-approved by 2014—confirms this design path was commercially implemented well before the priority date: a drop-in, three-position M16-style selector whose third position approaches "full-auto rates" while still requiring a trigger pull per shot. *See* Ex. R; Ex. S.

---

█████████

### 5.  U.S. Patent No. 12,031,784

Plaintiff asserts claims 1, 3, and 4 of U.S. Patent No. 12,031,784 (the "'784 Patent").[4] The Atrius FRS does not infringe, and the claims are invalid.

### a.    The Atrius Forced Reset Selector Does Not Infringe the '784 Patent

The Atrius FRS does not infringe the '784 Patent because (1) it does not contain the claimed "locking member" and (2) even if it does, the alleged locking member is not movable between a first locked position and a second unrestricted position.

<u>First</u>, the Atrius FRS does not contain the claimed "locking member" but rather consists of a lever-cam combined with a selector lever. Ex. G at §§ 9.3, 11.3.3, 11.3.4, 11.3.5, 11.3.6. Plaintiff alleges that the Atrius FRS contains a "locking member" consisting of an "upwardly extending deflectable portion" (the lever-cam) and a "body portion" (the selector lever). Dkt. 8-10 at 13. However, the Atrius FRS does not contain a locking member at all. Ex. G at §§ 11.3.6. Rather, the Atrius FRS has a lever-cam which performs a distinct functionality from a "locking member." *Id.* at 11.3.3-4. The purpose of a lever-cam is to interface with the trigger, forcing the trigger to "reset" while the purpose of a "locking member", as claimed by the '784 Patent, is to "lock[] a trigger member against pulling movement." Ex. G at §§ 11.3.3-4; '784 Pat. at 5:14-17. Further, contrary to Plaintiff's allegation, the '784 Patent does not contemplate a selector lever as the required "body portion" of the "locking member." Ex. G at 11.3.6. This is because the claimed "body portion" actively interfaces with the "trigger member" to lock the trigger member from pulling, something the Atrius FRS's selector lever does not do. *See* '784 Pat. at 3:61-4:7, FIG. 5; *see also* Ex. G at §§

---

[4] While Plaintiff asserts claim 3 of the '784 Patent in their Consolidated Motion for Preliminary Injunction, neither Plaintiff or their expert provide any evidence or analysis that the Atrius FRS infringes claim 3. As such, Plaintiff has failed to prove the Atrius FRS infringes, directly or indirectly, claim 3 of the '784 Patent. Regardless, as shown below, claim 3 is not infringed by the Atrius FRS or, in the alternative, is anticipated by Blakely '723.

11.3.3-6. As such, the Atrius FRS does not contain the required "locking member."

Second, even if the Atrius FRS's lever-cam and selector lever combination comprises a "locking member", the lever-cam and selector lever do not "pivot as a whole unit." Ex. G at § 11.3.7. Claim 1 requires two distinct movements caused by the bolt carrier: (1) the "locking member" moving "from the first position to the second position" (when the bolt carrier is moving from rear to front) and (2) the "upwardly extending deflectable portion that is separately movable relative to the body portion between an extended position and a deflected position" (when the bolt carrier is moving from front to rear). '784 Pat. at 5:12-6:7; Ex. G at § 11.3.8. In the Atrius FRS, only the lever-cam pivots from interfacing with the bolt carrier, the selector lever is held in place by the detent pin during operation. Ex. G at § 11.3.7.1. As such, Plaintiff points to only the movement of the lever-cam to satisfy both claimed movements. Dkt. 8-10 at 11-12, 17-18. However, the specification makes it clear: the "locking member" is to "pivot as a whole unit." '784 Pat. at 3:30-36; Ex. G at §§ 11.3.5.1-4. Thus, the same movement of the lever-cam cannot satisfy both movements required by claim 1.

The dependent claims fare no better. Claim 3 requires that "the locking member body portion pivots between the first and second positions," but the detent pin holds the safety selector in place during operation. Ex. G at § 11.3.9.1. Claim 4 depends from claim 1 and fails for the same reasons claim 1 is not infringed. Ex. G at § 11.3.9.2.

### b.       The Claims of the '784 Patent are Invalid

#### i.       Independent Claims

Applying Plaintiffs' infringement theory, the claims are invalid under Blakley '723. *See generally* Ex. G at § 12.4.

[1Pre]: To the extent that the preamble is held to be limiting, Blakley '723 discloses "[i]n

---

a forced res[e]t trigger mechanism, an extended trigger member locking device." For example, Blakley '723 pertains to a FRT mechanism for use in a semi-automatic firearm. Blakley '723 at 3:46–50, 6:33–36, FIG. 5; Ex. G-3 at 1-2. Further, Blakely '723 discloses an extended trigger member locking device. Ex. J at 2:49–3:20, FIG. 5; Ex. G-3 at 2-3.

[1a]: Blakely '723 discloses "a locking member that is movable between a first position in which it locks a trigger member against pulling movement." For example, when applying the claims in the same manner that Plaintiff applies the claims for infringement purposes, Blakely '723 discloses "a cam body subassembly 62 which comprises a cam body housing 64, a cam 66, and a cam mounting pin 68" and "a safety selector 82" which make up the "selector-cam." Ex. J at 5:60–62, 6:15–21; Ex. G-3 at 4-7. The "selector-cam" is an example of a "locking member" which, in a first position, locks a trigger member against pulling movement. Ex. J at 7:54–64, 11:11–25, FIG. 2; Ex. G-3 at 4-7.

[1b]: Blakely '723 discloses "a second position where it does not restrict movement of the trigger member." For example, as depicted in Figure 1, the "selector-cam" portion is moved into a second position where the trigger member is free to move. Ex. J at 8:20–26, FIG. 1; Ex. G-3 at 7-8.

[1c]: Blakely '723 discloses "the locking member configured to be movably supported by a frame." For example, Blakely '723 discloses that the cam body subassembly 62 is supported by the receiver of the firearm. Ex. J at 5:60–6:1; Ex. G-3 at 8-10. Further, the safety selector 82 is mated and received by the receiver safety aperture. Ex. J at 6:19–20; Ex. G-3 at 8-10. As such, the "selector-cam" portion is movably supported by a frame. Ex. G-3 at 8-10.

[1d]: Blakely '723 discloses "including a generally upward extension portion configured to make actuating contact with a surface of a bolt carrier." For example, as depicted in Figure 2,

the cam 66 is configured upwardly to make actuating contact with the surface of the bolt carrier. Ex. J at 10:38–46, FIG. 2; Ex. G-3 at 10-12. When the bolt carrier actuates rearward, the cam 66 is struck and hinged to the rear. *See id.*

[1e]: Blakely '723 discloses "such actuating contact causing the locking member to move from the first position to the second position." For example, Figures 2A and 3A depict the actuating contact from the bolt carrier with the cam 66 causing the "selector-cam" to move from the first position where the trigger member is locked from moving to the second position where the "selector-cam" does not restrict the movement of the trigger member. Ex. J at FIGS. 2A, 3A; Ex. G-3 at 12-15.

[1f]: Blakely '723 discloses "the locking member having a body portion that is movably supported." For example, the "selector-cam" has a safety selector 82 which is movably supported by the receiver of the firearm so a user may select which fire mode to use. Ex. J at 6:15–21, FIG. 5; Ex. G-3 at 15-16.

[1g]: Blakely '723 discloses "an upwardly extending deflectable portion that is separately movable relative to the body portion between an extended position and a deflected position." For example, the cam 66 is separately movable relative to the safety selector 82 as depicted in Figures 3A and 2A. Ex. J at 5:60–6:21, 10:38–46, FIGS. 2A, 3A; Ex. G at 16-19. Figure 3A depicts an extended position while Figure 2A depicts a deflected position. Ex. J at FIGS. 2A, 3A; Ex. G-3 at 16-19.

### ii.    Dependent Claims

Further, Plaintiff asserts dependent claims 3 and 4. While Plaintiff does not provide any evidence of infringement of claim 3 against the Atrius FRS, if the claim language is interpreted consistently with Mr. Luettke's declaration, claim 3 is also anticipated by Blakely '723. Ex. G at

§ 12.4.

[3]: Blakely '723 discloses "[t]he device of claim 1, wherein the locking member body portion pivots between the first and second positions." For example, it is well known to a POSITA in the field of firearms that the safety selector 82 is movable between a first, "safe", position and a second, "fire", position. *See* Ex. J at 6:15–21; Ex. G-3 at 20-21.

[4]: Blakely '723 discloses "[t]he device of claim 1, wherein the locking member deflectable portion pivots relative to the body portion." For example, the cam 66 pivots more than 45 degrees relative to the safety selector 82 when making actuating contact with the bolt carrier as depicted in Figure 2A. Ex. J at 10:28–46, FIG. 2A; Ex. G-3 at 21-23.

Accordingly, Plaintiffs have not carried their burden to show a likelihood of success on the merits. They have not established that they are likely to prove infringement of any valid and enforceable asserted claim. Because a movant must establish both a likelihood of success and likely irreparable harm, failure on either element requires denial of preliminary relief. *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350–51 (Fed. Cir. 2001). Plaintiffs have failed to make either showing. The balance of hardships, discussed below, independently confirms that preliminary relief is unwarranted.

## D.  The Balance of Hardships Favors the Atrius Customer Defendants.

The balance of hardships requires Plaintiffs to show that the harm they would suffer without an injunction outweighs the harm an injunction would inflict on the non-movant. *eBay*, 547 U.S. at 391; *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1051 (5th Cir. 1997). It does not. Plaintiffs' asserted injury is economic, compensable, and—for the reasons shown above—unproven as to these Defendants, while the Atrius Customer Defendants face concrete compliance burdens, supplier disruption, customer confusion, lost sales opportunities, and

reputational stigma from a public injunction. Ex. A ¶¶ 20–21; Ex. B ¶ 17; Ex. C ¶¶ 15–17; Ex. D ¶¶ 15–16. *Peak Tactical* held as much: absent a showing of irreparable harm, the balance favored the defendant facing commercial restraint. 2026 WL 713000, at *13–14. That these retailers sell other products does not make an injunction costless. Their declarations identify customer, supplier, operational, and reputational harms extending well beyond the lost FRS margin. Ex. A ¶¶ 8–11, 20–21; Ex. B ¶¶ 5–9, 17; Ex. C ¶¶ 5–9, 15–17; Ex. D ¶¶ 5–9, 15–16.

Nor are those harms self-inflicted. Plaintiffs' contrary authorities discount hardship only where a defendant "elect[ed] to build a business on a product found to infringe." *Windsurfing Int'l v. AMF, Inc.*, 782 F.2d 995, 1003 n.12 (Fed. Cir. 1986); *see also Smith Int'l, Inc. v. Hughes Tool Co.*, 718 F.2d 1573, 1581 (Fed. Cir. 1983); *Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 931 (Fed. Cir. 2012). Plaintiffs concede the opposite here, grouping the Atrius Customer Defendants among the "diversified" sellers that would lose only "a small slice" of their product lines. Mot. 38. A diversified retailer's incidental resale of a standalone component is not the infringement-built enterprise that those cases address, so the equitable predicate for discounting Defendants' hardship is absent.

The notice record confirms the point. No Atrius Customer Defendant received a pre-suit cease-and-desist letter or other direct patent assertion concerning the Atrius FRS. Ex. A ¶ 22; Ex. B ¶ 18; Ex. C ¶ 18; Ex. D ¶ 17. Service of a complaint supplies litigation notice; it does not establish infringement or strip these Defendants of equitable weight. And the *Hoffman* order addressed only the Super Safety and certain patents; it adjudicated neither the Atrius FRS nor any conduct by these retailers. PistolCap and ProSource illustrate this inequity. PistolCap conducted no Atrius FRS transaction, and ProSource completed no customer sale. Yet, a uniform injunction would brand both with the reputational and compliance consequences of an adjudicated infringer

while restraining no actual conduct. Ex. A ¶¶ 5–6, 17–18; Ex. B ¶¶ 14–17.

**E. The Public Interest and Tailoring Requirements Do Not Support Plaintiffs' Requested Relief.**

**1. The Public Interest Does Not Favor the Requested Injunction.**

The public's interest in enforcing valid patents does not, by itself, support an injunction; after *eBay*, this factor turns on the case-specific equities, not on a categorical preference for patentees. 547 U.S. at 391–94. Plaintiffs cannot convert the general interest in patent enforcement into a thumb on the scale for broad preliminary relief while infringement, validity, causal nexus, irreparable harm, and the proper scope of any order all remain disputed. Where those questions are unresolved, the public interest does not favor enjoining lawful retail commerce in a commercially supplied product. Plaintiffs' reliance on the DOJ settlement, which only applies to the '223 Patent that is not at issue in this case with respect to the Atrius FRS or Super Super Safety, and ATF materials does not fill that gap. The settlement provision obligating Plaintiffs to enforce their patents against products that they have a good-faith basis to believe infringe does not establish infringement, irreparable harm, a causal nexus, or appropriate relief against these retailers—it is Plaintiffs' obligation, not proof of Defendants' liability. Mot. 5; Dkt. 7-7. And the ATF Statement of Interest in *Hoffman* spoke only to the public interest; it took no position on the likelihood of success, irreparable harm, the adequacy of legal remedies, hardship, or whether preliminary relief should issue. *See* Dkt. 10–9.

*Peak Tactical* shows why the *Hoffman* public-interest rationale does not carry over. Hoffman involved the alleged public release of firearm designs and 3D-print files—raising the prospect of widespread copying, third-party manufacture, and uncontrolled downstream infringement. 2026 WL 713000, at *14–15. The Atrius Customer Defendants present none of that risk. They are downstream retailers of genuine, commercially supplied FRS units who are not

accused of releasing files, supplying manufacturing specifications, manufacturing products, or altering the device's internal operating mechanics. Ex. A ¶¶ 10, 12–16; Ex. B ¶¶ 8, 10–14; Ex. C ¶¶ 8, 10–14; Ex. D ¶¶ 8, 10–14; Ex. F ¶¶ 3–4.

Plaintiffs' lone "safety" example does not bridge that gap either. The "Blem packs" and no-warranty listings Plaintiffs cite are another seller's Super Safety products, not the genuine Atrius FRS these retailers sold. Mot. 39 & n.13. Plaintiffs identify no safety defect in the Atrius FRS itself—and the record affirmatively refutes one, because Atrius designed the FRS so that, even in forced-reset mode, the disconnector remains active and temporarily catches the hammer during cycling. Ex. F ¶¶ 5, 9–11. Generalized assertions about a different product thus cannot manufacture a public-safety interest in enjoining these retailers.

## 2. Any Injunction Must Be Narrowly Tailored and Defendant-Specific.

Any relief must be confined to defendants against whom Plaintiffs prove all four factors, the products actually accused, the claims asserted in an operative complaint against that defendant, and conduct in the record—not assertions still awaiting leave to amend. Mot. 4 n.4. The proposed order exceeds those limits. It reaches undefined "derivatives," "substantially similar" products, components, installation tools, and platform extensions, and binds parents, affiliates, subsidiaries, and common-control entities with no showing of participation—which Rule 65(d)(2) forbids. Dkt. 7-27 (Plfs' Proposed Order) ¶¶ 3–4, 14. It also commands status-altering measures— wholesale delisting, year-back counterparty notice, inventory segregation, and sworn compliance reports—that exceed the status quo and are disfavored absent a clear showing. *Id.* ¶¶ 15–16; *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976). These defects are particularly acute here. PistolCap conducted no FRS transaction, and ProSource completed no sale. Ex. A ¶¶ 5–6, 17–18; Ex. B ¶¶ 14–16. The rest sold only standalone units; they did not bundle, install, modify,

---

or assemble, so the order's design-file, manufacturing-specification, installation, and technical-support provisions cannot apply to them. Ex. A ¶¶ 14–16; Ex. C ¶¶ 12–14; Ex. D ¶¶ 12–14; Ex. F ¶¶ 3–4. At a minimum, any order must identify the covered products and acts with the specificity Rule 65(d)(1) requires. Fed. R. Civ. P. 65(d)(1); *Additive Controls & Measurement Sys., Inc. v. Flowdata, Inc.,* 96 F.3d 1390, 1394 (Fed. Cir. 1996).

## F.  Plaintiffs' No-Bond Request Should Be Rejected.

Rule 65(c) requires security in an amount the Court considers proper to cover costs and damages sustained by a party later found to have been wrongfully enjoined. Plaintiffs ask for "no security, or alternatively, nominal security." Mot. 40. That request is incompatible with their proposed order. Delisting, counterparty notice, inventory segregation, and sworn-compliance requirements create immediate compliance costs and customer, supplier, operational, and reputational consequences. Dkt. 7-27 ¶ 15–16; Ex. A ¶¶ 20–21; Ex. B ¶ 17; Ex. C ¶¶ 16–17; Ex. D ¶¶ 15–16. A nominal bond would improperly shift the risk of error from Plaintiffs to downstream retailers.

## III. CONCLUSION

Plaintiffs' Consolidated Motion for Preliminary Injunction should be denied as to the Atrius Customer Defendants. Plaintiffs have not shown a likelihood of success on the merits, likely irreparable harm caused by these Defendants, causal nexus, inadequacy of monetary damages, favorable equities, the public interest, or an appropriately tailored and secured injunction.

At minimum, any relief should be limited to specific defendants, products, patent claims, and conduct supported by defendant-specific proof; should exclude PistolCap and ProSource absent proof of actual or imminent accused conduct; should exclude non-Atrius and non-accused products, modified products, products from other suppliers, alleged counterfeits, and products or

claims not properly before the Court; and should require meaningful Rule 65(c) security.


Dated: June 26, 2026

/s/ Edward Chin
Robert Manley
Texas Bar No. 787955
Scott W. Hejny
Texas Bar No. 24038952
Christian Hurt
Texas Bar No. 24059987
Edward K. Chin
Texas State Bar No. 50511688
Alex Chern
Texas Bar No. 24109718
Brandon Merrill
Texas Bar No. 24144769
RManley@McKoolSmith.com
SHejny@McKoolSmith.com
CHurt@McKoolSmith.com
EChin@McKoolSmith.com
AChern@McKoolSmith.com
BMerrill@McKoolSmith.com
**MCKOOL SMITH, P.C.**
300 Crescent Court, Suite 1500
Dallas, TX 75201
Telephone: (214) 978-4000
Telecopier: (214) 978-4044

Adam V. Floyd
Texas Bar No. 00790699
AFloyd@FloydIP.com
**FLOYD IP**
3203 Bluffs Lane
Parker, Texas 75002
Tel: (512) 497-7500

Conor M. Civins
Texas Bar No. 24040693
Michael Chibib
Texas Bar No. 00793497
Christopher J. Mierzejewski
Texas Bar No. 2407270
Conor.Civins@Bracewell.com
Michael.Chibib@Bracewell.com
Chris.Mierzejewski@Bracewell.com

**BRACEWELL LLP**
111 Congress Ave., Suite 2300
Austin, TX 78701
Telephone: (512) 472-7800

**Counsel for Defendants PistolCap Limited Company, d/b/a Frisco Guns, and Mordekhai Harroch; Prosource Firearms, LLC; Mister Guns, LLC, Thomas Carter II, and Brandi Carter; and Superior Firearms of Texas, LLC**

## CERTIFICATE OF SERVICE

I certify that, because the Court's CM/ECF system and related services were unavailable during the Court-announced maintenance period beginning at 6:30 p.m. Central Time on June 26, 2026, counsel for Defendants served a true and correct copy of the foregoing document and its accompanying materials on all counsel of record for Plaintiffs by electronic mail on June 26, 2026. Service by electronic mail was completed upon sending pursuant to Local Rule CV-5(d). Defendants will file this document promptly upon restoration of the Court's CM/ECF system.

*/s/ Edward K. Chin*

## CERTIFICATE OF AUTHORIZATION TO FILE UNDER SEAL

I hereby certify that a motion to file documents under seal has been filed with the Court on June 26, 2026.

*/s/ Edward K. Chin*