██████████

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | |
|---|---|
| **In Re: Rare Breed Triggers Patent Litigation** | **4:26-MD-03176-ALM** |
| ABC IP, LLC, and RARE BREED TRIGGERS, INC., <br><br> *Plaintiffs,* <br><br> v. <br><br> MISTER GUNS, LLC, THOMAS CARTER II, and BRANDI CARTER, <br><br> *Defendants.* | Civil No. 2:26-CV-00056-ALM |
| ABC IP, LLC, and RARE BREED TRIGGERS, INC., <br><br> *Plaintiffs,* <br> v. <br> PISTOLCAP LIMITED COMPANY, d/b/a FRISCO GUNS, and MORDEKHAI HARROCH, <br><br> *Defendants.* | Civil No. 2:26-CV-00053-ALM |
| ABC IP, LLC, and RARE BREED TRIGGERS, INC., <br><br> *Plaintiffs,* <br> v. <br> PROSOURCE FIREARMS, LLC, <br><br> *Defendant.* | Civil No. 2:26-CV-00055-ALM |
| ABC IP, LLC, and RARE BREED TRIGGERS, INC., <br><br> *Plaintiffs,* <br> v. <br> SUPERIOR FIREARMS OF TEXAS, LLC, <br><br> *Defendant.* | Civil No. 2:26-CV-00058-ALM |

**DECLARATION OF PAUL C. BENOIT**

**TABLE OF CONTENTS**

I.   ASSIGNMENT ............................................................................................................... 1

II.   QUALIFICATIONS AND COMPENSATION.......................................................... 1

III.   INFORMATION REVIEWED ................................................................................... 2

IV.   ASSESSMENT OF THE EICHMANN DECLARATION......................................... 2

   a)   The Eichmann Declaration's assessment of the characteristics of the relevant market ..... 7

   b)   The possibility of lost market share and permanent market displacement ........................ 9

   c)   Lost Lead Time and Market Exclusivity ............................................................... 13

   d)   Distribution and Channel Disruption .................................................................. 15

   e)   Price Erosion and Reference Pricing Effects ..................................................... 17

   f)   Economic Effects of Market Confusion and Perceived Product Legitimacy .................... 21

   g)   Enforcement Signaling and Cascading Competitive Entry ............................................. 23

   h)   Asymmetric Economic Impact of an Injunction................................................. 24

   i)   Reputational Harm ................................................................................................ 25

   j)   Inadequacy of Monetary Damages....................................................................... 26

   k)   Materiality and Revenue Concentration .............................................................. 27

V.   CONCLUSION ........................................................................................................... 27

## I.    ASSIGNMENT

1.    I have been retained to review and offer my opinion regarding the findings contained in the Declaration of Richard J. Eichmann in Support of Plaintiffs' Consolidated Motion for Preliminary Injunction filed May 28, 2026 ("Eichmann Declaration") to the extent that they pertain to Mister Guns, LLC, Thomas Carter II, Brandi Carter, PistolCap Limited Company, Mordekhai Harroch, ProSource Firearms, LLC, and Superior Firearms of Texas, LLC (the "Atrius Customer Defendants"). I have also been asked to offer my opinion as to whether Plaintiffs can be adequately compensated through monetary damages in the event it is found that the Atrius Customer Defendants have infringed U.S. Patent No. 12,038,247 ("the '247 Patent"), U.S. Patent No. 12,031,784 ("the '784 Patent"), U.S. Patent No. 12,529,538 ("the '538 Patent"), U.S. Patent No. 12,578,159 ("the '159 Patent"), and U.S. Patent No. 12,636,403 ("the '403 Patent") (collectively, "Patents-in-Suit").[1] I understand that the products accused of infringing the Patents-in-Suit are the Atrius Forced Reset Selector ("Atrius Selector"), designed by Atrius Development Group Corporation, Inc. ("Atrius"), as well as the MARC Selector, Super Safety, and ARC-Fire Trigger ("ARC-Fire") products (collectively, the "Accused Products").[2]

## II.    QUALIFICATIONS AND COMPENSATION

2.    I am President and Founder of Nouvelle Analytics, LLC ("Nouvelle"), an independent financial advisory and business valuation firm specializing in evaluating intellectual property litigation claims, developing licensing strategies, performing business valuations, and providing forensic accounting services. I am a Certified Public Accountant and a Certified Fraud Examiner licensed to practice in Texas. A copy of my resume, including my current and past employment and professional affiliations, a listing of my publications during the last ten years, and a listing of cases in which I have provided trial or deposition testimony during the past four years, is included as Exhibit A to this declaration.

---

[1] Declaration of Brian Luettke in Support of Plaintiffs' Consolidated Motion for Preliminary Injunction, May 28, 2026, p.1.

[2] Declaration of Richard J. Eichmann in Support of Plaintiffs' Consolidated Motion for Preliminary Injunction, May 28, 2026, p.7.

3.    Nouvelle is being compensated at a rate of $550 per hour for my work performed in connection with this matter. My fees are not contingent upon the outcome of this litigation or the substance of my opinion.

## III.    INFORMATION REVIEWED

4.    In developing my opinions in this case, I and staff working under my direction and supervision have obtained information from documents produced in this matter and have performed independent research. The sources of information considered in forming my opinions are cited in Exhibit B to this declaration. Review and analysis of this information, together with my business experience, knowledge, education, and training, has formed the basis of my opinions.

## IV.    ASSESSMENT OF THE EICHMANN DECLARATION

5.    The Eichmann Declaration does not offer an opinion regarding the likelihood that Plaintiffs will suffer irreparable harm, but rather limits its stated opinion to a finding that "the alleged conduct <u>can</u> cause immediate, ongoing, and compounding economic harm."[3] (emphasis added) In fact, the Eichmann Declaration does not even seek to consider whether there is a likelihood that the Plaintiffs will suffer irreparable harm but only claims to "evaluate whether the alleged conduct [by the Defendants] is <u>capable</u> of causing immediate, ongoing, and irreparable economic harm" to Plaintiffs and whether an award of monetary damages would adequately remedy such harm.[4] (emphasis added) I understand that a preliminary injunction requires a showing of the <u>likelihood</u> of irreparable harm, not merely whether the alleged infringement was <u>capable</u> of causing irreparable harm.[5]

6.    I am informed that several remedies are available to plaintiffs once infringement has been established at trial. The Patent Act (35 U.S. Code §284) states that patent damages shall be "adequate to compensate for the infringement, but in no event less than a reasonable royalty

---

[3] Declaration of Richard J. Eichmann in Support of Plaintiffs' Consolidated Motion for Preliminary Injunction, May 28, 2026, p.36.
[4] Declaration of Richard J. Eichmann in Support of Plaintiffs' Consolidated Motion for Preliminary Injunction, May 28, 2026, p.8.
[5] *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008);
https://supreme.justia.com/cases/federal/us/555/7/.

for the use made of the invention by the infringer, together with interest and costs as fixed by the court."[6] In instances in which the patent holder and the alleged infringer competed for sales made by the defendant, lost profits damages (including price erosion) may be awarded at trial to provide adequate compensation for infringement.[7] Additionally, I am informed that a number of courts have awarded lost profits based on lost sales likely to occur after the infringement suit ends and before the patent expires.[8] In instances where the patent holder and the alleged infringer were not in competition for all of the defendant's sales, some combination of lost profits and reasonable royalty damages may be awarded to compensate for the infringement. Ultimately, upon a finding of infringement, plaintiffs are provided an opportunity to obtain a permanent injunction of the defendant's products by showing that irreparable harm would result without permanently enjoining such products from the market.

7.    Given that the remedies available to a plaintiff are intended to be "adequate to compensate for the infringement," I understand that "irreparable harm" refers to harm caused by the alleged infringement during the pre-trial period that cannot be adequately remedied by monetary damages — harm that is actual and imminent rather than remote or speculative, and that is attributable to the accused conduct rather than independent market factors. The Eichmann Declaration does not identify any such likely, noncompensable harm. It does not analyze whether any asserted economic effect would fall outside the available remedies under 35 U.S. Code §284, whether the effect could be measured with reasonable economic reliability at the time of trial, or whether it would persist after trial to a materially greater

---

[6] https://www.law.cornell.edu/uscode/text/35/284.

[7] *See, e.g., Scripto-Tokai Corp. v. Gillette Co.*, 788 F. Supp. 439, 444 (C.D. Cal. 1992). *See generally* Paul M. Janicke, *Contemporary Issues in Patent Damages,* 42 AM. U. L. REV. 691, 697-98 & nn.32-36 (1993) (identifying as additional grounds for awarding lost profits, patentee's sales of the invention not made at new, higher prices that the market could have sustained absent the infringement and "lost tag-along sales of unpatented products that would have flowed from sales of patented product). Lost profits entitle the patentee to recover its incremental profit, which is the patentee's price less its incremental costs, such as parts, labor, and promotional activities. *See Ristvedt-Johnson, Inc. v. Brandt, Inc.*, 805 F. Supp. 557, 564 (N.D. Ill. 1992) (Rader, Circuit Judge, Federal Circuit, sitting by designation).

[8] *See, e.g., Sun Prods. Group, Inc. v. B & E Sales Co.*, 700 F. Supp. 366, 386-87 (E.D. Mich. 1988); *BIC Leisure Prods. v. Windsurfing lnt'l, Inc.*, 687 F. Supp. 134, 137-38 (S.D.N.Y. 1988) (ruling that plaintiff may attempt to prove future losses for the purpose of awarding damages). Courts have also upheld the validity of future lost profits damages for events occurring after expiration of the patent, known as "accelerated reentry damages"; that is, damages to the patentee due to the infringer's ability to reenter the market after expiration of the patent in suit at a level accelerated by its earlier infringement. *See BIC,* 687 F. Supp. at 137-38 (holding that projected lost profits based on future competition is not impermissible infringement damages theory).

3

degree absent preliminary relief. Instead, the Eichmann Declaration primarily offers generalized descriptions of circumstances that may arise when a plaintiff in a differentiated niche market may have lost sales due to infringement by a competitor.

8.    Additionally, the Eichmann Declaration assumes without analysis that sales of the Accused Products resulted in lost sales of Plaintiffs' FRT® products. It does not analyze Plaintiffs' or the Atrius Customer Defendants' sales trends, whether the products compete in the same market segment, whether customers have preferences for the products' distinguishing characteristics, or marketing activities. It does not establish the degree to which, if any, sales of the Accused Products have resulted in Plaintiffs' lost sales or would be expected to result in Plaintiffs' lost sales during the pre-trial period. The likelihood of harm must first be established before it can be said to be irreparable or inadequately compensable through monetary damages. Counsel has informed me that to recover lost profits rather than royalties, a patent owner must prove a causal relationship between the infringement and its loss of profits. *BIC Leisure Prods., Inc. v. Windsurfing Int'l, Inc.*, 1 F.3d 1214, 1218 (Fed. Cir. 1993).

9.    The Eichmann Declaration fails to perform any analysis to determine whether Plaintiffs have experienced sales disruptions *at all*, much less because of the alleged infringing sales. It does not analyze Plaintiffs' actual sales volumes by distribution channel or geographic region on a weekly or monthly basis to determine any noticeable impact on sales growth. It makes no comparison between actual and projected sales on a weekly or monthly basis to determine whether the Atrius Customer Defendants' alleged infringement may have caused sales shortfalls. It does not analyze Plaintiffs' marketing efforts or expenditures, or whether there have been any changes in the efficiency of such efforts and expenditures.

10.    Additionally, the Eichmann Declaration fails to establish that the Accused Products are sold in the same market segment as Plaintiffs' FRT® products. As the Eichmann Declaration observes, Plaintiffs' FRT® products are typically priced at least 130.5% higher and as much as 462.5% higher than the Accused Products.[9] Such large price differences call into question whether the FRT® products and Accused Products compete in the same market segment. Counsel has informed me that established case law shows that substantial price differentials can indicate that products are sold in different market segments. For example, in the matter

---

[9] 130.5% = \$620 / \$269 - 1; 462.5% = \$450 / \$80 - 1.

4

of *BIC Leisure Products, Inc. v. Windsurfing International, Inc.*, the Federal Circuit determined that products with price differences of as little as 80% were sold into different market segments.[10] Economic research likewise recognizes that market segmentation may arise because "groups of customers differ in their willingness-to-pay … in systematic ways," such that products offered at materially different price points may serve distinct customer segments rather than competing as close substitutes.[11] Customers that are willing to purchase lower priced products may be unwilling to purchase higher priced products, particularly at the same volume at which they were willing to purchase the lower priced products. According to the Declaration of Lawrence DeMonico in Support of Plaintiffs' Motion for Preliminary Injunction ("DeMonico Declaration"), customers in the forced reset device market are price sensitive.[12] It is unreasonable to merely assume that the same customers who were willing to purchase the less expensive Accused Products would have been willing to purchase the same volume of FRT® products at prices as much as 462.5% higher.

11.    The Eichmann Declaration also fails to establish that customers who preferred the Accused Products would have been willing to purchase Plaintiff's FRT® products. I understand that use of the Accused Products does not require replacement of the AR-platform rifles' trigger, whereas use of Plaintiffs' FRT® products requires replacement of the trigger. FIGURE 1 below compares the Accused Products with the Plaintiffs' FRT-15L3 product.

**FIGURE 1**
**COMPARISON OF ACCUSED PRODUCTS TO PLAINTIFFS' FRT®**

| Atrius Selector | ARC-Fire | Super Safety | FRT-15L3™ |
| --- | --- | --- | --- |

---

[10] https://law.justia.com/cases/federal/appellate-courts/F3/1/1214/575074/.
[11] https://umbrex.com/resources/b2b-pricing-playbook/segmentation-and-tiered-pricing-matching-price-to-customer-segments/.
[12] Declaration of Lawrence Demonico in Support of Plaintiffs' Motion for Preliminary Injunction, May 28, 2026, p.19.

5

12. I understand that AR-15 rifle owners may select specific triggers based on personal preference, experience level, and shooting activity.[13] The Eichmann Declaration fails to consider that customers of the Accused Products may have preferences for their existing triggers, leading them to purchase the Accused Products rather than the FRT® products. Such preferences may prevent their purchase of the FRT® products even if the Accused Products were enjoined from the market.

13. I also understand that the Accused Products use a safety lever to reset the trigger. In contrast, Plaintiffs' FRT® products use the hammer's rearward motion to reset the trigger (FRT-15L3®) or a cam to reset and lock the trigger (FRT-15C3™).[14] According to the DeMonico Declaration, devices that use a cam to reset the trigger "produce a different feel for the shooter" than devices that use the hammer's rearward motion to reset the trigger.[15] The Eichmann Declaration fails to address whether such differences in use and feel of each device would have impacted substitutability.

14. Despite the lack of evidence of the extent, if any, to which the Atrius Customer Defendants' customers would have purchased Plaintiffs' FRT® products if the Accused Products were enjoined from the market, the Eichmann Declaration assumes various market dynamics that might result in lost sales by Plaintiffs. Specifically, the Eichmann Declaration considers the following generic circumstances that are untied to specific facts of the alleged infringement:

- Economic characteristics of the relevant market;
- The possibility of lost market share and permanent market displacement;
- The possibility of lost lead time and market exclusivity;
- The possibility of distribution and channel disruption;
- The possibility of price erosion and reference pricing effects;
- The economic effects of market confusion and perceived product legitimacy;
- The possibility of enforcement signaling and cascading competitive entry; and
- The possibility of reputational harm.

---

[13] https://triggertech.com/blogs/guides/the-ultimate-ar-15-trigger-selection-guide.
[14] Declaration of Lawrence Demonico in Support of Plaintiffs' Motion for Preliminary Injunction, May 28, 2026, p.6.
[15] Declaration of Lawrence Demonico in Support of Plaintiffs' Motion for Preliminary Injunction, May 28, 2026, p.6.

6

I address the Eichmann Declaration's observations regarding these possible market occurrences in the following sections.

### a) The Eichmann Declaration's assessment of the characteristics of the relevant market

15. The Eichmann Declaration defines Plaintiffs' FRT® products and the Accused Products as "durable or semi-durable" consumer firearm components associated with mechanically resetting trigger functionality for AR-pattern and related firearm platforms.[16] It also defines the relevant market as a "differentiated niche" market rather than a commodity market, noting that in differentiated niche markets, product substitution occurs over a short period of time.[17]

16. According to the Eichmann Declaration, early adoption patterns in differentiated niche markets "can" influence later purchasing behavior and competitive positioning as products "may" become more visible and familiar to the market.[18] Further, the Eichmann Declaration indicates that such increased visibility "can" influence future purchasing decisions and other market dynamics.[19] The Eichmann Declaration also indicates that early competitive displacement "may" persist because prior adoption patterns "can" continue to shape subsequent purchasing decisions.[20]

17. The Eichmann Declaration provides no discussion of how such early adoption and visibility during the pre-trial period would result in harm beyond what can be quantified as lost profits. For example, if sales of the Accused Products resulted in increased visibility, leading to additional sales, such volumes occurring during the pre-trial period would be considered in the lost profits analysis. Furthermore, the Eichmann Declaration provides no context for

---

[16] Declaration of Richard J. Eichmann in Support of Plaintiffs' Consolidated Motion for Preliminary Injunction, May 28, 2026, p.8.

[17] Declaration of Richard J. Eichmann in Support of Plaintiffs' Consolidated Motion for Preliminary Injunction, May 28, 2026, p.10.

[18] Declaration of Richard J. Eichmann in Support of Plaintiffs' Consolidated Motion for Preliminary Injunction, May 28, 2026, p.10.

[19] Declaration of Richard J. Eichmann in Support of Plaintiffs' Consolidated Motion for Preliminary Injunction, May 28, 2026, p.10.

[20] Declaration of Richard J. Eichmann in Support of Plaintiffs' Consolidated Motion for Preliminary Injunction, May 28, 2026, p.10.

7

whether such early adoption patterns are equally impactful on later purchasing behaviors and competitive positioning when products that enjoy such early adoption and visibility are subsequently removed from the market.

18.     The Eichmann Declaration offers no discussion of whether pre-trial sales of the Accused Products would increase or decrease demand for Plaintiffs' FRT® products in the post-trial period. The Eichmann Declaration implicitly assumes that Plaintiffs' FRT® products and the Accused Products are substitutes. It follows that demand driven by marketing and exposure of the Accused Products during the pre-trial period would result in increased demand for Plaintiffs' FRT® products if the Accused Products are found to infringe at trial and are permanently enjoined. Accordingly, the early adoption and exposure concepts espoused in the Eichmann Declaration do not support irreparable harm during either the pre-trial period or post-trial period.

19.     The Eichmann Declaration continues its definition of the relevant market by observing that competitive position in the market is not only shaped by price but also by non-price factors such as product design, perceived reliability, brand identity, and access to distribution channels, noting that early displacement "can" lead to durable changes in customer behavior and supplier relationships that do not readily reverse, leading to long-term erosion of market position. However, the Eichmann Declaration provides no analysis of whether the non-price factors favor Plaintiffs' FRT® products or the Accused Products. It does not assess customer preferences for the product designs, the perceived reliability of the products, the relative strength of each brand, or the extent to which sales of the Accused Products have influenced or will influence distribution channels that would be otherwise available to Plaintiffs during the preliminary injunction period.[21] Additionally, the Eichmann Declaration provides no discussion of how such non-price factors would result in harm during the pre-trial period beyond what is quantifiable as lost profits or whether the impact of the durability of such non-price factors on the "long-term erosion of market position" is equally impactful when products benefiting from early displacement are subsequently removed from the market. As such, the market influences described by the Eichmann Declaration do not support the finding of irreparable harm that would result if the Accused Products are not enjoined from

---

[21] I understand that the Defendants are retailers and are thus part of the distribution channel. The Eichmann Declaration fails to provide a discussion of the likelihood that a preliminary injunction would result in such retailers offering Plaintiffs' FRT® products.

8

the market.

**b) <u>The possibility of lost market share and permanent market displacement</u>**

20. The Eichmann Declaration concludes that, due to changes in customer behavior, dealer relationships, and market expectations resulting from sales of the Accused Products, the competitive position of Plaintiffs' FRT® products that would have existed absent the alleged infringement during the pre-trial period would not be restorable.[22] To reach this conclusion, the Eichmann Declaration relies on the following assumptions and observations:

- The sale of "competing products" would be expected to "result in displacement of demand from Plaintiff's products;"

- Lost market share is difficult to recapture in durable or semi-durable goods markets because the purchase is infrequent, and thus there is a reduction in future demand from the customer;

- A lost sale results in additional lost sales because the customer that may have purchased additional units, upgraded to future versions, or recommended the product to other users, and may be less likely to do so after adopting a product that "satisfies the same underlying need;"

- Once customers adopt a competing product, factors such as familiarity, switching costs, and platform-specific preferences further reduce the likelihood of reversion to the original supplier;

- Increased adoption of a competing product leads to greater visibility and channel support, which in turn facilitate further adoption, compounding over time, and reshaping the incumbent's competitive position even if the legal outcome later favors the incumbent.

The above assumptions and observations can be placed into two categories: The Existence of a Causal Relationship and the Effects of a Causal Relationship.

21. Regarding the existence of a causal relationship between sales of the Accused Products and the lost sales of Plaintiffs' FRT® products, the Eichmann Declaration attempts to establish that relationship by citing market share observations in the DeMonico Declaration.

---

[22] Declaration of Richard J. Eichmann in Support of Plaintiffs' Consolidated Motion for Preliminary Injunction, May 28, 2026, p.16.

According to the DeMonico Declaration, Rare Breed Triggers, Inc. ("RBT") held the entire commercially available "forced reset" device market when its products were first launched, but now holds less than ▌ of the reset device market.[23] However, Mr. DeMonico bases this percentage on his personal observations of competing products appearing online and at gun shows.[24] It is not possible to reliably estimate RBT's market share from such observations, and the Eichmann Declaration identifies no underlying sales data, market survey, or other reliable methodology validating that estimate. Additionally, neither Mr. DeMonico nor Mr. Eichmann indicate whether these observations properly compare the same market segments. To the extent that the forced reset device market is segmented by customers who preferred to replace the gun's entire trigger versus customers who preferred to retain their gun's trigger, the Eichmann declaration's reliance on such market share differences is misleading. For example, the DeMonico Declaration indicates that products like the Super Safety, ARC-Fire, and other similar forced-reset devices, which I understand do not replace the gun's trigger, account for the market share difference.[25] To the extent that these products are sold to a different market segment than Plaintiffs' FRT® products, RBT would still hold substantially the entire market for the segment that prefers to replace the gun's entire trigger.

22. While the Accused Product and Plaintiffs' FRT® products are both in the "forced reset" device market,[26] such functional overlap is insufficient to define the relevant market. In fact, the RBT AR-1 forced reset trigger was a predecessor to the FRT-15® product. Despite being functionally equivalent to the FRT-15®, Mr. DeMonico expressed doubts about the commercial viability of RBT's AR-1 product because installing the AR-1 on an AR-15 would require "clumsy modified parts, rendering it unfriendly to the average consumer."[27]

---

[23] Declaration of Lawrence Demonico in Support of Plaintiffs' Motion for Preliminary Injunction, May 28, 2026, p. 21.

[24] Declaration of Lawrence Demonico in Support of Plaintiffs' Motion for Preliminary Injunction, May 28, 2026, p.21.

[25] Declaration of Lawrence Demonico in Support of Plaintiffs' Motion for Preliminary Injunction, May 28, 2026, p.21.

[26] I understand that, in addition to "full" forced reset devices, other devices exist that only partially reset the trigger between pulls. I understand that these partial-reset devices existed before full forced reset devices were developed, that these partial-reset devices are still sold to firearms owners, and that sometimes these products are called "assisted reset triggers." Luettke Decl., para. 8, 16; Case No. 2:26-cv-00018-KHR (D. Wyo.), Doc. 27 at 6-7, Filed 01/30/26. (Partisan PI Opp.).

[27] https://www.courtlistener.com/docket/66761832/139/united-states-v-rare-breed-triggers-llc/.

Consistent with Mr. DeMonico's feedback, Mr. Rounds designed the FRT-15® that required far less sophistication to install.[28] The FRT-15® was designed as a "drop in" trigger, allowing a user to easily replace an AR-15®'s original trigger with an FRT-15® trigger without complicated installation.[29] However, the FRT-15 was considered functionally indistinguishable from the AR-1 in terms of its internal firing mechanism.[30] Just as in an AR-1-equipped firearm, a firearm equipped with an FRT-15 trigger permits the weapon's bolt carrier to force the trigger forward back into the shooter's finger and thus facilitate rapid fire of multiple rounds as long as the shooter simply maintains pressure on the trigger shoe.[31] Both the AR-1 and the FRT-15 allow a shooter to rapidly fire multiple rounds by simply maintaining pressure on the trigger shoe, because the rearward force of the bolt carrier automatically pushes the trigger shoe back into the shooter's finger.[32] Despite such functional equivalence, Mr. DeMonico considered the AR-1 to be unviable due to differences in how the products were installed.

23.    As previously discussed, I understand that AR-15 rifle owners may install specific triggers in their AR-15s based on personal preference, experience level and shooting activity.[33] The Eichmann Declaration fails to consider that customers of the Accused Products may have preferred to retain their existing triggers thereby resulting in purchases of the Accused Products rather than the FRT® products. Neither Mr. DeMonico nor Mr. Eichmann have discussed these differences and their impact on their assessment of Plaintiffs' share of the forced reset device market. To the extent that the forced reset market has expanded due to marketing and exposure of the Accused Products and such demand is unique to features of the Accused Products, the market share differentials observed in the DeMonico Declaration and Eichmann Declaration would not support a conclusion that sales of the Accused Products displaced demand from Plaintiffs' FRT® products.

24.    The prices customers are willing to pay for products can indicate market segmentation. As previously discussed, Plaintiff's FRT® products are typically priced at least 130.5% higher

---

[28] https://www.courtlistener.com/docket/66761832/139/united-states-v-rare-breed-triggers-llc/.
[29] https://www.courtlistener.com/docket/66761832/139/united-states-v-rare-breed-triggers-llc/.
[30] https://www.courtlistener.com/docket/66761832/139/united-states-v-rare-breed-triggers-llc/.
[31] https://www.courtlistener.com/docket/66761832/139/united-states-v-rare-breed-triggers-llc/.
[32] https://www.courtlistener.com/docket/66761832/139/united-states-v-rare-breed-triggers-llc/.
[33] https://triggertech.com/blogs/guides/the-ultimate-ar-15-trigger-selection-guide.

11

and as much as 462.5% higher than the Accused Products.[34] Customers who are willing to purchase lower-priced products may be unwilling to purchase higher-priced products, particularly at the same volume at which they were willing to purchase the lower-priced products. Mr. DeMonico seems to recognize this market segmentation, claiming that RBT's products are "positioned … as premium, high-quality products" that purportedly justify the higher pricing.[35] Accordingly, the Eichmann Declaration's conclusion that sales of Plaintiffs' FRT® products have been, and will continue to be, further displaced during the pre-trial period is unfounded.

25.   The Eichmann Declaration does not show that an injunction would cause any difference in future demand for Plaintiffs' FRT® products. With regard to the effects of a causal relationship, the Eichmann Declaration argues that the impact of an assumed demand displacement of Plaintiffs' FRT® products during the pre-trial period would manifest in the post-trial period, even "if the legal outcome later favors the incumbent."[36] The reasoning provided for this result is that the Accused Products are durable or semi-durable goods and are therefore purchased infrequently, thereby reducing future demand from the customer. Stated another way, if a customer views an Accused Product as an acceptable substitute for Plaintiffs' FRT® product and purchases the Accused Product during the pre-trial period, such customer will not purchase another product until the post-trial period, at which time the Accused Product would presumably be permanently enjoined from the market. Based on the logic of the Eichmann Declaration, it is unclear how the future demand for a forced reset trigger would differ, whether or not the customer purchased an Accused Product or Plaintiffs' FRT® product during the pre-trial period. In both cases, the customer's future demand for a forced reset trigger would occur at the end of the useful life of the product that was purchased during the pre-trial period. Plaintiffs would be adequately compensated through an award of lost profits for the customer's purchase of the Accused Product during the pre-trial period. In the absence of the Accused Products from the market during the post-trial period, Mr. Eichmann assumes the customer would purchase Plaintiffs' FRT® product. This same outcome applies to the Eichmann Declaration's contemplated customer that may

---

[34] 130.5% = \$620 / \$269 - 1; 462.5% = \$450 / \$80 - 1.
[35] Declaration of Lawrence Demonico in Support of Plaintiffs' Motion for Preliminary Injunction, May 28, 2026, p.15.
[36] Declaration of Richard J. Eichmann in Support of Plaintiffs' Consolidated Motion for Preliminary Injunction, May 28, 2026, p.15.

have purchased additional units, upgraded to future versions, or recommended the product to other users. Accordingly, the Eichmann Declaration fails to adequately explain how the durability of the Accused Products is relevant to a determination of irreparable harm without a preliminary injunction.

26.    The Eichmann Declaration also opines that increased adoption of a competing product during the pre-trial period will lead to greater visibility and channel support, which in turn facilitates further adoption of the Accused Products that can compound over time. The Eichmann Declaration provides no context for how such early adoption patterns would benefit the Accused Products and detrimentally affect Plaintiffs' FRT® products if the Accused Products are found to infringe at trial and subsequently removed from the market. It offers no discussion of whether pre-trial sales of the Accused Products would increase or decrease demand for Plaintiffs' FRT® products in the post-trial period. The Eichmann Declaration implicitly assumes that Plaintiffs' FRT® products and the Accused Products are substitutes. It follows that demand driven by marketing and exposure of the Accused Products during the pre-trial period would result in increased demand for Plaintiffs' FRT® products if the Accused Products are found to infringe at trial and are permanently enjoined. Accordingly, the early adoption and exposure concepts espoused in the Eichmann Declaration neither support irreparable harm during the pre-trial or post-trial period.

c)    **Lost Lead Time and Market Exclusivity**

27.    The Eichmann Declaration concludes that entry of the Accused Products into the forced reset device market during the initial period following the resolution of regulatory constraints reduces or eliminates the ability for Plaintiffs to establish first-mover advantage and market structure (pricing expectations, customer and dealer relationships, operating scale, brand identity, and informational advantages). The Eichmann Declaration does not indicate the number of months or years that define "the initial period" following resolution of regulatory constraints, or why it considers the end of the regulatory constraints to be the starting point for Plaintiffs to have established such first-mover advantage.

28.    I understand that Plaintiffs initially sold their FRT-15® product in December 2020 for $380.00, which they claim was the first commercially available "forced reset" trigger of its

13

kind.[37] On July 27, 2021, the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") sent RBT a cease-and-desist letter asserting that the FRT-15® was a machine gun.[38] RBT disagreed and filed a declaratory judgment action in the Middle District of Florida seeking a ruling that the FRT-15® was a lawful semi-automatic trigger.[39] As of December 19, 2022, RBT continued to offer its FRT-15® product for sale on its website.[40] I understand that over less than two years, RBT sold approximately 100,000 FRT-15® products, generating approximately $39 million in revenue.[41] On January 19, 2023, the U.S. Department of Justice filed a civil action alleging that RBT engaged in mail fraud and wire fraud and sought a temporary restraining order ("TRO").[42] On January 27, 2023, the court granted the temporary restraining order.[43] On February 1, 2023, the TRO was extended.[44] On September 5, 2023, a temporary injunction was granted against RBT.[45] In mid-May 2025, the DOJ settled with RBT.[46]

29.    Based on the above dates, I understand that Plaintiffs sold the FRT-15 for approximately two years from December 2020 through January 27, 2023. Plaintiffs have represented that they achieved a near-national presence in the firearm accessories market and sold their FRT-15® through third-party distributors.[47] Additionally, RBT generated sales of approximately 100,000 FRT-15® products, resulting in revenue of approximately $39 million.[48] Based on this evidence, RBT appears to have already exercised and benefited from its first mover advantage before the September 5, 2023, injunction. Notably, despite asserting this

---

[37] Declaration of Lawrence Demonico in Support of Plaintiffs' Motion for Preliminary Injunction, May 28, 2026, p.2; https://www.courtlistener.com/docket/66761832/139/united-states-v-rare-breed-triggers-llc/.

[38] Declaration of Lawrence Demonico in Support of Plaintiffs' Motion for Preliminary Injunction, May 28, 2026, p.3; https://case-law.vlex.com/vid/united-states-v-rare-1060624144.

[39] Declaration of Lawrence Demonico in Support of Plaintiffs' Motion for Preliminary Injunction, May 28, 2026, p.3.

[40] https://web.archive.org/web/20221219235014/https://rarebreedtriggers.com/.

[41] https://case-law.vlex.com/vid/united-states-v-rare-1060624144.

[42] https://case-law.vlex.com/vid/united-states-v-rare-1060624144.

[43] https://case-law.vlex.com/vid/united-states-v-rare-1060624144.

[44] https://case-law.vlex.com/vid/united-states-v-rare-1060624144.

[45] https://case-law.vlex.com/vid/united-states-v-rare-1060624144.

[46] Declaration of Lawrence Demonico in Support of Plaintiffs' Motion for Preliminary Injunction, May 28, 2026, p.3; https://www.justice.gov/usao-edny/pr/united-states-obtains-temporary-restraining-order-against-firearm-companies-illegally.

[47] https://case-law.vlex.com/vid/united-states-v-rare-1060624144.

[48] https://case-law.vlex.com/vid/united-states-v-rare-1060624144.

advantage to be valuable, RBT chose not to enforce any of its patent rights to preserve its first mover advantage from September 5, 2023 through at least mid-May 2025 to preserve its established first mover position.[49] The Eichmann Declaration ignores the fact that the claimed benefits of a first mover advantage (the ability to establish pricing expectations, customer and dealer relationships, operating scale, brand identity, and informational advantages) have already been enjoyed by Plaintiffs and that Plaintiffs chose not to protect such advantage by enforcing its patents.

### d) Distribution and Channel Disruption

30.    The Eichmann Declaration concludes that the presence of competing products in a market can hinder current or future adoption of the patented product in both intermediated distribution channels and direct-to-consumer channels.[50] However, it does not contemplate whether such circumstances are relevant to a post-trial setting assuming Plaintiffs prevail and obtain permanent injunctive relief against the relevant accused products. Under such circumstances, there would be no alternative product for intermediary distribution channels to choose, and therefore no chance that a competing product could affect Plaintiffs' distribution channels.[51] Rather, the Eichmann Declaration cites published materials discussing switching costs and network effects in multi-player markets, a condition that would be fundamentally different from the market conditions that would exist post-trial if there were a finding of infringement and a permanent injunction were granted.[52] For

---

[49] Declaration of Lawrence Demonico in Support of Plaintiffs' Motion for Preliminary Injunction, May 28, 2026, p.3; https://www.justice.gov/usao-edny/pr/united-states-obtains-temporary-restraining-order-against-firearm-companies-illegally.

[50] Declaration of Richard J. Eichmann in Support of Plaintiffs' Consolidated Motion for Preliminary Injunction, May 28, 2026, p.20.

[51] I understand Plaintiffs previously sought and were denied a preliminary injunction against the Partisan Disruptor, which is a cassette-type forced reset trigger product more closely resembling RBT's FRT® products. *See ABC IP, LLC v. Peak Tactical, LLC,* No. 26-CV-18-R, 2026 U.S. Dist. LEXIS 55891, at *5–6, *46 (D. Wyo. Feb. 13, 2026) (denying Plaintiffs' request for a TRO and preliminary injunction concerning the Partisan Disruptor). In a situation where the Accused Products are enjoined but the Disruptor remains publicly available, there would be an alternative product distributor to choose. However, a more likely scenario is that, if the Accused Products are permanently enjoined post-trial, the Disruptor may similarly be enjoined, thus presenting a market where there are no alternative products. In making this observation, I do not opine on the technical merits (including infringement, validity, and enforceability) of any patents, the Accused Products, or other products such as the Disruptor. I offer an economic observation, not a technical one.

[52] Farrell, Joseph and Paul Klemperer, "Coordination and Lock-In: Competition with Switching Costs and Network Effects," Working Paper (2006) ("Switching costs and network effects bind customers to

example, the Eichmann Declaration indicates that the core functionality claimed in the Patents-in-Suit is not available in non-infringing alternative products.[53] Mr. Eichmann further assumes throughout the declaration that this core functionality creates demand for the Accused Products and Plaintiffs' FRT® products.[54] Accordingly, in the event of a finding of infringement and granting of a permanent injunction, intermediary distribution channels would not be faced with the decision of whether to remain as the distributor of the Accused Products, a third-party's product, or Plaintiffs' FRT® products, but whether to remain as a distributor of products to the forced reset device market by distributing Plaintiffs' FRT® products or to exit the market entirely.

31.    The fallacy of the Eichmann Declaration's observations related to the impact of pre-trial infringement on post-trial distribution networks can be observed from its argument that once intermediaries adopt a competing product, investments in inventory, training, customer support, compliance, and marketing economically disincentivize such distributors from "switching back" to the incumbent product. This argument is self-defeating because it recognizes that the distributor was willing to switch from the incumbent's products to the alleged infringing product in the first place, and thus that such investments in the incumbent's products did not preclude the switch.

32.    The Eichmann Declaration further opines, without explanation or support, that even if a competing product is removed from the market, intermediaries may not revert to the original

---

vendors if products are incompatible, locking customers or even markets in to early choices."), available at https://www.nuff.ox.ac.uk/ economics/papers/2006/w7/Farrell_KlempererWP.pdf, accessed May 20, 2026; *See*, for example, Coate, Malcolm B. and Mark R. Fratrik, "Dual Distribution as a Vertical Control Device," FTC Bureau of Economics Working Paper No. 143 (1986), p. 12 ("By using independent[] [distributors], a new firm can sell its product without a heavy investment in distribution-assets. This strategy serves to reduce sunk costs, because a new firm would not have to invest in industry-specific distribution capital that it might not be able to salvage it the entry failed."), available at https://www.ftc.gov/sites/default/files/documents/reports/dualdistribution-vertical-control-device/wp143.pdf, accessed May 26, 2026.

[53] Declaration of Richard J. Eichmann in Support of Plaintiffs' Consolidated Motion for Preliminary Injunction, May 28, 2026, p.12, footnote 11.

[54] *E.g.*, Declaration of Richard J. Eichmann in Support of Plaintiffs' Consolidated Motion for Preliminary Injunction, May 28, 2026, p.12 ("When competing products exhibit functional overlap, particularly with respect to core functionality not otherwise available on the market, …. such products may serve as viable alternatives for the same underlying consumer need. When a customer purchases a competing product and satisfies the need, the relevant demand opportunity is effectively exhausted for the foreseeable future.").

supplier because doing so would require reinvestment, operational disruption, and renewed uncertainty regarding product continuity.[55] Note that the Eichmann Declaration provides no indication of the magnitude of such costs and whether they would be so substantial as to prohibit such intermediaries from participating in the market. It is reasonable to assume that if an intermediary perceived it to be profitable to distribute products to the forced reset device market in the first instance, the distributor's sunk costs related to the Accused Products would not diminish the future market opportunity to distribute Plaintiffs' FRT® products. Additionally, the Eichmann Declaration assumes that customers who purchased the Accused Products would consider Plaintiffs' FRT® products to be acceptable substitutes. It follows that demand driven by marketing and exposure of the Accused Products during the pre-trial period would result in increased demand for Plaintiffs' FRT® products if the Accused Products are found to infringe at trial and are permanently enjoined from the market, thus reducing the need for marketing expenses to be incurred by intermediaries.

33. Lastly, the Eichmann Declaration ignores the fact that intermediary distributors can sell multiple products within the same segment. The Eichmann Declaration claims to provide a "concrete example" of channel disruption ████████████████████ ████████████████████████████████████ █████████████████.[56] Note that such a circumstance is inconsistent with the arguments made by the Eichmann Declaration that intermediaries may choose an infringing product and refuse to "switch back" to the incumbent product. ███████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████ This contradicts the fundamental argument of the Eichmann Declaration that the presence of competing products in a market can hinder current or future adoption of the patented product because it requires additional investment in inventory, training, customer support, compliance and marketing. ███████████████ ████████████████████████████████████████

e) **Price Erosion and Reference Pricing Effects**

---

[55] Declaration of Richard J. Eichmann in Support of Plaintiffs' Consolidated Motion for Preliminary Injunction, May 28, 2026, p.19.
[56] Declaration of Richard J. Eichmann in Support of Plaintiffs' Consolidated Motion for Preliminary Injunction, May 28, 2026, p.20.

34.    The Eichmann Declaration concludes by reference to a single observation of a reduction in the price of the FRT-15L3® from $499 to $450 that Plaintiffs are at risk of suffering price erosion damages that may not be fully recovered through lost profits damages unless a preliminary injunction is awarded. As will be discussed below, a reduction in the price of a plaintiff's product does not indicate that it has suffered price-erosion damages. Such price reductions may have occurred due to other market forces or may have occurred to take advantage of market elasticities, resulting in a possible increase in total profit. Thus, price reductions may occur even without the existence of a competitor's product in the market.

35.    In reaching its conclusion regarding price erosion, the Eichmann Declaration states that even temporary price reductions can have long-term consequences because "price erosion can create persistent pricing benchmarks, particularly in markets characterized by transparent pricing and repeated transactions."[57] Additionally, the Eichmann Declaration states "[o]nce buyers internalize a lower reference price, efforts by the incumbent to restore prior price levels may result in lost sales."[58] Note, however, that the Eichmann Declaration does not indicate whether these conditions apply equally to products purchased frequently and those purchased infrequently. Any impact from such an internalized reference point would reasonably be greater for frequently purchased products than for infrequently purchased ones. The Eichmann Declaration characterizes the forced reset device market as being "durable or semi-durable consumer firearm components," which are "typically acquired on an infrequent basis," effectively "remov[ing] that customer from the addressable market for the . . . duration of the product's useful life."[59] The Eichmann Declaration fails to establish that its observation regarding internalized lower reference points applies to the infrequently purchased durable or semi-durable forced-reset devices.

36.    Further, the Eichmann Declaration incorrectly states that if such price erosion damages occur, then monetary damages are insufficient to compensate for those losses. Specifically, the Eichmann Declaration states:

---

[57] Declaration of Richard J. Eichmann in Support of Plaintiffs' Consolidated Motion for Preliminary Injunction, May 28, 2026, p.21.
[58] Declaration of Richard J. Eichmann in Support of Plaintiffs' Consolidated Motion for Preliminary Injunction, May 28, 2026, p.21.
[59] Declaration of Richard J. Eichmann in Support of Plaintiffs' Consolidated Motion for Preliminary Injunction, May 28, 2026, p.8, 12, 14.

18

> Although monetary relief may estimate lost profits based on observed pricing, it does not restore the pricing expectations or competitive conditions that would have supported higher prices in the absence of the alleged conduct. As a result, the relevant counterfactual is not limited to a set of lost transactions, but includes a different pricing equilibrium that cannot be recreated through retrospective compensation. These effects operate through changes in expectations and bargaining dynamics, which are not directly observable in market data and cannot be reconstructed with sufficient reliability to replicate the but-for pricing environment.[60]
> (emphasis added)

37. The Eichmann Declaration is incorrect on this point. Price erosion damages are a form of lost profits damages and compensate the plaintiff for the difference in not only the number of units that would have been sold absent infringement, but also the loss of price and profit margin that may have resulted from the infringement.

38. As previously stated, a reduction in a product's price is not synonymous with price-erosion damage. Price erosion damages occur when a company's revenue and profit are reduced because it must lower its product's prices to compete with a lower-priced alternative. To assess whether, and to what extent, price erosion damages exist, the elasticity of demand must be considered. This is because in markets characterized as highly elastic, a relatively small price reduction would result in a relatively large increase in the number of units sold. In such circumstances, a company's total revenue may exceed the revenue it would have achieved without the price reduction. As such, the likelihood of price erosion damages is greater in highly inelastic markets than in highly elastic markets. The Eichmann Declaration does not indicate the degree to which the forced reset device market is either elastic or inelastic. As such, the representation that the risk of price erosion is significant is unfounded.

39. RBT's own pricing history provides direct evidence that competition from a forced-reset device does not cause the price erosion predicted by the Eichmann Declaration. In September 2021, Big Daddy Unlimited ("BDU") launched its "Wide Open Trigger" ("WOT")—a cassette-style forced-reset trigger that, unlike the Accused Products at issue here, was a

---

[60] Declaration of Richard J. Eichmann in Support of Plaintiffs' Consolidated Motion for Preliminary Injunction, May 28, 2026, p.23.

19

replacement for the trigger mechanism and a substitute for RBT's then-offered FRT-15.[61] RBT itself sued BDU, and the court found the WOT "was plainly copied from the FRT-15."[62] The relevant timeline is as follows:

- September 7, 2021: BDU launches the WOT, a cassette-style FRT sold at $349.99, a lower price point than the $380.00 initial price (more recently $450) of RBT's FRT-15.[63]
- September 21, 2021: RBT files suit and moved for a preliminary injunction against BDU.[64]
- December 30, 2021: The court grants a preliminary injunction, finding the WOT "was plainly copied from the FRT-15."[65]
- January 31, 2022: The preliminary injunction is vacated, and the WOT returns to the market.[66]
- October 19, 2022: The case resolves via consent judgment and permanent injunction.[67]

40.    In total, the WOT was sold on the market for approximately four months before the preliminary injunction was granted, plus approximately nine months after the preliminary injunction was vacated—resulting in more than a year of direct head-to-head competition between RBT's FRT-15 and the WOT, its adjudicated copy. Despite this extended period of competition from a "plainly copied" product sold at a lower price, there is no evidence that RBT responded to competition by lowering the price of its FRT-15.

41.    This pricing history is significant for several reasons: First, unlike the Accused Products at issue in this case—which I understand to be safety-selector products that work with the firearm owner's existing trigger—the WOT was a cassette-type replacement for the entire fire control group, making it a true direct substitute for RBT's FRT-15 in both form and function.[68] If a direct copy of the FRT-15 did not cause RBT to lower its price, it is implausible that the Accused Products, which offer distinguishing qualities, would do so. Second, the Eichmann Declaration's theory that the presence of lower-priced competitors in the forced-reset device market creates "persistent pricing benchmarks" and compels the incumbent to lower price is directly contradicted by RBT's own experience. RBT maintained

---

[61] Case 1:21-cv-00149-RH-GRJ (N.D. Fla.), Document 10-1, p. 5, Filed 09/21/21.
[62] Case 1:21-cv-00149-RH-GRJ (N.D. Fla.), Document 47, p. 2, Filed 12/30/21.
[63] Case 1:21-cv-00149-RH-GRJ (N.D. Fla.), Document 10-1, p. 5, 21, Filed 09/21/21; https://www.courtlistener.com/docket/66761832/139/united-states-v-rare-breed-triggers-llc/.
[64] Case 1:21-cv-00149-RH-GRJ (N.D. Fla.), Document 10, Filed 09/21/21.
[65] Case 1:21-cv-00149-RH-GRJ (N.D. Fla.), Document 47, p. 2, Filed 12/30/21.
[66] Case 1:21-cv-00149-RH-GRJ (N.D. Fla.), Document 71, Filed 01/31/22.
[67] Case 1:21-cv-00149-RH-HTC (N.D. Fla.), Document 194, Filed 10/19/2022.
[68] See Case 1:21-cv-00149-RH-GRJ (N.D. Fla.), Document 10-1, p. 23, Filed 09/21/21 (depicting "WOT Hard Reset Trigger" and "FRT-15™ trigger" side-by-side).

"premium pricing" for approximately 13 months amid competition from an identical, lower-priced product. This empirical evidence from RBT's own market history undermines the Eichmann Declaration's speculative price erosion framework. Third, the only documented price reduction by RBT occurred years later—from $499 to $450 in August 2025—which RBT attributes to the current wave of competitors. However, as discussed above, the Eichmann Declaration has not established that this price reduction constitutes price erosion damages rather than a strategic pricing decision driven by other market forces, including demand elasticity. The BDU/WOT experience suggests that RBT's pricing decisions are not driven by the competitive pressures described in the Eichmann Declaration.

42. Based on the above, the Eichmann Declaration has neither established that harm related to price erosion has occurred, nor that such harm would be inadequately recovered through a calculation of price erosion damages.

### f) Economic Effects of Market Confusion and Perceived Product Legitimacy

43. The Eichmann Declaration opines that purchasing decisions for products in specialized enthusiast markets are influenced, in part, by perceived product origin, reputation, and technological leadership.[69] According to the Eichmann Declaration, such purchasing decisions result from customer uncertainty regarding which product is legitimized by authorization or support from the original developer.[70] This statement implies that when products are offered for sale in direct competition, customer knowledge of which product is "legitimate" influences the customer's purchasing decision. Notably, the Eichmann Declaration offers no opinion on whether such possible influences exist in the "forced reset" device market or any explanation of why lost profits would not adequately compensate for such an impact during the pre-trial period. Additionally, the Eichmann Declaration does not explain how such influences would be relevant in the post-trial period, at which time the Accused Product would presumably be permanently enjoined from the market if found to infringe.

---

[69] Declaration of Richard J. Eichmann in Support of Plaintiffs' Consolidated Motion for Preliminary Injunction, May 28, 2026, p.23-24.
[70] Declaration of Richard J. Eichmann in Support of Plaintiffs' Consolidated Motion for Preliminary Injunction, May 28, 2026, p.23-24.

44.    In support of its argument, the Eichmann Declaration references a 2016 article published in Vanderbilt Law Review titled "Nontechnical Disclosure." Based on my review of this article, it does not describe the potential loss of "legitimacy" benefits during a period after a permanent injunction, as implied in the Eichmann Declaration. The article argues that a patent document "informs innovators, investors, and consumers about the value of an inventive idea," as well as serves as an advertisement to fellow technologists and promotes useful embodiments of the invention to investors.[71] Such benefits of ownership of the Patents-in-Suit would not only continue to exist in the post-trial period but also be strengthened by the publication of the trial results if the patents were found to be valid and infringed.

45.    The Eichmann Declaration also references a 2025 article published in the University of Michigan Law School Scholarship Repository titled "Perception Pending: What do Patents Signal to Consumers?" Notably, the Eichmann Declaration references this article in support of its conclusion that perceptions of "legitimacy" can "influence product differentiation, willingness to pay, and future purchasing behavior." However, the abstract of the article reaches the opposite conclusion, stating:

> Our collective results suggest that while consumers view patented products as more innovative and well made, these positive attributes do not necessarily translate into heightened purchasing behavior. Our research suggests that patent marking might often serve only a legal, rather than a marketing, function.[72] (emphasis added)

Additionally, based on my review of this article, it does not describe the potential loss of "legitimacy" benefits during a period subsequent to a permanent injunction, as implied in the Eichmann Declaration.

---

[71] Anderson, J. Jonas, "Nontechnical Disclosure," *Vanderbilt Law Review* 69, no. 6 (2016):1573-1602, at 1594 ("Obtaining (and advertising) one's patent informs the world that what one has done is innovative/well-made/sexy."), available at https://cdn.vanderbilt.edu/vu-wp0/wp-content/uploads/sites/89/2016/ 11/30103806/Nontechnical-Disclosure.pdf.

[72] Billy, Alexander and Neel Sukhatme, "Perception Pending: What Do Patents Signal to Consumers?" *Journal of Empirical Legal Studies* 22, no. 2 (2025): 163-184, at 163 ("In an online randomized experiment, we demonstrate how increasing the salience of patent status heightens consumers' beliefs that products are innovative and well made."), available at https://repository.law.umich.edu/facarticles/3111/.

g) **Enforcement Signaling and Cascading Competitive Entry**

46.    The Eichmann Declaration opines that the continued sale of alleged infringing products during litigation "signals" to prospective entrants that entry is feasible and that the cost of participation is limited, thereby encouraging additional unlawful entry that, over time, disperses lost sales across multiple sellers and entrenches competitive displacement.[73] The Eichmann Declaration attributes the bulk of such entry to design files that Hoffman Tactical publicly released for free download—materials the Eichmann Declaration states had already been "widely disseminated" and used by a substantial number of third parties.[74] However, a preliminary injunction directed at the Accused Products would neither retrieve those publicly available files nor remediate the entry they have already enabled.

47.    Further to this point, RBT chose not to enforce its patent rights from September 5, 2023, through at least mid-May 2025, a time period during which RBT identified approximately 70 companies entering the forced reset device market.[75] As such, any effect of market signaling may already have occurred, encouraging many competitors to enter the market during that period. The Eichmann Declaration's conclusion that removing the Accused Products will discourage additional market entrants ignores the likelihood that companies perceiving economic opportunities in the forced reset device market have already entered the market, and it does not indicate how many such competitors might enter the market if a temporary injunction is not granted.

48.    The Eichmann Declaration further contends that as the number of sellers increases, the but-for allocation of sales and margins becomes diffuse, creating what it terms a "multi-firm attribution problem" that makes the but-for market difficult to reconstruct reliably.[76] The Eichmann Declaration overstates the complexity resulting from the existence of multiple

---

[73] Declaration of Richard J. Eichmann in Support of Plaintiffs' Consolidated Motion for Preliminary Injunction, May 28, 2026, p. 24-25.
[74] Declaration of Richard J. Eichmann in Support of Plaintiffs' Consolidated Motion for Preliminary Injunction, May 28, 2026, p. 25.
[75] Declaration of Lawrence Demonico in Support of Plaintiffs' Motion for Preliminary Injunction, May 28, 2026, p.3, 14; https://www.justice.gov/usao-edny/pr/united-states-obtains-temporary-restraining-order-against-firearm-companies-illegally.
[76] Declaration of Richard J. Eichmann in Support of Plaintiffs' Consolidated Motion for Preliminary Injunction, May 28, 2026, p. 26.

23

alleged infringers. Lost profits damages are established, in part, by determining the volume of each defendant's sales that would have been made by the plaintiff, but-for the alleged infringement. Price erosion damages pertain to the reconstruction of the prices that the Plaintiff would have charged and the volume of sales that would have taken place at such prices, but for the alleged infringement. As such, the relative contribution of each defendant to a plaintiff's lost profits and price erosion damages is a function of each defendant's sales volumes.

### h) Asymmetric Economic Impact of an Injunction

49. The Eichmann Declaration argues that Plaintiffs will suffer greater irreparable harm without an injunction than the Atrius Customer Defendants will suffer if an injunction is granted. In support of its argument, the Eichmann Declaration repeats its conclusions regarding the long-term effects of competition on market share, pricing, and customer relationships. It also emphasizes the "substantial" research and development and regulatory-related "sunk costs" incurred by the Plaintiffs. Lastly, it argues that defendants bore the risks of an injunction by continuing to operate after receiving cease-and-desist letters in 2025.[77]

50. The Eichmann Declaration claims to assess the balance of hardships each party would incur, yet it has no basis to do so. From the perspective of the harms that the Plaintiffs may bear, the Eichmann Declaration provides no quantification of any sales volumes or pricing power that would be lost by the Plaintiffs absent a preliminary injunction. It also fails to quantify the amounts that Plaintiffs invested in R&D and regulatory-related costs, or the timing of such investments. From the Atrius Customer Defendants' perspective, it fails even to acknowledge its own assertion that if a competing product is removed from the market, intermediaries may not revert to the original supplier because doing so would require reinvestment, operational disruption, and renewed uncertainty regarding product continuity.[78] Further, the Eichmann Declarations indicate that Intermediaries make product-specific investments in inventory and marketing.[79] Not only does the Eichmann Declaration

---

[77] I note that none of the Atrius Customer Defendants received a cease-and-desist letter before the Plaintiffs sued them. Carter Decl. ¶ 18; Harroch Decl. ¶¶ 22; Rohr Decl.¶ 17; Feldman Decl. ¶ 18.

[78] Declaration of Richard J. Eichmann in Support of Plaintiffs' Consolidated Motion for Preliminary Injunction, May 28, 2026, p.19.

[79] Declaration of Richard J. Eichmann in Support of Plaintiffs' Consolidated Motion for Preliminary Injunction, May 28, 2026, p.18.

ignore the circumstances of an injunction against the Atrius Customer Defendants, but it also fails to quantify the Atrius Customer Defendants' investments in the inventory and marketing of such products. Yet, despite a lack of evidence regarding the magnitude of harm that Plaintiffs and the Atrius Customer Defendants would incur, the Eichmann Declaration implies that Plaintiffs would incur greater irreparable harm without an injunction than the Atrius Customer Defendants would incur if an injunction is granted.

51.    Not only does the Eichmann Declaration lack a quantifiable basis for concluding that Plaintiffs would suffer asymmetric economic harm absent an injunction, but its reasoning is also flawed. First, it presumes that the sales volume and pricing power lost due to the Atrius Customer Defendants' sales, if any, would not be adequately compensated by monetary damages. As stated throughout this Declaration, the potential harms identified in the Eichmann Declaration are recoverable through monetary damages under 35 U.S. Code §284. Second, it misconstrues the nature of sunk costs, implying their existence results in increased harm without injunctive relief. However, the recovery of damages would enable Plaintiffs to recover such fixed costs. As such, the existence of sunk costs does not, in isolation, support a conclusion that Plaintiffs would suffer asymmetric economic harm without an injunction.

### i)  <u>**Reputational Harm**</u>

52.    The Eichmann Declaration concludes that sales of the Accused Products can cause "reputational spillover," whereby adverse signals associated with one product reduce demand for the supplier's broader product line, and it characterizes any such harm as path-dependent and difficult to reverse. As with the other mechanisms it describes, the Eichmann Declaration frames this conclusion in terms of what "can" or "may" occur generally in differentiated or premium markets. It offers no opinion that Plaintiffs have suffered, or are likely to suffer, reputational harm during the pre-trial period as a result of the Accused Products.

53.    The Eichmann Declaration performs no analysis of Plaintiffs' actual reputation or brand. It does not assess the relative strength of the Rare Breed brand and the Accused Products' brands, identify any instance in which a customer or dealer revised its perception of Plaintiffs' products downward because of the Accused Products, or measure any resulting effect on demand. A generalized description of reputational spillover, untethered to the facts

of this market, does not establish that reputational harm has occurred or is likely to occur, and therefore cannot support a finding of irreparable harm.

54. More fundamentally, the only evidence the Eichmann Declaration cites in support of reputational harm describes public opposition to Plaintiffs' products, including calls for boycotts, "associated with Plaintiffs' patent enforcement efforts."[80] Reputational effects arising from Plaintiffs' own enforcement activity are not harm caused by the Atrius Customer Defendants' alleged infringement. The Eichmann Declaration thus fails to connect any reputational harm to the conduct it seeks to enjoin. It identifies no evidence that any customer, dealer, distributor, or other market participant altered its purchasing behavior because of the Atrius Customer Defendants' sales, or that consumers attribute the Atrius Customer Defendants' conduct to Plaintiffs or their reputation. The required causal nexus is therefore absent. And the Eichmann Declaration offers no lost-customer evidence, market analysis, survey evidence, or other basis to conclude that any alleged incremental reputational effect would be difficult to measure or compensate with money damages.

55. Finally, to the extent Plaintiffs' perceived "innovator identity" is affected by the presence of competing products, the Eichmann Declaration's own logic undermines a finding of irreparable harm. If the Accused Products are found to infringe and are permanently enjoined, Plaintiffs' position as the recognized source of the patented technology would be restored and, consistent with the discussion of the Eichmann Declaration's market-confusion arguments above, potentially strengthened by a determination of validity and infringement. Any reduction in pre-trial demand attributable to reputational effects would be reflected in Plaintiffs' sales and is therefore recoverable as lost profits. The Eichmann Declaration identifies no reputational harm that is both caused by the Accused Products and incapable of adequate monetary compensation.

### j) Inadequacy of Monetary Damages

56. The Eichmann Declaration asserts that monetary damages "may be inherently incomplete" because reconstruction of the market with "sufficient precision" may not be possible due to "changes in expectations, relationships, pricing dynamics, and competitive positioning,

---

[80] Declaration of Richard J. Eichmann in Support of Plaintiffs' Consolidated Motion for Preliminary Injunction, May 28, 2026, p.27, footnote 49.

which alter the structure of the market itself." Notably, this conclusion does not address the likelihood that Plaintiffs will suffer irreparable harm absent a temporary injunction.

57.    The Eichmann Declaration separately contends that monetary damages are inadequate because of "collectability risk" due to what it describes as newly formed firms with limited operating history that may be unable to satisfy a damages award.[81] However, the Eichmann Declaration provides no analysis to support its argument. It does not estimate the magnitude of any potential damages award, assess any Atrius Customer Defendants' assets, revenues, or financing capacity, or compute the "expected value of recovery." The fact that certain defendants were recently formed and lack publicly available financial information does not indicate an inability to pay. Many privately held companies have no publicly available financial statements, and recent formation is not evidence of insolvency. Plaintiffs, therefore, have not shown that any otherwise available monetary remedy would be uncollectible.

### k)    Materiality and Revenue Concentration

58.    The Eichmann Declaration observes that Plaintiffs' business is highly concentrated in FRT® products and reasons that a non-diversified firm is "generally more vulnerable to competitive displacement" than a diversified one. The Eichmann Declaration expressly labels this discussion "Preliminary Context" and "Non-Quantified," and it offers no opinion that Plaintiffs are likely to suffer irreparable harm as a result of their business being highly concentrated on FRT® products. Additionally, the arguments raised in this section of the Eichmann Declaration regarding developing market effects and early displacement have previously been addressed in this declaration.

## V.    CONCLUSION

59.    Assuming the Atrius Customer Defendants committed the alleged wrongful acts, it is my opinion, based on my above responses throughout this declaration, that the Eichmann Declaration has failed to identify any likelihood of economic harm that would not be adequately compensated through monetary damages recoverable under 35 U.S. Code §284.

---

[81] Declaration of Richard J. Eichmann in Support of Plaintiffs' Consolidated Motion for Preliminary Injunction, May 28, 2026, p.33.

27

60.   The Eichmann Declaration relies heavily on publications describing the long-term effects of competition on pricing expectations, customer and dealer relationships, product visibility, and brand identity, none of which address the conditions that would exist over the long term if the Accused Products are ultimately found to infringe and are enjoined. In fact, the Eichmann Declaration's characterization of the relevant market as a "differentiated niche" market in which "one product can displace another over a relatively short period of time" implies that such long-term effects would not persist in a post-trial permanent injunction environment.[82]

61.   The Eichmann Declaration has also failed to establish the degree to which, if any, customers of the Accused Products would find Plaintiffs' FRT® products to be acceptable substitutes. This is a particularly relevant inquiry given the fundamental difference of trigger replacement required for use of Plaintiffs' FRT® products and evidence that AR-15 rifle owners may prefer to use their preselected triggers.[83] Failure to establish the substitutability of the FRT® products for the Accused Products renders the Eichmann Declaration's observations on loss of market share unreliable.

62.   The Eichmann Declaration has also failed to establish that Plaintiffs have been harmed due to price erosion. The Eichmann Declaration does not contain any price trend analyses that reflect the extent to which the weighted average prices of the FRT® products have decreased, if at all. Further, the Eichmann Declaration contains no assessment of market elasticities necessary to establish whether any reduction in the prices of FRT® products increased total revenue and profits.

63.   Even if one were to assume that sales of the Accused Products would result in lost sales of Plaintiffs' FRT® products during the pre-trial period, the Eichmann Declaration fails to identify harm that monetary damages would not adequately compensate during that period. Further, it provides no support for concluding that such pre-trial sales would result in harm that would persist beyond the date of trial if a permanent injunction were awarded.

64.   Accordingly, in my opinion, prompt injunctive relief is not economically necessary in this

---

[82] Declaration of Richard J. Eichmann in Support of Plaintiffs' Consolidated Motion for Preliminary Injunction, May 28, 2026, p.10.
[83] https://triggertech.com/blogs/guides/the-ultimate-ar-15-trigger-selection-guide.

case.

## VI.  ADDITIONAL INFORMATION RELEVANT TO A FULL ECONOMIC ASSESSMENT

65.   The opinions above address the adequacy of the analyses presented in the Eichmann Declaration based on the materials presently available to me. I have been asked to describe the relevant categories of information that would be useful in assessing whether, and to what extent, Plaintiffs have incurred harm as a result of the Atrius Customer Defendants' sales, if any, of the Accused Products and the degree to which such harm would be adequately compensated through monetary damages.

66.   Plaintiffs' categories of relevant information include at least the following:

- RBT's gross and net revenue, units sold, gross profit, and operating profit from sales of the FRT® products on a monthly basis from inception through the present;
- RBT's annual audited and unaudited income statements and balance sheets from inception through the present;
- RBT's gross revenue, net revenue, and units of FRT® products sold by distribution channel every month from inception through present;
- RBT's projections of its gross revenue, net revenue, and unit sales of FRT® products on a monthly, quarterly, and annual basis from inception through the present;
- RBT's analyses reflecting its assessment of the total addressable market for FRT® products;
- RBT's analysis reflecting its assessment of each competitor's relative share of the forced reset device market;
- RBT's marketing expenses related to the FRT® products, broken down by categories of print advertising, trade show advertising, social media advertising, and other advertising on a monthly basis from inception through the present;
- RBT's print advertising samples related to the FRT® products, representative of its messaging to prospective customers;
- RBT's analyses establishing the prices it charges for its FRT® products;
- RBT's customer correspondence related to the FRT® products from inception through the present;
- RBT's customer surveys related to the FRT® products conducted from inception through

29

the present;

- RBT's records reflecting the volume of FRT® products that are manufactured by RBT or outsourced to third-parties on a monthly basis, and the identification of such third-party manufacturers;

- RBT's records reflecting its excess manufacturing capacity and/or outsourced manufacturing capacity related to the FRT® products on a monthly basis; and

- RBT's internal correspondence related to sales, marketing, pricing, and competitors of the FRT® products from inception through the present.

67. The Atrius Customer Defendants' categories of relevant information needed include at least the following:

- Atrius Customer Defendants' gross and net revenue, units sold, gross profit, and operating profit from sales of the Accused Products on a monthly basis from inception through present;

- Atrius Customer Defendants' audited and unaudited income statements and balance sheets from inception through the present;

- Atrius Customer Defendants' gross revenue, net revenue, and units sold of Accused Products by distribution channel on a monthly basis from inception through present;

- Atrius Customer Defendants' expenses related to inventory and marketing of the Accused Products from inception through present;

- Atrius Customer Defendants' analyses reflecting their assessment of the total addressable market for FRT® products;

- Atrius Customer Defendants' print advertising samples related to the Accused Products are representative of their messaging to prospective customers; and

- Atrius Customer Defendants' analyses establishing the prices they charge for the Accused Products.

I declare under penalty of perjury that the forgoing is true and correct to the best of my knowledge, information and belief.

Executed this 26th day of June 2026.

**Paul C. Benoit**

Nouvelle Analytics, LLC
12912 Hill Country Blvd., Suite F-225
Austin, TX 78738

31

**Exhibit A**

| | |
|---|---|
| **NAME:** | Paul C. Benoit |
| **POSITION:** | Paul is President of Nouvelle Analytics, an independent consulting firm that provides a variety of consulting services including financial analysis and valuation assessments for companies relating to technology issues such as patents, trade secrets, copyrights, and other forms of intellectual property. The firm also provides financial analysis relating to damages assessments and evaluations for corporate disputes, litigation, acquisitions, and divestitures. |
| **LITIGATION CONSULTING EXPERIENCE:** | Paul is a Certified Public Accountant and Certified Fraud Examiner with more than 30 years of experience in consulting with clients on matters involving accounting, valuation, and damage quantification issues. His experience includes consulting with clients in a variety of litigation matters, some of which have involved allegations of patent infringement, breach of contract, business interruption, predatory pricing, securities fraud and embezzlement of corporate funds. He has provided deposition and trial testimony in federal and state court. |

**INDUSTRY EXPERIENCE:**

Experience in the following industries:

- Telecommunications
- Software
- Biotechnology
- Electronics
- Retail
- Electric Power
- Chemicals
- Manufacturing
- Oil and Gas
- Agricultural and Horticultural

**ENGAGEMENTS:**

**Intellectual Property**

- Patent matter involving the alleged infringement of technology that facilitated non-scrolling banner ads and the ability to automatically refresh such ads.
- Patent matter involving the alleged infringement of technology used to facilitate the transfer of digital content from a peripheral device to a PC using a USB cable without the need to install and maintain customized device drivers.
- Patent matter involving the alleged infringement of technology used in reactive shaped charges to perforate oil and gas wells in low permeable formations.
- Patent matter involving the alleged infringement of technology used in oil and gas separators.
- Trade secret matter involving the alleged theft of the confidential materials and information necessary to develop lighting products that were customized for particular customer projects.

1

**Nouvelle Analytics**

**Exhibit A**

**ENGAGEMENTS:**
*(CONT'D)*

- Trade secret matter involving the alleged theft of confidential materials and information related to full-funnel cross channel attribution of online advertising.
- Patent matter involving the alleged infringement of technology used in silicon TV tuners.
- Patent matter involving the alleged infringement of technology used in flex-wing rotary cutters to increase the device's torsional stiffness and ease of cleaning.
- Patent matter involving the alleged infringement of technology used in receivers, transceivers, and basebands. The technology related to the down-conversion of electromagnetic signals.
- Patent matter involving the alleged infringement of a technology used in the transmission of media via mobile phones and other devices to the internet and/or directly to other mobile phones.
- Patent matter involving the alleged infringement of technology enabling consumers to seamlessly use data while traveling and technology used in push notifications.
- Patent matter involving the alleged infringement of technologies used to provide addressable advertising through a Set-Top box and ability of customers to store rented or limited-use content on Set-Top boxes.
- Patent matter involving the alleged infringement of technology used to enable companies to secure and control the provision of media content to users of a website.
- Patent matter involving the alleged infringement of technology used to enable eCommerce companies to provide personalized product recommendations to its online customers.
- Patent matter involving the alleged infringement of technology used to reduce the specific absorption rate (SAR) of radiation emitted by cellular telephones.
- Patent matter involving the alleged infringement of technology used in capturing oblique aerial imagery.
- Patent matter involving the alleged infringement of wireless modem card technology by a product manufacturer and wireless carriers.
- Patent matter involving the alleged infringement of prepaid wireless phone technology by a product manufacturer and wireless carriers.
- Patent matter involving the alleged infringement of prepaid wireless phone technology by a service bureau and wireless carriers.
- Patent matter involving the alleged infringement of early packet discard technology used in switches and routers.
- Patent matter involving the alleged infringement of vehicle storage system.
- Patent matter involving the alleged infringement of rotary cutter deck design.
- Patent matter involving the alleged infringement of security software.

2

**Exhibit A**

**ENGAGEMENTS:**
*(CONT'D)*

- Patent matter involving the alleged infringement of recommendation and personalization computer software.
- Patent matter involving the alleged infringement of generic template technology used in the development of software programs.
- Patent matter involving the alleged infringement of voice recognition software technology which allowed for playback and editing of dictation.
- Patent matter involving the alleged infringement of contact lens technology.
- Patent matter involving the alleged infringement of highly cross-linked polyethylene technology used in knee and hip replacement products.
- Patent matter involving the alleged infringement of an offset stem technology used in the insertion of knee replacement products.
- Patent matter involving the alleged infringement of the use of chromium picolinate to treat various medical conditions.
- Patent matter involving the alleged infringement of pet food product technology involving the moisture content of various dog and cat pet snack products.
- Patent matter involving the alleged infringement of horticultural product manufacturing technology.
- Patent matter involving the alleged infringement of a chemical encapsulant.
- Patent malpractice matter involving the value of patent rights related to bioassay technology lost in the Japanese market.
- Patent matter involving the alleged infringement of an audio codec technology.
- Patent matter involving the alleged infringement of a cardiac pacemaker technology.
- Trade secret matter involving the alleged theft of marine geological survey technology.
- Trade secret matter involving the alleged theft of business plans and compilation materials.
- Copyright matter involving the alleged infringement of a wedding dress designs.
- Copyright matter involving the alleged infringement of doors designs.
- Assisted client in negotiating a royalty for use of trademark.

**Valuation**

- Breach of contract matter involving valuation of a prepaid wireless MVNO.
- Estate tax matter involving the valuation of a limited liability partnership.
- Bankruptcy matter involving the valuation of a hotel in Hawaii.
- Minority shareholder matter involving the valuation of patented technology used in conjunction with ultrasonic flow meters.

3

**Exhibit A**

**ENGAGEMENTS:**
*(CONT'D)*

- Minority shareholder matter involving the valuation of a financial services limited partnership.
- Divorce matter involving the valuation of an Internet Service Provider.
- Business consulting matter involving the valuation of real estate for purposes of negotiating an acquisition.
- Business consulting matter involving the valuation of a software program and recommending a deal structure for purposes of negotiating a sale.
- Business consulting matter involving the quantification of the value of an angioplasty technology for purposes of negotiating a settlement.
- Business consulting matter involving the valuation of a computer software testing tool for purposes of negotiating an acquisition.

## Breach of Contract/Other

*Energy Industry*

- Breach of contract matter involving the quantification of royalties that were owed under a settlement agreement.
- Business interruption matter involving lost profits due to the rupture of the pit wall of a coker unit in a petroleum refinery.
- Business interruption matter involving lost profits due to the damage of an ethylene and propylene manufacturer.
- Breach of contract matter involving the quantification of lost profits due to a large oil and gas company having prevented a distributor from expanding inside of a designated geographic territory.
- Breach of contract matter involving the claimed overpayments and over allocations of natural gas products to suppliers of natural gas liquids.
- Breach of contract matter involving the quantification of lost profits due to its energy trading and marketing service provider's failure to execute contracts placed for the future purchase of natural gas.
- Breach of contract matter involving the quantification of lost profits due to an energy trading and marketing company's alleged failure to properly identify profits associated with speculative trading.
- Breach of contract matter involving the quantification of lost profits resulting from defendant's alleged failure to fund field improvement investments sought by plaintiff.

*Computer Hardware Industry*

- Breach of contract matter involving the quantification of lost profit damages alleged by a manufacturer of stacked DRAM.

4

**Nouvelle Analytics**

**Exhibit A**

ENGAGEMENTS: (CONT'D)

*Banking and Finance Industry*

- Breach of contract matter involving the quantification of lost profits due to a sub-prime auto lender's alleged failure to properly service debt collection efforts.

*Construction Industry*

- Breach of contract matter involving the quantification of lost profits of an Indonesian laminate distributor.

*Wrongful Termination/Personal Injury*

- Personal injury matter involving the quantification of surgeon's lost earnings and lost earnings capacity due to an automobile accident that injured the surgeon's hands.
- Wrongful termination and Breach of contract matter involving the quantification of lost wages and bonuses due to the alleged breach of employment agreement by an oil exploration company.
- Personal injury matter involving the quantification of a painter's/day laborer's lost earnings and lost earnings capacity resulting from an from accident involving alleged defective bicycle components.
- Wrongful termination and wage discrimination matter involving the quantification of the present value of plaintiff's reduced earnings.
- Personal injury matter involving plaintiff's lost income as a farmer as a result of an accident.

**Fraud**

*Securities*

- Securities class action involving allegations that executives of a public company intentionally inflated its stock price by releasing unreasonable earnings estimates and failing to provide timely information regarding the company's inability to meet such estimates, and that executives sold shares based on nonpublic knowledge of the company's performance.

*Other*

- Fraud matter involving allegations that funds provided to fund the prosecution of Fen-phen cases were misappropriated.
- Fraud matter involving the alleged theft of $10 million by the CFO of an oilfield pipe company.
- Fraud matter involving the alleged theft of computer equipment from a Fortune 500 computer manufacturer.

5



**Exhibit A**

| | |
|---|---|
| **ENGAGEMENTS:** *(CONT'D)* | **Auditing and Accounting** |

- Performed a royalty audit on a multinational provider of products and services to the energy industry for use in exploration, development, and production of oil and natural gas. Technology involved a method of mixing and injecting fracing fluid beneath the earth's surface.
- Audited financial statements of privately held oil and gas companies using GAAS to determine conformity with GAAP.
- Identified a reporting error related to FAS 122 and EITF 98-10 in publicly traded company's Form 10-K, resulting in admission of error by international accounting firm.
- Analyzed a publicly traded company's annual report to determine company's ability to post bond.
- Compiled financial statements of various companies, including preparation of year end journal entries.
- Prepared federal and state income tax returns for corporate and individual clients.

**Antitrust**

- Patent misuse matter involving the quantification of lost profit damages resulting from alleged anticompetitive activities of a music practice room manufacturer.
- Predatory pricing matter involving lost profit damages alleged by a wood products manufacturer.

**Insurance Claim**

- Insurance subrogation matter involving the quantification of lost profits by an insurance company as a result of an explosion of power generating facility and the subsequent claimed business interruption loss of a steel manufacturing facility, its suppliers, and its customers.

**PREVIOUS EMPLOYMENT:**

| | |
|---|---|
| *President,* Nouvelle Analytics, LLC | 2011 - Present |
| *Director*, IPFC Corp. | 2009 - 2011 |
| *Principal*, CRA International/ERS Group | 2004 - 2008 |
| *Senior Managing Consultant*, LECG, LLC | 2002 - 2004 |
| *Senior Engagement Manager*, Peterson Consulting | 2000 – 2002 |
| PricewaterhouseCoopers | 1997 – 2000 |
|    *Manager* | *1999 – 2001* |
|    *Senior Consultant* | *1997 – 1999* |
| *Audit and Tax Accountant,* Switzer, Hopkins & Mange | 1992 - 1995 |

6

**Nouvelle Analytics**

**Exhibit A**

| | |
|---|---|
| **EDUCATION:** | Bachelor of Science in Accountancy, University of Mississippi, 1992 |
| | Master of Business Administration, concentration in Finance & Information Systems, Louisiana State University, 1997 |
| **PRESENTATIONS AND PUBLICATIONS:** | "Determining Economic Damages in Trade Secrets Litigation." Continuing legal education program sponsored by the State Bar of Texas, May 19–20, 2005. |
| | "Implications of Daubert and Kumho Tire on Expert Witness Testimony." Continuing education program sponsored by PricewaterhouseCoopers, June 2000. |
| | "Protecting Your Company from Shareholder Liability – Securities Litigation Update 2000." Continuing education program sponsored by PricewaterhouseCoopers, March 2000. |
| | "Implications of Daubert and Kumho Tire on Expert Witness Testimony." Continuing education program sponsored by PricewaterhouseCoopers, August 1999. |
| | "It's All in Your Head: The Promise of Intellectual Property." Texas Business Review, Bureau of Business Research, University of Texas (Contributor), June 1998. |
| | "Brand Armor: Protecting Your Most Valuable Asset" (with Andrien and Zerrillo), Book chapter, Emory University's Zyman Institute for Brand Science, December 2015. |
| | "Reconciling the Federal Circuit's VirnetX and Summit 6 Rulings." Law360, December 2015. |
| | "A Reasonable Approach to Royalties." Continuing education program presented at the American Intellectual Properties Lawyer Association annual meeting in Washington, D.C., October 2016. |
| **TRIAL/ARBITRATION TESTIMONY:** | *Acoustic Systems, Inc.* v *Wenger Corporation and Steve Bright*, Western District of Texas, Austin Division, Civil Action No. A-97-CA-436-JN. |
| | *Chevron Phillips Chemical Company, L.P.* v. *Austin Industrial, Inc.*, Southern District of Texas, Houston District, Case No. 22698*BH03. |
| | *APS Capital Corp. v. Mesa Air Group, Inc.,* Western District of Texas, Austin Division, Case No. A07CA327. |

7

Nouvelle Analytics

**Exhibit A**

**TRIAL/ARBITRATION TESTIMONY:** *(CONT'D)*

*DNT v. Sprint Spectrum, LP and Nextel Operations, Inc., et al.* Eastern District of Virginia, Richmond Division, Case No. 3:09-cv-21(JRS).

*The Premcor Refining Group v. Kinder Morgan Energy Partners, L.P. and Kinder Morgan Petcoke, L.P.,* AAA Arbitration No. 70 918 Y 00712 10

*Summit 6 LLC v. Research In Motion Corp., et al,* Northern District of Texas, Dallas Division, Case No. 3:11-cv-00367-O.

*ParkerVision Inc. v. Qualcomm Incorporated, et al,* Middle District of Florida, Jacksonville Division, Case No. 3:11-cv-719-J-37TEM

*Deere & Company v. Duroc LLC, Alamo Group, Inc., Bush Hog, Inc., & Great Plains Manufacturing Incorporated*, Southern District of Iowa, Davenport Division, Case No. 3:09-cv-00095

*Vital Needs International, L.P. vs. Kinetic Concepts, Inc. and KCI Licensing, Inc.,* American Arbitration Association, Case No. 70 122 Y 00575 13

*Centego II, LLC v. Metrosplash Systems Group, Inc. and Philip S. Babick v. Excentus Corporation; Dickson Perry; Brandon Logsdon; and Jim Mills* 298th Judicial District of Dallas County, Case No. DC-14-07297

*GEODynamics, Inc. v. DynaEnergetics US, Inc.*, Eastern District of Texas, Marshall Division, Case No. 2:17-cv-00371-RSP

*Papst Licensing GMBH & Co. KG, v. Samsung Electronics Co., LTD. and Samsung Electronics America, Inc.*, Eastern District of Texas, Tyler Division, Case No. 6:15-cv-1002

*John E. Bosch, Jr., v. Brian Crowell,* Arbitration in Austin, Texas

*Diamondback Industries, Inc. v. Repeat Precision, LLC, NCS Multistage, LLC, NCS Multistage Holdings, Inc., Robert Nipper, Gary Martin, and Grant Martin,* Northern District of Texas, Fort Worth Division, Case No. 6:19-CV-00034-ADA

*Legacy Separators, LLC v. Halliburton Energy Services, Inc. and J. Wayne Richards*, Southern District of Texas, Houston Division, Case No. 4-14-cv-02081

*Dr. Ford Albritton, IV v. Acclarent Inc. and Ethicon, Inc. / Ethicon US, LLC,* Northern District of Texas, Dallas Division, Civil Action No. 3:16-cv-03340-M

*Densys Ltd., v. 3Shape TRIOS A/S and 3Shape A/S*, Western District of Texas, Waco Division, Case No. 6:19-cv-00680-ADA

8

**Nouvelle Analytics**

**Exhibit A**

| | |
|---|---|
| **TRIAL/ARBITRATION TESTIMONY:** *(CONT'D)* | *Appliance Computing III, Inc. d/b/a Surfield v. Redfin Corporation*, Western District of Texas, Waco Division, Case No. 6:20-cv-00376-ADA |
| | *US Capital Advisors, LLC et al. v. David M. Harris, FINRA Case No. 23-02726* |
| | *MyChoice, LLC and BarBoards, LLC v. Taiv, Inc.,* Eastern District of Texas, Marshall Division, Case No. 2:23-cv-00507-JRG-RSP |
| | *Charis Engineering, LLC v. BCCK Engineering, Incorporated and BCCK Holding Company,* Western District of Texas, Midland-Odessa Division, Case No. 7:23-CV-84 |
| **DEPOSITION TESTIMONY:** | *Acoustic Systems, Inc. v Wenger Corporation and Steve Bright*, Western District of Texas, Austin Division, Civil Action No. A-97-CA-436-JN. |
| | *Paul V. Johnson v. James E Gallagher*, 125th Judicial District, Harris County, Texas, Case No. 2003-35487. |
| | *Kenneth Lawrence v. Wal-Mart Stores, Inc., and Shimano American Corporation,* Southern District of Texas, Houston Division, Civil Action No.: H-03-5304. |
| | *Chevron Phillips Chemical Company, L.P. v. Austin Industrial, Inc.*, Southern District of Texas, Houston District, Case No. 22698*BH03. |
| | *Ezequiel Reyna, et al. v. Miller & Assoc., et al.* Southern District of Texas, McAllen Division, Case No. M-05-006. |
| | *Glenn Lehle, et al. v. Energy Resource Technology, Inc., et al.,* 269th Judicial District, Harris County, Texas, Case No. 2006-77241. |
| | *APS Capital Corp. v. Mesa Air Group, Inc.,* Western District of Texas, Austin Division, Case No. A07CA327. |
| | *Fusion Mobile, Inc. v. MPower Ventures, LP,* 200th Judicial District, Travis County, Texas, Case No. D-1-GN-08-002621. |
| | *DNT v. Sprint Spectrum, LP and Nextel Operations, Inc., et al.* Eastern District of Virginia, Richmond Division, Case No. 3:09-cv-21(JRS). |
| | *GEOSPAN Corporation v. Pictometry International Corporation*, District of Minnesota, Case No. 0:08-CV-00816-ADM-JSM |
| | *Allied Home Mortgage Capital Corporation vs. Linda Bullington,* 157th |

9

**Nouvelle Analytics**

**Exhibit A**

**DEPOSITION TESTIMONY: (CONT'D)**

Judicial District, Harris County, Texas, Case No. 2010-65912.

*Allied Home Mortgage Capital Corporation vs. Jonathan Fowler,* 215th Judicial District, Harris County, Texas, Case No. 2010-54286.

*The Premcor Refining Group v. Kinder Morgan Energy Partners, L.P. and Kinder Morgan Petcoke, L.P.,* AAA Arbitration No. 70 918 Y 00712 10

Summit 6 LLC v. Research In Motion Corp., et al, *Northern District of Texas, Dallas Division, Case No. 3:11-cv-00367-O.*

*ICON Internet Competence Network B.V. v. Travelocity.com LP,* Northern District of Texas, Dallas Division, Case No. 3:11-cv-1131-O.

*ParkerVision Inc. v. Qualcomm Incorporated, et al,* Middle District of Florida, Jacksonville Division, Case No. 3:11-cv-719-J-37TEM

*Deere & Company v. Duroc LLC, Alamo Group, Inc., Bush Hog, Inc., & Great Plains Manufacturing Incorporated*, Southern District of Iowa, Davenport Division, Case No. 3:09-cv-00095

*Optimize Technology Solutions, LLC, v. Staples, Inc., Dillard's Inc., HSN, Inc., J.C. Penney Corporation, Inc., and Recreational Equipment, Inc.,* Eastern District of Texas, Marshall Division, Case No. 2:11-cv-00419-JRG

*Vital Needs International, L.P. vs. Kinetic Concepts, Inc. and KCI Licensing, Inc.,* American Arbitration Association, Case No. 70 122 Y 00575 13

*Encore Media Metrics, LLC, FKA Spur Digital LP, D/B/A Spur Interactive v. Adometry, Inc. F/K/A Click Forensics, Inc., and Google, Inc.,* The District Court of Travis County, Texas, 261st Judicial District, Cause No. D-1-GN-12-001805

*Silicon Laboratories, Inc. v. Cresta Technology Corporation,* Northern District of California, San Jose Division, Case No. 5:14-cv-03227-PSG

*Tivoli, LLC, a California limited Liability company et al. v. Targetti Sankey, S.p.A, an Italian business entity, et al.*, Central District of California, Southern Division, Case No. 14-1285-DOC (JCGx)

*Centego II, LLC v. Metrosplash Systems Group, Inc. and Philip S. Babick v. Excentus Corporation; Dickson Perry; Brandon Logsdon; and Jim Mills* 298th Judicial District of Dallas County, Case No. DC-14-07297

*Legacy Separators, LLC v. Halliburton Energy Services, Inc. and J. Wayne Richards*, Southern District of Texas, Houston Division, Case No. 4-14-cv- 02081

10

**Nouvelle Analytics**

**Exhibit A**

**DEPOSITION TESTIMONY: (CONT'D)**

*Customedia Technologies, L.L.C.*, v. *Dish Network Corporation, and Dish Network, L.L.C.,* Eastern District of Texas, Marshall Division, Case No. 2:16-cv-00129

*Papst Licensing GMBH & Co. KG, v. Apple, Inc.*, Eastern District of Texas, Tyler Division, Case No. 6:15-cv-1095

*Papst Licensing GMBH & Co. KG, v. LG Electronics, Inc., LG Electronics USA., Inc., and LG Electronics Mobilecomm U.S.A., Inc.*, Eastern District of Texas, Tyler Division, Case No. 6:15-cv-1099

*Papst Licensing GMBH & Co. KG, v. Lenovo (United States), Inc.* and Motorola Mobility, LLC, Eastern District of Texas, Tyler Division, Case No. 6:15-cv-1111

*Papst Licensing GMBH & Co. KG, v. Samsung Electronics Co., LTD. and Samsung Electronics America, Inc.*, Eastern District of Texas, Tyler Division, Case No. 6:15-cv-1002

*Papst Licensing GMBH & Co. KG, v. ZTE Corporation and ZTE (USA), Inc.*, Eastern District of Texas, Tyler Division, Case No. 6:15-cv-1100

*Image Processing Technologies, LLC v. Samsung Electronics Co., Ltd; Samsung Electronics America, Inc.* Eastern District of Texas, Marshall Division, Case No. 2:16 v-0505-JRG

*Darrin Winner, Individually and on Behalf of Land Guardian, Inc. v. Ayman Jarrah,* Harris County, Texas, 234th Judicial District, Case No. 2015-66413

*KlausTech, Inc. v. Google, LLC*, Northern District of California, Oakland Division, Case No. 4:10-cv-05899-JSW

*GEODynamics, Inc. v. DynaEnergetics US, Inc.*, Eastern District of Texas, Marshall Division, Case No. 2:17-cv-00371-RSP

*Eduardo Miranda, M.D. and Oncology & Hematology of South Texas, P.A., v. Laredo Specialty Hospital, LP; Laredo Specialty Hospital Management, LLC; and Ernest Health, Inc.,* 49th Judicial District, Web County, Texas, Cause No. 2016-CVQ-001536-D1

*Polaris PowerLed Technologies, LLC, v. Samsung Electronics America, Inc., Samsung Electronics Co., LTD., and Samsung Display Co., LTD.,* Eastern District of Texas, Marshall Division, Case No. 2:17-cv-00715-JRG

*Dr. Ford Albritton IV v. Acclarent, Inc.*, Northern District of Texas, Dallas Division, Case No. 2:17-cv-00371-RSP

11

**Exhibit A**

**DEPOSITION TESTIMONY: (CONT'D)**

*Phillip N. Hudson, Jr. and Ellen Hudson v. 4001 Council of Co-Owners Condominium Association, Inc., Beldon Roofing Company, and John Greene*, 150th Judicial District, Cause No. 2017CI13795

*Diamondback Industries, Inc. v. Repeat Precision, LLC, NCS Multistage, LLC, NCS Multistage Holdings, Inc., Robert Nipper, Gary Martin, and Grant Martin,* Northern District of Texas, Fort Worth Division, Case No. 6:19-CV-00034-ADA

*Roy Faldalen v. BNSF Railway Company*, Judicial District of Tarrant County, Texas, Cause No. 153-304146-18

*United Access Technologies, LLC v. AT&T Corp., AT&T Services, Inc. and SBC Internet Services, Inc.,* Case No. 1:11-cv-00338-LPS

*United Access Technologies, LLC v. CenturyTel Broadband Services LLC, and Qwest Corporation,* Case No. 1:11-cv-00339-LPS

*Allparts Music Corporation v. Emergent Partners LLC*, 55th Judicial District, Harris County, Texas, Case No. 2020-01260

*Densys Ltd., v. 3Shape TRIOS A/S and 3Shape A/S*, Western District of Texas, Waco Division, Case No. 6:19-cv-00680-ADA

*Via Vadis, LLC and AC Technologies, S.A. v. Amazon.com, Inc.*, Western District of Texas, Austin Division, Case No. 1:14-cv-00813-LY

*Appliance Computing III, Inc. d/b/a Surfield v. Redfin Corporation*, Western District of Texas, Waco Division, Case No. 6:20-cv-00376-ADA

*DRW Texas LLC, v. Lucas McGrew v. DRW Holdings, LLC et al.,* Western District of Texas, Austin Division, Civil Action No. 1:19-cv-00830

*Collision Communications, Inc. v. Telefonaktiebolaget LM Ericsson and Ericsson Inc.,* Eastern District of Texas, Marshall Division, Civil Action No. 2:21-cv-00327

*ParkerVision, Inc. v. Intel Corporation,* Western District of Texas, Waco Division, Civil Action No. 6:20-cv-00108

*Maxum Enterprises, LLC d/b/a Pilot Thomas Logistics v. McCoart Trucking & Equipment L.L.C. d/b/a MCO Truck and Equipment*, District Court of Tarrant County, Texas, 48th Judicial District, Cause No: 048-322694-21

*T4V2, LLC d/b/a City-Base Vista Apartments; and T-4 Housing Interests Management, LLC v. American Risk Insurance Company, Inc.*, District Court of Bexar County, Texas, 73rd Judicial District, Cause No. 2018CI08516

12

**Nouvelle Analytics**

**Exhibit A**

**DEPOSITION TESTIMONY: (CONT'D)**

*Panasonic Automotive Systems Co. LTD v. Magna International, Inc. et al.,* Western District of Texas, Waco Division, Civil Action No. 6:21-cv-00319

*Accredo Packaging, Inc. v. ACR Construction, LLC D/B/A, Starko-ACR Construction, LLC and Starko Incorporated,* Southern District of Texas, Houston Division, Civil Action No. 4:22-CV- 03031

*Clearwater Benefits, LLC v. Planstin Administration, Inc. and Zion Health,* Western District of Texas, Austin Division, Civil Action No. A-22-CV-802-RP

*Internet Sports International, Ltd. v. Amelco USA, LLC. et al.,* District of Nevada, Case No.: 2:23-cv-00893-ART-NJK

*NetSocket, Inc. v. Cisco Systems, Inc.,* Eastern District of Texas, Marshall Division, Civil Action No. 2:22-cv-00172-JRG

*Deque Systems, Inc. v. Browserstack, Inc. and Browserstack Software Pvt. Ltd.,* Eastern District of Virginia, Alexandria Division, Case No. 1:24-cv-00217-AJT-WEF

*Jacob Thomas and JTurbo Engineering & Technology, LLC v. v. Joule Processing, LLC, Plug Power, Inc., Daniel Kennedy, and Ben Victor,* Southern District of Texas, Case No. 4:23-cv-01615

*Chilisin Electronics Corp., and Chilisin America, Ltd., v. Steptoe & Johnson LLP, and DOES 1-20,* Superior Court of California, County of Alameda, Case No. 23CV027831.

*Charis Engineering, LLC v. BCCK Engineering, Incorporated and BCCK Holding Company,* Western District of Texas, Midland-Odessa Division, Case No. 7:23-CV-84

*Riot, Individually and as Trustee and Trust Administrator, on behalf of Quasar Spendthrift Trust, and Day Traders LLC v. Apex Trader Funding, Inc. et al.,* Western District of Texas-Austin Division, Case No. 1:24-CV-1557-ADA

*ParkerVision, Inc. v. Realtek Semiconductor Corp.,* Western District of Texas-Waco Division, Case No. 6:22-cv-01162-ADA

*Cadence Bank and Linscomb Wealth f/k/a Linscomb & Williams, Inc. v. Precedent Wealth Partners, LLC, Joseph Harond Williams, and George Williams,* Western District of Texas-San Antonio Division, Case No. 5:24-cv-00256-FB-RBF

*ParkerVision, Inc. v. MediaTek, Inc. and MediaTek USA, Inc.,* Western District of Texas-Waco Division, Case No. 6:22-cv-01163-ADA

**Exhibit A**

| | |
|---|---|
| **CONTACT INFORMATION:** | Nouvelle Analytics<br>12912 Hill Country Blvd., Suite F-225<br>Austin, TX  78738<br>pbenoit@nouvelleanalytics.com<br>(512) 614-1335 (office)<br>(832) 573-0303 (cell) |

14

*ABC IP, LLC and Rare Breed Triggers, Inc. v. Mister Guns, LLC, et al.,* 2:26-CV-00056-ALM (E.D. Tex.)
*ABC IP, LLC and Rare Breed Triggers, Inc. v. PistolCap Limited Co., et al.,* 2:26-CV-00053-ALM (E.D. Tex.)
*ABC IP, LLC and Rare Breed Triggers, Inc. v. ProSource Firearms, LLC,* 2:26-CV-00055-ALM (E.D. Tex.)
*ABC IP, LLC and Rare Breed Triggers, Inc. v. Superior Firearms of Texas, LLC,* 2:26-CV-00058-ALM (E.D. Tex.)

**Exhibit B**

Documents Reviewed

**1. Discovery, Patents, and Court Documents**
ABC IP, LLC et al. v. Peak Tactical, LLC d/b/a Partisan Triggers: Transcript of Hearing Proceedings
ABC IP, LLC v. Peak Tactical, LLC, No. 26-CV-18-R, 2026 U.S. Dist. LEXIS 55891
ABC IP, LLC, and Rare Breed Triggers, Inc.'s Consolidated Motion for Expedited Discovery, Exhibits and Appendices, May 29, 2026
ABC IP, LLC, and Rare Breed Triggers, Inc.'s Consolidated Motion for Preliminary Injunction
Addendum to Exclusive Patent License Between ABC and Rare Breeds
Appellants ABC IP, LLC and Rare Breed Triggers, Inc.'s Corrected Emergency Motion to Expedite Proceedings
Appellants ABC IP, LLC and Rare Breed Triggers, Inc.'s Emergency Motion to Expedite Proceedings
Appellants ABC IP, LLC and Rare Breed Triggers, Inc.'s Reply in Support of Emergency Motion to Expedite Proceedings
Appellees' Answering Brief, May 26, 2026
Appellees' Answering Brief, May 28, 2026
Appellees' Opposition to Appellants' Corrected Emergency Motion to Expedite Proceedings
Case 1:21-cv-00149-RH-GRJ (N.D. Fla.), Document 10-1, Filed 09/21/21
Case 1:21-cv-00149-RH-GRJ (N.D. Fla.), Document 10, Filed 09/21/21
Case 1:21-cv-00149-RH-GRJ (N.D. Fla.), Document 47, Filed 12/30/21
Case 1:21-cv-00149-RH-GRJ (N.D. Fla.), Document 73, Filed 01/31/22
Case 1:21-cv-00149-RH-HTC (N.D. Fla.), Document 194, Filed 10/19/2022
Case 2:26-cv-00018-KHR, Document 27-1, Filed 01/30/26
Case 2:26-cv-00018-KHR, Document 27-2, Filed 01/30/26
Case 2:26-cv-00018-KHR, Document 27-3, Filed 01/30/26
Case 2:26-cv-00018-KHR, Document 27-4, Filed 01/30/26
Case 2:26-cv-00018-KHR, Document 37-1, Filed 02/11/26
Case 2:26-cv-00018-KHR, Document 37-2, Filed 02/11/26
Case 2:26-cv-00018-KHR, Document 7-1, Filed 01/16/26
Case 2:26-cv-00018-KHR, Document 7-10, Filed 01/16/26
Case 2:26-cv-00018-KHR, Document 7-11, Filed 01/16/26
Case 2:26-cv-00018-KHR, Document 7-12, Filed 01/16/26
Case 2:26-cv-00018-KHR, Document 7-13, Filed 01/16/26
Case 2:26-cv-00018-KHR, Document 7-14, Filed 01/16/26
Case 2:26-cv-00018-KHR, Document 7-15, Filed 01/16/26
Case 2:26-cv-00018-KHR, Document 7-16, Filed 01/16/26
Case 2:26-cv-00018-KHR, Document 7-17, Filed 01/16/26
Case 2:26-cv-00018-KHR, Document 7-2, Filed 01/16/26
Case 2:26-cv-00018-KHR, Document 7-20, Filed 01/16/26
Case 2:26-cv-00018-KHR, Document 7-21, Filed 01/16/26
Case 2:26-cv-00018-KHR, Document 7-22, Filed 01/16/26
Case 2:26-cv-00018-KHR, Document 7-23, Filed 01/16/26
Case 2:26-cv-00018-KHR, Document 7-24, Filed 01/16/26
Case 2:26-cv-00018-KHR, Document 7-25, Filed 01/16/26
Case 2:26-cv-00018-KHR, Document 7-26, Filed 01/16/26
Case 2:26-cv-00018-KHR, Document 7-27, Filed 01/16/26
Case 2:26-cv-00018-KHR, Document 7-3, Filed 01/16/26
Case 2:26-cv-00018-KHR, Document 7-4, Filed 01/16/26
Case 2:26-cv-00018-KHR, Document 7-5, Filed 01/16/26
Case 2:26-cv-00018-KHR, Document 7-6, Filed 01/16/26
Case 2:26-cv-00018-KHR, Document 7-7, Filed 01/16/26
Case 2:26-cv-00018-KHR, Document 7-8, Filed 01/16/26
Case 2:26-cv-00018-KHR, Document 7-9, Filed 01/16/26
Claim Chart of U.S. Patent 12,021,784 for Claim 1
Claim Chart of U.S. Patent 12,038,247 for Claim 15
Complaint for Declaratory Judgment, May 26, 2026
Complaint for Patent Infringement, Case 2:26-cv-00053-ALM
Defendants' Response in Opposition to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction
Electronic Acknowledgement Receipt, Application #18/052,606, August 8, 2024
Electronic Acknowledgement Receipt, Application #18/325,225, August 21, 2024
Exclusive Patent License Between ABC and Rare Breeds
Extension of TRO
First Amended Complaint for Declaratory Judgment, May 14, 2026
Grants of Plaintiffs' Motion for a Preliminary Injunction in Hoffman Matter
Issue Notification, Patent No. 12,636,403, May 26, 2026
Letter Notifying Infringement
Letter Notifying Infringement, February 9, 2022
Letter Re: Notice of Entry of Preliminary Injunction in Case No. 1:25-cv-00389-CLC-CHS
Letter Re: Threat of Contempt; Grant of Preliminary Injunction; ABC IP, LLC, et al. v. Hoffman Tactical LLC, et al.
Memorandum & Order, Case 1:23-cv-00369-NRM-RML
Memorandum in Support of Grant of PI in Hoffman Matter
Memorandum, May 29, 2026
Motion for Temporary Restraining Order
Nonparty As Designs' Limited Response in Opposition to Plaintiffs' Motion and Brief for Order to Show Cause Why As Designs, LLC Should Not Be Held in Contempt for Violating Preliminary Injunction (Doc. 52)
Notice of Appeal

*ABC IP, LLC and Rare Breed Triggers, Inc. v. Mister Guns, LLC, et al.,* 2:26-CV-00056-ALM (E.D. Tex.)
*ABC IP, LLC and Rare Breed Triggers, Inc. v. PistolCap Limited Co., et al.,* 2:26-CV-00053-ALM (E.D. Tex.)
*ABC IP, LLC and Rare Breed Triggers, Inc. v. ProSource Firearms, LLC,* 2:26-CV-00055-ALM (E.D. Tex.)
*ABC IP, LLC and Rare Breed Triggers, Inc. v. Superior Firearms of Texas, LLC,* 2:26-CV-00058-ALM (E.D. Tex.)

**Exhibit B**

Documents Reviewed

Notice of Pre-AIA or AIA Status
Notice of Publication of Application, February 26, 2026
Notice of Supplemental Authority Re Order Granting Preliminary Injunction Re Case 1:25-00389-CKC-CHS ABC IP, LLC et al. v. Hoffman
Notice of Withdrawal of ABC IP, LLC and Rare Breed Triggers, Inc.'s Motion and Brief for Order to Show Cause (Dkt. 52)
Order Denying Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction [6]
Order Denying Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction, February 13, 2026
Order Granting Expedite
Order Granting Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction
Order Granting Preliminary Injunction
Order Setting Hearing and Briefing Schedule
Order to Show Cause
Patent Assignment Abstract of Title
Patent Assignment to Rare Breed
Plaintiffs' First Set of Requests for Production of Documents (Nos. 1 – 4)
Plaintiffs' Memorandum in Support of Their Motion for Temporary Restraining Order and Preliminary Injunction
Plaintiffs' Motion and Brief for Order to Show Cause Why As Designs, LLC Should Not Be Held in Contempt for Violating Preliminary Injunction (Doc. 46)
Plaintiffs' Motion for Preliminary Injunction with Incorporated Brief in Support
Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction
Plaintiffs' Motion for Temporary Restraining Order with Incorporated Brief in Support
Plaintiffs' Notice of Appeal
Plaintiffs' Reply in Support of Motion for Order to Show Cause
Plaintiffs' Supplemental Brief in Support of Its Motion for Preliminary Injunction Pursuant to Local Rule 7.1(d)
Preliminary Injunction
Proposed Order Granting Plaintiffs' Consolidated Motion for Expedited Discovery, May 29, 2026
Proposed Order Granting Plaintiffs' Consolidated Motion for Preliminary Injunction
Receipt of Provisional Patent Application, September 28, 2022
Representative Claim Chart for U.S. Patent No. 12,038,247
Response in Opposition to Plaintiffs' Motion for Order to Show Cause
Response to Plaintiffs' Motion for a Preliminary Injunction
Second Addendum to Exclusive Patent License Between ABC and Rare Breeds
Settlement Agreement with USA, May 13, 2025
Statement of Interest of the United States of America, May 29, 2026
Temporary Restraining Order Under Rule 65 of the Federal Rules of Civil Procedure
TRO Order
U.S. Patent No. 12,031,784
U.S. Patent No. 12,038,247
U.S. Patent No. 12,529,538
U.S. Patent No. 12,578,159
U.S. Patent No. 12,636,403
U.S. Patent No. 7,398,723

**2. Expert Reports and Declarations**

Declaration of Austin Rohr in Support of Defendant Superior Firearms of Texas, LLC's Opposition to Plaintiffs' Consolidated Motion for Preliminary Injunction
Declaration of Ben Woods in Response to Motion for Temporary Restraining Order and Preliminary Injunction
Declaration of Brian Luettke in Support of Plaintiffs' Consolidated Motion for Preliminary Injunction, May 28, 2026
Declaration of Brian Luettke in Support of Plaintiffs' Motion for Preliminary Injunction, May 29, 2026
Declaration of Decker A. Cammack in Support of Plaintiffs' Motion to Show Cause Why As Designs, LLC Should Not Be Held in Contempt for Violating Permanent Injunction
Declaration of Hoffman Supporting Def. Response to ABC's Injunction
Declaration of Lawrence Demonico in Support of Plaintiffs' Motion for Preliminary Injunction, May 28, 2026
Declaration of Lawrence Demonico in Support of Plaintiffs' Motion to Show Cause Why As Designs, LLC Should Not Be Held in Contempt for Violating Permanent Injunction
Declaration of Lawrence Demonico Pursuant to 28 U.S.C. § 1746 in Support of Plaintiffs' Motion for Preliminary Injunction
Declaration of Matthew Karlovic on Behalf of As Designs, LLC
Declaration of Michael Stakes (Inventor of U.S. Patent 9,146,067)
Declaration of Mordekhai Harroch in Support of Defendants' Opposition to Plaintiffs' Consolidated Motion for Preliminary Injunction
Declaration of Richard J. Eichmann in Support of Plaintiffs' Consolidated Motion for Preliminary Injunction, May 28, 2026
Declaration of Roland Feldman in Support of Defendant ProSource Firearms, LLC's Opposition to Plaintiffs' Consolidated Motion for Preliminary Injunction
Declaration of Samir P. Warty, Ph.D. (Secretariat) in Support of TRO
Declaration of Scott W. Cragun on Behalf of Peak Tactical (Partisan Triggers)
Declaration of Thomas Carter II in Support of Defendants' Opposition to Plaintiffs' Consolidated Motion for Preliminary Injunction
Declaration of Timothy Hoffman in Support of Defendants' Response in Opposition to Plaintiffs' Motion for Order to Show Cause
Declaration of Malcolm Brown, June 24, 2026
Rebuttal Declaration of John Nixon in Support of Peak Tactical

**3. Third Party Sources**

https://case-law.vlex.com/vid/united-states-v-rare-1060624144
https://cdn.vanderbilt.edu/vu-wp0/wp-content/uploads/sites/89/2016/11/30103806/Nontechnical-Disclosure.pdf
https://repository.law.umich.edu/facarticles/3111/
https://triggertech.com/blogs/guides/the-ultimate-ar-15-trigger-selection-guide
https://umbrex.com/resources/b2b-pricing-playbook/segmentation-and-tiered-pricing-matching-price-to-customer-segments/

*ABC IP, LLC and Rare Breed Triggers, Inc. v. Mister Guns, LLC, et al.,*  2:26-CV-00056-ALM (E.D. Tex.)
*ABC IP, LLC and Rare Breed Triggers, Inc. v. PistolCap Limited Co., et al.,*  2:26-CV-00053-ALM (E.D. Tex.)
*ABC IP, LLC and Rare Breed Triggers, Inc. v. ProSource Firearms, LLC,*  2:26-CV-00055-ALM (E.D. Tex.)
*ABC IP, LLC and Rare Breed Triggers, Inc. v. Superior Firearms of Texas, LLC,*  2:26-CV-00058-ALM (E.D. Tex.)

**Exhibit B**

Documents Reviewed

https://web.archive.org/web/20221219235014/https://rarebreedtriggers.com/
https://www.courtlistener.com/docket/66761832/139/united-states-v-rare-breed-triggers-llc/
https://www.ftc.gov/sites/default/files/documents/reports/dualdistribution-vertical-control-device/wp143.pdf, accessed May 26, 2026
https://www.justice.gov/usao-edny/pr/united-states-obtains-temporary-restraining-order-against-firearm-companies-illegally
https://www.law.cornell.edu/uscode/text/35/284
https://www.nuff.ox.ac.uk/
https://www.nuff.ox.ac.uk/economics/papers/2006/w7/Farrell_KlempererWP.pdf, accessed May 20, 2026
ABC IP, LLC v. Peak Tactical, LLC, No. 26-CV-18-R, 2026 U.S. Dist. LEXIS 55891(D. Wyo. Feb. 13, 2026)
Anderson, J. Jonas, "Nontechnical Disclosure," Vanderbilt Law Review 69, no. 6 (2016):1573-1602
BIC Leisure Prods. v. Windsurfing Int'l, Inc., 687 F. Supp. 134, 137-38 (S.D.N.Y. 1988)
BIC Leisure Prods., Inc. v. Windsurfing Int'l, Inc., 1 F.3d 1214, 1218 (Fed. Cir. 1993)
Billy, Alexander and Neel Sukhatme, "Perception Pending: What Do Patents Signal to Consumers?" Journal of Empirical Legal Studies 22, no. 2 (2025): 163-184
Coate, Malcolm B. and Mark R. Fratrik, "Dual Distribution as a Vertical Control Device," FTC Bureau of Economics Working Paper No. 143 (1986)
Farrell, Joseph and Paul Klemperer, "Coordination and Lock-In: Competition with Switching Costs and Network Effects," Working Paper (2006)
Paul M. Janicke, Contemporary Issues in Patent Damages, 42 AM. U. L. REV. 691, 697-98 & nn.32-36 (1993)
Ristvedt-Johnson, Inc. v. Brandt, Inc., 805 F. Supp. 557, 564 (N.D. Ill. 1992)
Scripto-Tokai Corp. v. Gillette Co., 788 F. Supp. 439, 444 (C.D. Cal. 1992)
Sun Prods. Group, Inc. v. B & E Sales Co., 700 F. Supp. 366, 386-87 (E.D. Mich. 1988)
Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7 (2008)