## GENESIS DESIGN ENGINEERING LLC



**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | |
|---|---|
| **In Re: Rare Breed Triggers Patent Litigation** | **4:26-MD-03176-ALM**<br><br>**MDL 3176** |
| ABC IP, LLC, and RARE BREED TRIGGERS, INC.,<br><br>*Plaintiffs,*<br><br>v.<br><br>MISTER GUNS, LLC, THOMAS CARTER II, and BRANDI CARTER,<br><br>*Defendants.* | Civil No. 2:26-CV-00056-ALM |
| ABC IP, LLC, and RARE BREED TRIGGERS, INC.,<br><br>*Plaintiffs,*<br><br>v.<br><br>PISTOLCAP LIMITED COMPANY, d/b/a FRISCO GUNS, and MORDEKHAI HARROCH,<br><br>*Defendants.* | Civil No. 2:26-CV-00053-ALM |
| ABC IP, LLC, and RARE BREED TRIGGERS, INC.,<br><br>*Plaintiffs,*<br><br>v.<br><br>PROSOURCE FIREARMS, LLC,<br><br>*Defendant.* | Civil No. 2:26-CV-00055-ALM |



| GENESIS DESIGN ENGINEERING LLC |
|---|

ABC IP, LLC, and RARE BREED TRIGGERS, INC.,

*Plaintiffs,*

v.

SUPERIOR FIREARMS OF TEXAS, LLC,

*Defendant.*

Civil No. 2:26-CV-00058-ALM

**DECLARATION OF RYAN D. COOK, MS, PE IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' CONSOLIDATED MOTION FOR PRELIMINARY INJUNCTION**



Ryan D. Cook

June 26, 2026

**GENESIS DESIGN ENGINEERING LLC**

## Table of Contents

1  Introduction and Scope ...................................................................................4

2  Educational Background and Qualifications...................................................4

3  Legal Standards ..............................................................................................6

4  Documents and Materials Reviewed .............................................................7

5  Methodology.................................................................................................10

6  Summary of Opinions ..................................................................................11

7  Background of Relevant Technology............................................................13

8  The Asserted Patents ...................................................................................17

9  The Atrius Forced Reset Selector ................................................................25

10  Claim Construction .......................................................................................30

11  Non-Infringement.........................................................................................31

12  Invalidity ......................................................................................................40

13  Conclusion ...................................................................................................49

**GENESIS DESIGN ENGINEERING LLC**

## 1   Introduction and Scope

1.1   My name is Ryan Cook.  I have been engaged by McKool Smith, on behalf of Atrius Development Corp., to provide expert consulting and testimonial services in connection with the matter of *Atrius Development Corp. v. Rare Breed* MDL Proceeding.  I have been retained to provide my independent expert opinion based on the materials presented and my knowledge in the pertinent field.  I am being compensated for my time spent providing these services at my standard hourly rates, plus reimbursement for any expenses incurred. Payment of fees is not dependent on the opinion expressed or the outcome of any litigation matters.  I have no conflicts of interest with any of the identified parties.

1.2   This report includes my opinions, based on analysis of Atrius Development Corporation's *Forced Reset Selector* (the "Atrius FRS") in relation to the following four (4) patents:

1.2.1   U.S. Patent 12,038,247  Blakley,       FIREARM TRIGGER MECHANISM  (the " '247 Patent")

1.2.2   U.S. Patent 12,578,159  Blakley,       FIREARM TRIGGER MECHANISM   (the " '159 Patent")

1.2.3   U.S. Patent 12,031,784  DeMonico,   ADAPTED FORCED RESET TRIGGER  (the " '784 Patent")

1.2.4   U.S. Patent 12,636,403  Strbac,        FIREARM TRIGGER MECHANISM   (the " '403 Patent")

## 2   Educational Background and Qualifications

2.1   I am a licensed Professional Engineer (PE) in the field of mechanical engineering, with more than 25 years of firearm design and analysis experience.  I have designed over 1500 parts, including 5 firearm product families and been issued ten (10) patents, nine (9) of which are firearm related; two (2) of these relate to mechanisms in the trigger assemblies.  I have worked with various trigger mechanism designs for AR-15 platform firearms since 2015; I personally own, operate and maintain five (5) AR-15 firearms and one (1) AR-10. I earned Bachelor of Science and Master of Science degrees in mechanical engineering at Brigham Young University in Provo, Utah.

2.2   I provide engineering consulting services as Owner and Principal Consulting Engineer of Genesis Design Engineering LLC.  For almost 20 years, these consulting services have included concept creation, styling, computer modeling, engineering calculation/analysis, prototyping, marketing graphics and intellectual property support.  Industries served include health care, sporting goods, fitness, petroleum exploration, circuit board enclosures, toys, and household goods.



2.3    In addition to my consulting business, I am currently employed as Senior Design and Analysis Engineer in the R&D Department of the Browning Arms Company, designing Browning and Winchester rifles, shotguns, and handguns since 1999. This work includes concept generation, computer modeling, mechanism kinematics, stress analyses, material specifications, manufacturing process selection, hands-on assembly, testing, diagnosis, and debugging. I also review intellectual property for potential infringement and prepare disclosure materials for new applications, including utility and design patents. I evaluate claim coverage, research prior art, and assist with infringement prosecution.

2.4    As an expert witness consultant and in my role at Browning, I provide engineering support to pending litigation by inspecting and documenting failures related to product liability. I have also participated in criminal trial proceedings with engineering evaluations and expert report review. I have been qualified in Federal Court to provide expert opinion testimony in the fields of design, testing, history and functions of firearms.

2.5    Since 2016 I have been a designated representative for Browning on the Technical Committee of SAAMI, the Sporting Arms & Ammunition Manufacturer's Institute, Inc., and recently concluded serving 5 years as Chair of the Firearms Section of that committee. SAAMI is an accredited standards developer for the American National Standards Institute (ANSI). The SAAMI Standards are published to provide safety, reliability, and interchangeability standards for commercial manufacturers of firearms, ammunition, and their components. I regularly contribute to many of the committee's working groups, including the recent publication of SAAMI Z299.6-2025 *Voluntary Industry Performance Standards Criteria for Firearm Sound Suppressors for the Use of Commercial Manufacturers*.

2.6    I am a member of the American Society of Mechanical Engineers (ASME) and ASM International, and a Lifetime Member of the National Rifle Association (NRA). I have over 20 years' experience reloading ammunition for rifles, handguns and shotshells.

2.7    A person of ordinary skill in the art (POSITA) with respect to the Asserted Patents would have at least a bachelor's degree in mechanical engineering or related engineering discipline, together with at least 2 years of experience in designing and/or testing firearms and their fire control mechanisms. Additional experience may substitute for education.

2.8    Trial Testimony

2.8.1    United States v. Lawrence Rudolph, U.S. District Court--Denver, CO, Case No. 22-cr-00012-WJM-1

2.8.1.1    *Qualified under Federal Rule of Evidence 702 to provide expert opinion testimony in the fields of design, testing, history and functions of firearms.*



**GENESIS DESIGN ENGINEERING LLC**

## 3 Legal Standards

3.1    I am not a lawyer and have offered no legal opinions. Rather, counsel for Defendants has informed me of the applicable standards for patent infringement, invalidity, claim construction, priority, "But-For" materiality, and inequitable conduct as follows:

3.1.1    An analysis of infringement requires a two-step process: first, the language of patent claims must be properly construed, which the Court ultimately will decide; and second, the accused product—or use of an accused product—must include elements that correspond to each and every limitation of the claims as properly construed.

3.1.2    To establish literal infringement every limitation of a claim as construed must be expressly or inherently met by the accused product. If one claim limitation is not met, there is no literal infringement.

3.1.3    Infringement is not determined by whether an accused product is similar in nature, marketing description, or labeling but rather whether the accused product meets each limitation of an asserted claim when properly construed.

3.1.4    My opinions on infringement must be based on evidence and reasonable technical analysis.

3.1.5    In a preliminary injunction setting, the burden rests on the plaintiff to establish a likelihood of success on the merits of its infringement claims.

3.1.6    In a preliminary injunction setting, the defendants may raise substantial questions of invalidity, and that if such substantial questions are raised, this weighs against a finding that the plaintiff is likely to succeed on the merits.

3.1.7    Anticipation requires a single prior art reference disclosure that teaches all limitations of the claim as properly construed.

3.1.8    Obviousness may be shown by either a single prior art reference or a combination of multiple prior art references from the perspective of a person of ordinary skill in the art at or before the time of the effective filing date. A patent claim may be found invalid as obvious if the differences between the claim and the prior art references would have been obvious to a person of ordinary skill in the art at the time of the effective filing date, taking into account the scope and content of the prior art, the differences between the prior art and claims, the level of ordinary skill in the art, and any objective indicia of non-obviousness.

3.1.9    The meaning of claim terms is ordinarily evaluated from the perspective of a person of ordinary skill in the art at the time of the invention. I understand further that the claim meaning is informed mainly by the intrinsic record such as the claim language, the specification, and the prosecution history. In my analysis I apply the plain and ordinary meaning of the claim language unless otherwise specified.

3.1.10    A patent owner may show entitlement to the filing date of a provisional application to which a patent claims priority if four conditions are met: (1) the provisional must comply with the requirements of § 112, first paragraph, and the non-provisional must be for the same invention, otherwise known as the written description requirement; (2) the non-provisional must be filed within twelve months of the provisional; (3) there must be an overlap in inventorship; and (4) the non-provisional must include a specific reference to the provisional.



**GENESIS DESIGN ENGINEERING LLC**

3.1.11 I also understand from counsel that as a general matter, the materiality required to establish inequitable conduct is "but-for" materiality. When an applicant fails to disclose prior art to the PTO, the prior art is but-for material if the PTO would not have allowed a claim had it been aware of the undisclosed reference. The court must therefore assess whether the PTO would have allowed the claim if it had been aware of the undisclosed reference.

3.1.12 In making the but-for patentability determination, the court should apply the preponderance of the evidence standard and give claims their broadest reasonable construction—mirroring the standards used during PTO prosecution. A claim properly invalidated in district court based on the withheld reference is necessarily material, because invalidity in district court requires clear and convincing evidence, a higher burden than the preponderance standard used at the PTO. However, even if a district court does not invalidate a claim based on a deliberately withheld reference, the reference may still be material if it would have blocked patent issuance under the PTO's lower evidentiary standards.

3.1.13 I further understand from counsel that inequitable conduct regarding any single claim in the prosecution of a patent renders the entire patent unenforceable, not just that claim.

3.1.14 The taint of a finding of inequitable conduct can affect not just the improperly-prosecuted patent, but can also render unenforceable other related patents and applications in the same technology family.

3.1.15 This concept is what courts have referred to as the doctrine of infectious unenforceability.

3.2 As a technical expert, I have been asked to provide opinions grounded in engineering principles, utilizing my scientific knowledge, engineering education, training, and real-world experience, consistent with the governing legal standards as I understand them.

# 4    Documents and Materials Reviewed

4.1 Declaration of Brian Luettke in Support of Plaintiffs' Motion for Preliminary Injunction, May 28, 2026

4.1.1  Exhibit F:        Infringement Claim Chart – U.S. Patent No. 12,038,247

4.1.2  Exhibit C:        Infringement Claim Chart – U.S. Patent No. 12,578,159

4.1.3  Exhibit J:        Infringement Claim Chart – U.S. Patent No. 12,031,784

4.1.4  Exhibit M:        Infringement Claim Chart – U.S. Patent No. 12,636,403



**GENESIS DESIGN ENGINEERING LLC**

4.2    U.S. Patents and Patent File Histories

4.2.1    12,038,247    Blakley,    FIREARM TRIGGER MECHANISM

4.2.2    12,578,159    Blakley,    FIREARM TRIGGER MECHANISM

4.2.3    12,031,784    DeMonico,    ADAPTED FORCED RESET TRIGGER

4.2.4    12,636,403    Strbac,    FIREARM TRIGGER MECHANISM

4.2.5    12,529,538    Smith,    SAFETY MECHANISM FOR FIREARM

4.2.6    11,724,003    Strbac,    FIREARM TRIGGER MECHANISM

4.2.7    10,514,223    Rounds,    FIREARM TRIGGER MECHANISM

4.2.8    9,146,067    Stakes,    TRIGGER MECHANISM

4.2.9    4,023,465    Inskip,    FIREARM

4.2.10   3,045,555    Stoner,    AUTOMATIC TRIGGER MECHANISM WITH THREE SEARS AND A ROTATABLE CONTROL MEMBER

4.2.11   7,398,723    Blakley,    TRIGGER FORWARD DISPLACEMENT SYSTEM AND METHOD

4.2.12   9,267,751    Ruiz,    TRIGGER MECHANISMS

4.2.13   File History, Blakley '247 Patent

4.2.14   File History, Blakley '159 Patent

4.2.15   File History, DeMonico '784 Patent

4.2.16   File History, Strbac '403 Patent

4.2.17   File History, Blakley '723 Patent

4.2.18   Provisional Application disclosure for '003 Strbac



**GENESIS DESIGN ENGINEERING LLC**

4.3    Non-Patent Publications

4.3.1    Letter from the ATF to Michael Stakes approving the TAC-CON 3MR

4.3.2    Tac-Con 3MR Triggers Aiming at Speed, Accuracy, Elwood Shelton, Gun Digest

4.4    Physical Sample Examinations

4.4.1    AR-15 Prior Art

4.4.2    FRS AKA Selektor (Atrius FRS)

4.4.3    FRT – 15LR (marked as - Rare Breed Triggers, patents rbtpatents.com)

4.4.4    Super Safety Prior Art

4.4.5    FRT – 15 Prior Art (marked as - Rare Breed Triggers, Pat 10,514,233)


4.5    CAD Files

4.5.1    AR-15.IGS, dated June 8, 2026 (3D models/assembly of the Atrius FRS design)


4.6    Online Product Documentation and Videos

4.6.1    Atrius.dev

4.6.1.1    *Installation Video,* https://rumble.com/v785h4w-atrius-forced-reset-selector-frs-installation.html

4.6.1.2    *Function Test Video,* https://rumble.com/v785hmq-atrius-forced-reset-selector-frs-function-test.html

4.6.1.3    *Troubleshooting Video,* https://rumble.com/v794uio-atrius-forced-reset-selector-frs-troubleshooting.html

4.6.1.4    *Minimum Requirements,* https://rumble.com/v785huc-atrius-forced-reset-selector-frs-minimum-requirements.html

4.6.1.5    *Compatibility Guide,* https://atrius.dev/compatibility/

4.6.2    M16 and AR-15 - How firearms work! (Animation) https://www.youtube.com/watch?v=wMIBUIN30yU

4.6.3    Demonstrating how to convert a standard 2-position selector switch into a 3-position selector switch for use with an FRT https://web.archive.org/web/20260212143437/https://www.youtube.com/watch?v=Kj2S8gfTWew

4.6.4    Demonstrating how a 3-position selector switch works in conjunction with an FRT https://www.youtube.com/watch?v=00mQ2mfjqfU

4.6.5    Demonstrating the installation of a 3-position selector in an FRT https://www.youtube.com/watch?v=PSvjkaUGJ3Q



**GENESIS DESIGN ENGINEERING LLC**

## 5   Methodology

5.1   My methodology included a review of each of the four asserted patents ('247, '159, '784, '403) to establish in my mind the nature and extent of each claimed invention – the structure of what each included, and how each operated with these structures.  This allowed me to contrast the claimed technologies against prior art, as well as against the Atrius Forced Reset Selector products.

5.2   My understanding of the design, features and function of the Atrius Forced Reset Selector is based on the following three (3) types of information sources: publicly available promotional/marketing videos, computer design modeling, and physical examination.

5.2.1   I watched the installation and troubleshooting videos available at atrius.dev

5.2.2   I received a CAD (Computer Aided Design) assembly file from counsel for Defendants containing the Atrius Forced Reset Selector design models assembled into a computer model representing an AR-15 pattern rifle. With these files, I was able to assemble and move the components in various configurations to study the sequential contacts, clearances, sliding and rotating motions, and overall operation of this design.

5.2.3   I studied a physical sample of the Atrius product to confirm the CAD assembly configuration and validate my understanding of its operation.

5.3   I studied U.S. Patent 3,045,555 – the patent issued in 1962 to Eugene Stoner, designer of the original trigger mechanism in the AR-15/M16 rifle. This patent provides context for the various adaptations that have been applied to the original design over the last 60+ years.

5.4   I also reviewed seven (7) other patents and documents related to the forced resetting of triggers which provided additional context as to other developments in the field and the associated intellectual property landscape, as follows:

5.4.1   U.S. Patent 12,529,538 of Smith, issued in January 2026

5.4.2   U.S. Patent 11,724,003 of Strbac, issued in 2023

5.4.3   U.S. Patent 10,514,223 of Rounds, issued in 2019

5.4.4   U.S. Patent 9,267,751 of Ruiz, issued in 2016

5.4.5   U.S. Patent 9,146,067 of Stakes, issued in 2015

5.4.6   U.S. Patent 7,398,723 of Blakley, issued in 2008

5.4.7   U.S. Patent 4,023,465 of Inskip, issued in 1977

5.4.8   File History, U.S. Patent 7,398,723

5.4.9   File History, U.S. Patent 12,038,247

5.4.10  File History, U.S. Patent 12,578,159

5.4.11  File History, U.S. Patent 12,031,784

5.4.12  File History, U.S. Patent 12,636,403



**GENESIS DESIGN ENGINEERING LLC**

# 6   Summary of Opinions

6.1    Infringement Analysis of the '247 Patent

6.1.1    The Atrius Forced Reset Selector does not infringe Asserted Claim 15 of the '247 Patent.

6.2    Infringement Analysis of the '159 Patent

6.2.1    The Atrius Forced Reset Selector does not infringe Asserted Claim 1 of the '159 Patent.

6.2.2    The Atrius Forced Reset Selector does not infringe Asserted Claim 3 of the '159 Patent.

6.2.3    The Atrius Forced Reset Selector does not infringe Asserted Claim 6 of the '159 Patent.

6.2.4    The Atrius Forced Reset Selector does not infringe Asserted Claim 7 of the '159 Patent.

6.2.5    The Atrius Forced Reset Selector does not infringe Asserted Claim 9 of the '159 Patent.

6.2.6    The Atrius Forced Reset Selector does not infringe Asserted Claim 10 of the '159 Patent.

6.2.7    The Atrius Forced Reset Selector does not infringe Asserted Claim 11 of the '159 Patent.

6.2.8    The Atrius Forced Reset Selector does not infringe Asserted Claim 14 of the '159 Patent.

6.2.9    The Atrius Forced Reset Selector does not infringe Asserted Claim 15 of the '159 Patent.

6.2.10   The Atrius Forced Reset Selector does not infringe Asserted Claim 16 of the '159 Patent.

6.2.11   The Atrius Forced Reset Selector does not infringe Asserted Claim 17 of the '159 Patent.

6.3    Infringement Analysis of the '784 Patent

6.3.1    The Atrius Forced Reset Selector does not infringe Asserted Claim 1 of the '784 Patent.

6.3.2    The Atrius Forced Reset Selector does not infringe Asserted Claim 3 of the '784 Patent.

6.3.3    The Atrius Forced Reset Selector does not infringe Asserted Claim 4 of the '784 Patent.

6.4    Infringement Analysis of the '403 Patent

6.4.1    The Atrius Forced Reset Selector does not infringe Asserted Claim 14 of the '403 Patent.

6.4.2    The Atrius Forced Reset Selector does not infringe Asserted Claim 15 of the '403 Patent.

6.4.3    The Atrius Forced Reset Selector does not infringe Asserted Claim 17 of the '403 Patent.

6.4.4    The Atrius Forced Reset Selector does not infringe Asserted Claim 29 of the '403 Patent.

6.4.5    The Atrius Forced Reset Selector does not infringe Asserted Claim 30 of the '403 Patent.

6.4.6    The Atrius Forced Reset Selector does not infringe Asserted Claim 32 of the '403 Patent.

6.4.7    The Atrius Forced Reset Selector does not infringe Asserted Claim 38 of the '403 Patent.

6.4.8    The Atrius Forced Reset Selector does not infringe Asserted Claim 39 of the '403 Patent.



**GENESIS DESIGN ENGINEERING LLC**

6.5    Invalidity Analysis of the '247 Patent

6.5.1    Asserted Claim 15 of the '247 Patent is anticipated or otherwise obvious over U.S. Patent 7,398,723 issued July 15, 2008, to Brian Blakley in view of the Tommy Triggers FRT-15-3MD.

6.5.2    Asserted Claim 15 of the '247 Patent is Unenforceable due to Rare Breed's Inequitable Conduct.

6.5.3    Invalidity Analysis of the '159 Patent

6.5.4    All Asserted Claims of the '159 Patent are Unenforceable due to Rare Breed's Inequitable Conduct.

6.5.5    All Asserted Claims of the '159 Patent are anticipated or otherwise obvious over U.S. Patent 7,398,723 issued July 15, 2008, to Brian Blakley in view of the Tommy Triggers FRT-15-3MD.

6.6    Invalidity Analysis of the '784 Patent

6.6.1    All Asserted Claims of the '784 Patent are anticipated by U.S. Patent 7,398,723 issued July 15, 2008, to Brian Blakley.

6.7    Invalidity Analysis of the '403 Patent

6.7.1    All Asserted Claims of the '403 Patent are invalid for insufficient written description and enablement support in the specification as asserted against the Atrius FRS.

6.7.2    All Asserted Claims of the '403 Patent are obvious over U.S. Patent 3,045,555 issued July 24, 1962, to E.M. Stoner in view of U.S. Patent 10,514,223 issued December 24, 2019, to Jeffrey Rounds.



## 7   Background of Relevant Technology

7.1   When the patent for the original AR-15/M16 trigger mechanism was issued in 1962 to Eugene Stoner, the design featured many of the components included in the designs at issue in this matter, including "*a hammer (62), a trigger (50), an intermediate sear (68) and an automatic sear (96) pivotally mounted in juxtaposition to each other within the receiver of a gun, said hammer, intermediate sear and automatic sear being subject to control by a single control member (120) which, by its position, determines whether the gun is maintained in safety condition, in semi-automatic fire condition or automatic fire condition*[1]."



*Figure 1 Trigger Mechanism according to U.S. Patent 3,045,555 Fig. 2*

7.1.1   The component referred to as the "intermediate sear" in the nomenclature of the '555 Patent in 1962 is more commonly referred to as the "disconnector" today.  As this is the term used throughout the asserted patents, this is the term I will use in the remainder of this report when referring to this component.

7.2   One of Stoner's objectives was to create a trigger mechanism "extremely resistant to the effects of the infiltration of dirt, sand and mud[2]." While his design met this objective, later developments of replacement trigger mechanisms would provide refinements preferred by some users, including lighter trigger pull forces, shorter trigger travel, and less overtravel.

7.3   When the control member is positioned in the safety condition, "*the trigger is locked against movement and the hammer is maintained in the cocked position*[3]."  In this condition, "*the sear on the forward extremity of the trigger engages the sear abutment on the forward extremity of the hammer and thus locks the hammer in the cocked position*[4]."

---

[1] U.S. Patent 3,045,555 1:29-36
[2] U.S. Patent 3,045,555 1:18-19
[3] U.S. Patent 3,045,555 3:38-39
[4] U.S. Patent 3,045,555 3:47-50



**GENESIS DESIGN ENGINEERING LLC**

7.4    When the control member is positioned for semi-automatic firing, the firearm will fire one cartridge each time the trigger is pulled.  After the cartridge fires, the action will unlock and open, thereby re-cocking the hammer while extracting and ejecting the empty cartridge casing.  Once the bolt carrier group has reached the end of its rearward movement, (unless the magazine is empty), it will begin to close; in doing so, it will load an unfired cartridge from the magazine into the chamber.  The final closing movement of the bolt carrier locks the bolt.

7.4.1    "A standard semiautomatic trigger mechanism includes a disconnector, which holds the hammer or striker in a cocked position until the trigger member is reset to engage the sear. This allows the firearm to be fired only a single time when the trigger is pulled and held, because the user is not typically able to release the trigger rapidly enough so that the sear engages before the bolt or bolt carrier returns to its in-battery position. The disconnector prevents the firearm from either firing multiple rounds on a single pull of the trigger, or from allowing the hammer or striker to simply 'follow' the bolt as it returns to battery without firing a second round, but leaving the hammer or striker uncocked.[5]"

7.4.2    In this semi-automatic condition, the user must release the trigger between shots, which "will cause the intermediate sear [disconnector] to release the hammer but not until the sear on the forward extremity of the upper portion of the trigger engages the sear abutment on the hammer. When the sear engages the sear abutment, the hammer is in the cocked position[6]."  Refer to Figure 2 for a graphical representation of the basic steps in a semi-automatic firing cycle.



*Figure 2 Typical Semi-Automatic Firing Cycle*

---

[5] U.S. Patent 12,038,247 1:26-37
[6] U.S. Patent 3,045,555 4:9-14

7.5    In contrast to the typical semi-automatic firing cycle illustrated in Figure 2, the automatic firing cycle can be schematically illustrated as shown in Figure 3.



*Figure 3 Typical Automatic Firing Cycle*

7.5.1    Comparing the graphical schematic of the automatic firing cycle against the semi-automatic firing cycle, note that in the automatic firing cycle that the selector has disabled the disconnector so that it does not capture the hammer.  Instead, the automatic sear is pivoted into an engaging position by movement of the bolt carrier such that the automatic sear captures the hammer.

7.5.2    Near the end of the closing motion of the bolt carrier, a contact surface on the bolt carrier contacts the automatic sear, rotating it out of engagement with the hammer.  This will "*immediately release the hammer to fire another round.  Thus, so long as the trigger is maintained in depressed condition, that is with the finger grip thereof pulled to the rear, the gun will continue to fire*"[7] and cycle until the magazine is empty.

7.5.3    Release of the trigger will stop the firing and cycling sequence when the hammer remains engaged on the sear in its cocked position, ready for another pull of the trigger by the user.

---

[7] U.S. Patent 3,045,555 4:52-56

7.6    These semi-automatic and automatic firing cycles of the original AR-15 trigger mechanism are illustrated and explained in a publicly available video animation at the following web address: https://www.youtube.com/watch?v=wMIBUIN30yU.  The safety, semi-automatic firing and automatic firing operations are between 1:35 and 3:05 of this video.

7.7    The distinguishing feature of forced reset selector/trigger mechanisms, compared to a typical semi-automatic firing cycle, is the *mechanical* reset of the trigger toward a forward (unpulled) position.  Just like the typical semi-automatic firing cycle, Forced Reset systems require a separate pull of the trigger for each shot fired; however, the resetting of the trigger into a condition which allows the user to actuate the trigger to fire the subsequent shots is accomplished by mechanical means within the firing mechanism in the course of the cycling of the action.

7.7.1  The mechanical reset of the trigger is also the distinguishing feature between forced reset systems and automatic firing cycles.  The automatic firing cycle originally designed for the AR-15/M16 rifles does not require any form of trigger release or reset between shots.

7.7.2  The specific design elements and methods by which the mechanical reset of the trigger is accomplished are key characteristics of each of the Asserted patents and the focus of the infringement analysis.



## 8   The Asserted Patents

8.1   The '247 Patent discloses a forced reset trigger mechanism which utilizes "a cam having a cam lobe[8]" to force the trigger member toward or to a reset condition during the rearward cycling of the bolt carrier.  This mechanism also requires the safety selector to disable the disconnector when operated in the forced reset semi-automatic mode so that the hammer can be released to fire as the closing of the bolt carrier pivots the cam to its first position.

8.1.1   If the safety selector is in the semi-automatic position, the "disconnector hook catches said hammer hook, and thereafter forward movement of the bolt carrier causes said cam to pivot to said first position, at which time a user must manually release said trigger member to free said hammer from said disconnector to permit said hammer and trigger member to pivot to said set position so that the user can pull said trigger member to fire the firearm.[9]"

8.1.2   If the safety selector is in the forced reset semi-automatic position, again the cam lobe forces the trigger member toward the reset condition; however, the normal operation of the disconnector to catch the hammer hook has been previously disabled by the placement of the safety selector into the forced reset semi-automatic position.  "The narrow semi-circular portion (116) of the safety selector (110) prevents the disconnector (60) from rotating with the trigger member (38), thus 'disabling' the disconnector (60), preventing the disconnector hook (64) from catching the hammer hook (53).[10]"  Refer to Figure 4, showing the disconnector disabled by the safety selector.

8.1.3   Unique features disclosed in this patent, relative to the original Stoner design of the '555 Patent, include the addition of the cam which works in conjunction with a specific trigger member geometry to forcibly reset the trigger and hold the trigger until the action is substantially closed.



*Figure 4 U.S. Patent 12,038,247 Fig 9D*

---

[8] U.S. Patent 12,038,247 10:43
[9] U.S. Patent 12,038,247 10:60-67
[10] U.S. Patent 12,038,247 9:31-35

**GENESIS DESIGN ENGINEERING LLC**

8.1.4   The Forced Reset firing cycle taught in the '247 Patent is shown schematically in Figure 5.



Figure 5 '247 Patent Forced Reset Firing Cycle



**GENESIS DESIGN ENGINEERING LLC**

8.2    The '159 Patent discloses a forced reset trigger mechanism which utilizes "a cam having a cam lobe[11]" to force the trigger member toward a reset condition during the rearward cycling of the bolt carrier.  This mechanism requires that "the disconnector hook is prevented from holding the hammer[12]" when operated in the forced reset semi-automatic mode so that the hammer can be released to fire as the closing of the bolt carrier pivots the cam to its first position.

8.2.1    If in the semi-automatic mode, the "disconnector hook catches the hammer hook, and thereafter the bolt means moves forward into battery, at which time a user must manually reduce pressure on the trigger member to free the hammer from the disconnector to permit the hammer and trigger member to pivot to the set positions so that the user can pull the trigger member to fire the firearm.[13]"

8.2.2    If in the forced reset semi-automatic mode, the cam lobe forces the trigger member toward the reset condition; however, the normal operation of the disconnector to catch the hammer hook has been disabled.  "The narrow semi-circular portion (116) of the safety selector (110) prevents the disconnector (60) from rotating with the trigger member (38), thus 'disabling' the disconnector (60), preventing the disconnector hook (64) from catching the hammer hook (53).[14]"  Refer to Figure 6, showing the cam lobe blocking the trigger movement and the disconnector disabled.

8.2.3    Unique features disclosed in this patent, relative to the original Stoner design of the '555 Patent, include the addition of the cam which works in conjunction with a specific trigger member geometry to forcibly reset the trigger and hold the trigger until the action is substantially closed.



*Figure 6 U.S. Patent 12,578,159 Fig 9D*

---

[11] U.S. Patent 12,578,159 10:48
[12] U.S. Patent 12,578,159 10:64-65
[13] U.S. Patent 12,578,159 10:55-61
[14] U.S. Patent 12,578,159 9:31-35

**GENESIS DESIGN ENGINEERING LLC**

8.2.4    The Forced Reset firing cycle taught in the '159 Patent is shown schematically in Figure 7.



*Figure 7 '159 Patent Forced Reset Firing Cycle*



8.3    The '784 Patent discloses a forced reset trigger mechanism without the operability of selection between semi-automatic and forced reset operation; it only provides for forced reset operation.  This disclosure specifically includes a locking member with a "deflectable portion that is separately movable relative to the body portion between an extended position and a deflected position[15]" to preclude interference with the bolt carrier during its rearward movement but engage it for release of the hammer near the end of the bolt carrier's closing motion.

8.3.1    Because there is no semi-automatic mode, there is no need for a disconnector.  Rather, "the pivotal reset of the hammer [forces] the trigger member to its reset position[16]".  Sequentially, the hammer must be rotated sufficiently far for the sear surface of the trigger to clear the sear abutment of the hammer; once this occurs, the trigger is forced to its reset position by direct contact from the hammer, after which "the locking member is biased to the locked position by a spring and prevents the trigger member from being pulled by the user.[17]"

8.3.2    The locking member does not drive any resetting motion to the trigger; it can be spring biased into locking position only after the trigger has been reset by contact from the hammer.  The locking member prevents the trigger from being pulled until the action is closed.  Refer to Figure 8, illustrating the trigger reset and locking member in the locking position.

8.3.3    Unique features disclosed in this patent, relative to the original Stoner design of the '555 Patent, include the trigger member designed to be reset by contact with the hammer, the deflectable locking member which accommodates bolt carriers with contact surfaces at higher and lower positions, such as AR-10 pattern firearms[18].



*Figure 8 U.S. Patent 12,031,784 Fig. 7*

---

[15] U.S. Patent 12,031,784 6:5-7
[16] U.S. Patent 12,031,784 3:65-66
[17] U.S. Patent 12,031,784 4:1-4
[18] U.S. Patent 12,031,784 1:24-44

**GENESIS DESIGN ENGINEERING LLC**

8.3.4    The Forced Reset firing cycle taught in the '784 Patent is shown schematically in Figure 9.



Figure 9 '784 Patent Firing Cycle

**GENESIS DESIGN ENGINEERING LLC**

8.4    The '403 Patent discloses a forced reset trigger mechanism, including a selector for switching between firing modes, in which "rearward pivoting of the hammer [causes] the trigger member to be forced to the set position, and the disconnector hook is prevented from catching the hammer hook[19]" when the safety selector is in the forced reset semi-automatic position.  This disclosure also includes a locking member which does not reset the trigger, but does prevent the trigger from being pulled until the bolt "reaches a substantially in-battery position or an in-battery position," at which point the locking member is pivoted out of its trigger blocking orientation and the user is able to pull the trigger to fire again.

8.4.1    If the safety selector is in the semi-automatic position, the "disconnector hook catches the hammer hook, at which time a user must manually release pressure on the trigger member to free the hammer from the disconnector to permit the hammer and the trigger member to pivot to the set positions so that the user can actuate the trigger member to fire the firearm again.[20]"

8.4.2    If the safety selector is in the forced reset semi-automatic position, again contact from the hammer forces the trigger member to the set position; however, the normal operation of the disconnector to catch the hammer hook has been previously disabled by "a narrow semi-circular portion [of the safety selector] permits the trigger blade to be pulled but prevents the disconnector from pivoting with the trigger member thus preventing the disconnector hook  from catching the hammer hook.[21]"  Refer to Figure 10, with the disconnector disabled by the selector.

8.4.3    Unique features disclosed in this patent, relative to the original Stoner design of the '555 Patent, include the addition of a specific trigger member geometry which works in conjunction with the hammer to forcibly reset the trigger, and the use of a locking member to hold the trigger in the reset position until the action is substantially closed.



*Figure 10 U.S. Patent 12,636,403 Fig. 9D*

---

[19] U.S. Patent 12,636,403 11:45-47
[20] U.S. Patent 12,636,403 11:37-43
[21] U.S. Patent 12,636,403 9:30-34

**GENESIS DESIGN ENGINEERING LLC**

8.4.4    The Forced Reset firing cycle taught in the '403 Patent is shown schematically in Figure 11.



Figure 11 '403 Patent Forced Reset Firing Cycle

# 9 The Atrius Forced Reset Selector

9.1 Unlike the trigger mechanisms described previously in section *8 The Asserted Patents* which include entire trigger mechanisms (trigger, hammer, disconnector, safety selector, etc.), the Atrius FRS is a forced reset selector assembly only, designed for compatibility with multiple trigger mechanism assemblies. Refer to the listing illustrated in Figure 12.

9.2 The original AR-15 trigger mechanism was designed to be robust for military use in harsh environments and have "relative immunity to immobilization by sand and dirt.[22]"

9.2.1 This type of hard-use design necessitates more generous engagements and clearances between components, as well as higher springs forces than may be acceptable outside military applications.

9.2.2 While the original design satisfies the need for robustness in harsh environments, many aftermarket trigger mechanisms have been developed to provide functional refinements preferred by some users outside of military uses.

9.2.3 The popularity of these aftermarket systems makes having a compatible design such as the Atrius product desirable, allowing the user to retain the advantages sought in an aftermarket trigger system of their choice, while adding the specific forced reset functionality provided by the Atrius solution.



*Figure 12 from https://atrius.dev/compatibility/ June 20, 2026*

---

[22] U.S. Patent 3,045,555 1:21-22



**GENESIS DESIGN ENGINEERING LLC**

9.3    The Atrius Forced Reset Selector is comprised of a detent shaft, spring, lever arm, selector, and a screw.

9.3.1    Ambidextrous versions, as shown in Figure 13, include an additional selector and screw.

9.3.2    The compatibility chart illustrated in Figure 12 indicates the variety of compatible trigger mechanisms that could be installed with the Atrius system to provide the necessary hammer, disconnector and trigger.



*Figure 13 https://atrius.dev/ambidextrous-forced-reset-selector/*

9.4    The Atrius FRS lever arm moves transversely along the axis of rotation of the selector (against resistance exerted by the compression spring, by means of semi-helical cam surfaces between the selector and the lever arm), when the selector is rotated from the semi-automatic position to the forced reset position.

9.5    When the selector is rotated from the forced reset position to the semi-automatic position, the semi-helical surfaces between the selector and lever arm act to allow the compression spring to bias the lever arm out of possible engagement with the trigger.



**GENESIS DESIGN ENGINEERING LLC**

9.5.1   If the selector is set to the semi-automatic position, the lever arm is free to rotate forward and backward when contacted by the reciprocating bolt carrier without affecting the trigger, disconnector or hammer of the compatible trigger mechanism in the firearm.  Refer to Figure 14.



*Figure 14 Atrius set for Semi-Automatic firing note that the lever arm is near the selector, preventing interaction with the trigger.*

9.5.2   The relative position of the lever arm when set to semi-automatic is also shown in Figure 15 below. When compared to Figure 16, as viewed from the bottom, the lever arm has shifted toward the trigger during selection of Forced Reset mode.





*Figure 15 Semi-automatic, lever arm is not engageable with trigger*

*Figure 16 Forced Reset, lever arm is engageable with trigger*

9.5.3    If the selector is set to the forced reset semi-automatic position, the lever arm is transversely aligned for engagement with the trigger of a compatible trigger assembly, while remaining out of alignment with the compatible disconnector.  Refer to Figure 16 and Figure 17.



Semi-helical surface

*Figure 17 Atrius set to Forced-Reset firing; note that the lever arm is shifted toward the trigger, allowing interaction with the trigger.*

9.6    One unique aspect of the Atrius FRS is that it does not disable the disconnector when in forced reset mode, as do all of the Asserted patent designs which include a disconnector.

9.7    The Atrius FRS lever arm only acts on the trigger when in the forced reset mode; it is displaced from the trigger in semi-automatic mode and unable to cause a resetting motion.

9.7.1    The designs in the Asserted patents cause a reset motion of the trigger during the cycling of the action, either by cam or by hammer contact, regardless of the selected firing mode.

9.7.2    In the disclosed designs of the Asserted patents, the operability of the firing mode (semi-automatic or forced reset), if selectable, is determined by the enabling/disabling of the disconnector because the forced movement of the trigger toward reset is always enabled.

9.7.3    Because the reset motion occurs in both modes, the amount of rotation of the trigger member toward reset is only enough to reset the sear engagement, not enough to release the disconnector.  This allows semi-automatic functionality with a working disconnector.

9.8    In forced reset mode, the Atrius FRS resets the trigger fully, sufficient to move the disconnector out of range of the hammer and eliminating the need to disable it.

9.8.1    This full reset of the trigger (in forced rest mode only) is possible because the lever arm is moved out of engagement with the trigger during semi-automatic firing, causing no trigger reset motion.

**GENESIS DESIGN ENGINEERING LLC**

9.9   The Forced Reset firing cycle of the Atrius FRS is shown schematically in Figure 18.



*Figure 18 Atrius FRS Forced Reset Firing Cycle*



# 10 Claim Construction

## 10.1 "Trigger Member"

10.1.1 I understand that the term "trigger member "appears in each asserted claim of the '403 Patent, and also in asserted claims of the '247 Patent and the '159 Patent. I have been asked to address how a person of ordinary skill in the art ("POSITA") would understand that term in light of the patents and their disclosures.

10.1.2 In my experience, and based on my education and work in firearms design, "trigger member" is not an established or standard term of art in the firearms field. A POSITA would not understand "trigger member" to be a recognized name for a conventional or mil-spec trigger, or for any generic AR-pattern trigger component. The standard term a POSITA uses for the user-actuated component is simply the "trigger."

10.1.3 Because "trigger member" is not a recognized term of art with an accepted ordinary meaning, a POSITA would look to the intrinsic record—the claims, specification, and drawings—to understand what structure the patentee meant by that term.

10.1.4 The intrinsic record uses "trigger member" to identify a specifically configured, pivoting, sear-bearing trigger structure that is forced toward its set position through interaction with the hammer. The specification identifies that structure as trigger member (38), which includes a convex contact surface (58) that cooperates with the hammer's concave surface (51), such that "surface (51) contacts surface (58) of trigger member (38) forcing trigger member (38) to pivot "to its set position. The disclosed trigger member (38) also includes a further contact surface (69)[23].

10.1.5 In my opinion, a POSITA would therefore understand "trigger member," as used in these patents, to mean the configured trigger structure disclosed as trigger member (38)—not a generic conventional trigger. The configured trigger member is designed to interact with associated components to accomplish the mechanical trigger reset, which a conventional trigger is not.

10.2 My comments on claim construction may be amended upon further review of any terms or conditions set forth by the Court in relation to the Asserted Patents and this matter.

---

[23] U.S. Patent 12,636,403 10:20-24



**GENESIS DESIGN ENGINEERING LLC**

## 11 Non-Infringement

11.1  U.S. Patent No. 12,038,247 has six (6) independent and seventeen (17) dependent claims.

11.1.1  Claim 15 of the '247 Patent is being asserted and reads as follows:

11.1.1.1  *A firearm trigger mechanism comprising:*

11.1.1.2  *a hammer having a sear catch and a hook for engaging a disconnector and adapted to be mounted in a fire control mechanism pocket of a receiver to pivot on a transverse hammer pivot axis between set and released positions, said hammer adapted to be pivoted rearward by rearward movement of a bolt carrier,*

11.1.1.3  *a trigger member having a sear and adapted to be mounted in the fire control mechanism pocket to pivot on a transverse trigger member pivot axis between set and released positions,*

11.1.1.4  *wherein said sear and sear catch are in engagement in said set positions of said hammer and trigger member and are out of engagement in said released positions of said hammer and trigger member,*

11.1.1.5  *said disconnector having a hook for engaging said hammer and adapted to be mounted in the fire control mechanism pocket to pivot on a transverse disconnector pivot axis, and*

11.1.1.6  *a cam having a cam lobe and adapted to be movably mounted in the fire control mechanism pocket, said cam being movable between a first position and a second position, in said second position said cam lobe forces said trigger member towards said set position,*

11.1.1.7  *whereupon in a standard semi-automatic mode, said cam is in said first position, rearward movement of the bolt carrier causes rearward pivoting of said hammer such that said disconnector hook catches said hammer hook, and thereafter the bolt carrier moves forward into battery, at which time a user must manually release said trigger member to free said hammer from said disconnector to permit said hammer and trigger member to pivot to said set positions so that the user can pull said trigger member to fire the firearm, and*

11.1.1.8  *whereupon in a forced reset semi-automatic mode, said cam is in said second position, rearward movement of the bolt carrier causes rearward pivoting of said hammer such that* **said disconnector hook is prevented from catching said hammer hook***, and thereafter the bolt carrier moves forward into battery, at which time the user can pull said trigger member to fire the firearm.*[24]

11.1.2  An explicit negative limitation of claim 15 requires that, when in the forced reset semi-automatic mode, the "disconnector hook is prevented from catching [the] hammer hook.[25]"

11.1.2.1  *Counsel for Defendants has confirmed my understanding that, as a basic principle of patent infringement analysis, any accused product which does not practice this negative limitation does not infringe[26].*

---

[24] U.S. Patent 12,038,247 14:30-15:3 (emphasis added)
[25] U.S. Patent 12,038,247 14:67-15:1
[26] Graver Tank & Mfg. Co. v. Linde Air Prods. Co., 339 U.S. 605, 607 (1950) , cited by counsel for Defendants



**GENESIS DESIGN ENGINEERING LLC**

11.1.3  My analysis of the accused product shows that the disconnector hook of the trigger mechanism of a firearm using the Atrius FRS, during cycling, *will* catch the hammer hook when the selector is in the forced reset mode. This action is shown in Exhibit 5.

11.1.3.1  *Specifically, during the rearward travel of the bolt carrier group, the bolt carrier will come into contact with and depress the hammer downward about its pivot point.  Once the hammer is pressed down sufficiently far by the bolt carrier, the disconnector hook will engage the hammer hook.*

11.1.3.2  *It is only after this engagement that the FRS's lever arm – also actuated by the rearward movement of the bolt carrier – will later cause disengagement of the disconnector when the trigger is forced toward the set position.  Therefore, the disconnector hook is not prevented from catching the hammer hook in the accused Atrius FRS, as required by claim 15.*

11.1.4  Consequently, for at least the above reasons, the Atrius FRS does not meet the limitations of the Asserted Claim 15 of the '247 Patent and therefore does not infringe.



**GENESIS DESIGN ENGINEERING LLC**

11.2  U.S. Patent No. 12,578,159 has eight (8) independent and ten (10) dependent claims.

11.2.1  Claims 1, 3, 6, 7, 9, 10, 11, 14, 15, 16, and 17 of the '159 Patent are being asserted.

11.2.2  Claim 1 of the '159 Patent reads as follows:

11.2.2.1  *A firearm trigger mechanism for a firearm having a fire control mechanism pocket and a reciprocating bolt means, the trigger mechanism* **operable in a first, standard semi-automatic mode and in a second, forced reset semi-automatic mode***, the mechanism comprising:*

11.2.2.2  *a hammer having a hammer sear surface and a hook for engaging a disconnector and adapted to be mounted in the fire control mechanism pocket to pivot on a transverse hammer pivot axis between set and released positions, the hammer adapted to be pivoted rearward by rearward movement of the bolt means,*

11.2.2.3  *a trigger member having a trigger sear surface and adapted to be mounted in the fire control mechanism pocket to pivot on a transverse trigger member pivot axis between set and released positions,*

11.2.2.4  *wherein the trigger member sear surface and hammer sear catch surface are in engagement in the set positions of the hammer and trigger member and are out of engagement in the released positions of the hammer and trigger member,*

11.2.2.5  *the disconnector having a hook for engaging the hammer and adapted to be mounted in the fire control mechanism pocket to pivot on a transverse disconnector pivot axis, and*

11.2.2.6  **a cam having a cam lobe** *and adapted to be movably mounted in the fire control mechanism pocket, the cam being movable between a first position and a second position, in the second position the cam lobe forces the trigger member toward the set position,*

11.2.2.7  *whereupon in the first mode, rearward movement of the bolt means causes rearward pivoting of the hammer such that the disconnector hook catches the hammer hook, and thereafter the bolt means moves forward into battery, at which time a user must manually reduce pressure on the trigger member to free the hammer from the disconnector to permit the hammer and trigger member to pivot to the set positions so that the user can pull the trigger member to fire the firearm, and*

11.2.2.8  *whereupon in the second mode, rearward movement of the bolt means causes rearward pivoting of the hammer such that the disconnector hook is prevented from holding the hammer, and thereafter the bolt means moves forward into battery, at which time the user can pull the trigger member to fire the firearm.*[27]

---

[27] U.S. Patent 12,578,159 10:24-67 (emphasis added)



**GENESIS DESIGN ENGINEERING LLC**

11.2.3  The '159 Patent requires that the Cam and Selector are two separate entities.

11.2.3.1  *Each of the asserted claims requires the operability provided by a multi-position fire selector for the user to select between at least two modes of operation of the trigger mechanism, including: a semi-automatic mode . . . and a forced reset mode[28].*

11.2.3.2  *Each independent claim of the '159 Patent separately includes a cam[29].*

11.2.3.3  *My understanding from counsel is that under the basic principles of claim construction, when a claim separately recites two distinct components, there is a strong legal presumption that those components are distinct, separate structures or instrumentalities.*

11.2.3.4  *In addition to the cam and safety selector being separately listed structures within each of the '159 Patent's independent claims[30], the broader disclosure confirms their separateness. First, at no point does the specification ever treat these elements as either being the same or otherwise being comingled into a singular composite structure, for example, with one being a sub part of the other[31].*

11.2.3.5  *Far more critically, however, is the confirmation of separateness in the consistent depiction of the cam, (72), being a physically separate element from the safety selector, (110), as seen throughout the figures[32]. Accordingly, for the claims of the '159 Patent to read the Atrius FRS, the FRS must possess a separate cam and selector.*

11.2.4  As described previously in 9.4, the Atrius FRS lever arm moves transversely along the axis of rotation of the selector when the selector is rotated from the semi-automatic position to the forced reset position.

11.2.4.1  *When the selector is rotated from the forced reset position to the semi-automatic position, the semi-helical surfaces between the selector and lever arm act to allow the compression spring to bias the lever arm out of possible engagement with the trigger.*

11.2.4.2  *The Atrius FRS lever arm only acts on the trigger when in the forced reset mode; it is displaced from the trigger in semi-automatic mode and unable to cause a resetting motion.*

11.2.5  Thus, the lever arm and selector act together in forced reset mode to achieve the resetting of the trigger and control when the trigger can release the hammer, and act together in semi-automatic mode to not reset the trigger or control the release of the hammer.

11.2.5.1  *The Atrius cannot have a functioning lever arm without a selector, nor a functioning selector without a lever arm.  These two elements of the Atrius FRS cannot exist separately, as would be required to read on the claims of the '159 Patent.*

11.2.6  Consequently, for at least the above reasons, the Atrius FRS does not meet the limitations of the Asserted Claims of the '159 Patent and therefore does not infringe.

---

[28] U.S. Patent 12,578,159 10:24-14:62
[29] U.S. Patent 12,578,159 10:48-52, 11:40-45, 12:27-32, 13:4-6, 13:39-42, 14:9-11, 14:34-36
[30] U.S. Patent 12,578,159 10:24-14:62
[31] U.S. Patent 12,578,159 Abstract, 1:1-10:22
[32] U.S. Patent 12,578,159 FIGS. 3-9D



**GENESIS DESIGN ENGINEERING LLC**

11.3  U.S. Patent No. 12,031,784 Patent has one (1) independent and six (6) dependent claims;

11.3.1  Claims 1, 3, and 4 of the '784 Patent are being asserted.

11.3.2  Claim 1 of the '784 Patent reads as follows:

11.3.2.1  *In a forced rest [sic] trigger mechanism, an extended trigger member locking device, comprising:*

11.3.2.2  **a locking member that is movable between a first position in which it locks a trigger member against pulling movement and a second position where it does not restrict movement of the trigger member**, *the locking member configured to be movably supported by a frame and including a generally upward extension portion configured to make actuating contact with a surface of a bolt carrier, such actuating contact causing the locking member to move from the first position to the second position,* **the locking member having a body portion that is movably supported and an upwardly extending deflectable portion that is separately movable** *relative to the body portion between an extended position and a deflected position.*[33]

11.3.3  There is a mechanical distinction between a "locking member" and a "cam" as these terms are used in the Asserted Patents.  This distinction is relevant in considering the operative elements acting during the forceful resetting of trigger mechanisms while cycling in forced reset mode.

11.3.3.1  *A locking member is only movable into "a first position in which it locks a trigger member against pulling movement[34]" if the trigger member is in its 'non-pulled' or set position.  The prior proper positioning of the component to be locked is a critical distinction between the action of a locking member and that of a cam.*

11.3.3.2  *A locking member moves into a position to prevent subsequent motion of another component.  This movement requires an initial clearance between the engaging structures to accommodate tolerance stacking between parts.*

11.3.3.3  *A cam acts upon another component to forcibly cause movement to occur.  The forceful engagement of a cam denotes a direct contact with a component and work done – the application of a force which accomplishes movement.  There is no purposeful work done by a locking member on another component as it moves into the locking position.  Movement of a cam with respect to the component being acted upon does not require an initial clearance between the engaging structures.*

11.3.4  A cam may or may not also prevent subsequent opposing movement of the component acted upon, thus it may also perform the primary task of a locking member, depending on the specific geometry of the cam and the angles of contact with respect to the directions of relative motion.  However, a locking element does not act as a cam and thus requires some other operative action to occur to ensure that the component to be locked is in the correct position prior to being locked.

---

[33] U.S. Patent 12,031,784 5:12-6:7 (emphasis added)
[34] U.S. Patent 12,031,784 5:14-16



**GENESIS DESIGN ENGINEERING LLC**

11.3.5  Claim 1 requires more than a part that rotates somewhere in the fire control mechanism pocket. The claim requires that the "locking member" itself be movable between the locked and unlocked positions, and it requires an upwardly extending deflectable portion that is separately movable relative to the locking member's body portion[35].

11.3.5.1  *This distinction is important because the claim treats the locking member/body movement and the deflectable-portion movement as different limitations, not as the same movement by the same structure.*

11.3.5.2  *The specification states that the "locking member (12) is supported to move (in this case, pivot, on a transverse axis)" and may be carried on a pivot pin "which allows the locking member (12), to pivot as a whole unit.[36]"*

11.3.5.3  *The specification then distinguishes whole-unit movement from the separate movement of the upwardly extending deflectable portion: force from the bolt when the firearm is in battery "causes the entire locking member (12) to pivot," while force from the bolt rearwards after firing causes only the upwardly extending deflectable portion to fold "without causing pivotal movement of the locking member body (26).[37]"*

11.3.5.4  *The Atrius FRS does not satisfy these limitations. Plaintiffs assert that the Atrius FRS operates as a "locking member," identify the safety selector as the "body portion," and identify an upwardly extending lever arm as the alleged upwardly extending deflectable portion[38]. Plaintiffs then allege that the lever arm separately travels between extended and deflected positions "without the body portion moving.[39]"*

11.3.6  The Atrius FRS does not contain a "locking member" at all. Claim 1 requires the "locking member" to be made up of two distinct structures: "a body portion that is movably supported" and "an upwardly extending deflectable portion that is separately movable relative to the body portion.[40]"

11.3.6.1  *At most, the Atrius FRS contains an upwardly extending deflectable portion—the lever arm that Plaintiffs identify—but it has no separate "body portion" that combines with that deflectable portion to form the claimed "locking member." Because the accused structure lacks the required body portion, there is no "locking member" that is "movable between" the claimed first and second positions, and the Atrius FRS does not satisfy this limitation of claim 1.*

11.3.7  In the alternative, even if the safety selector were found to be the "body portion" of the claimed locking member, the Atrius FRS still would not infringe. Plaintiffs are attempting to stitch together the Atrius FRS's lever arm and safety selector to form the claimed "locking member," but the accused combined structure does not move as the claimed locking member.

11.3.7.1  *During operation of the Atrius FRS, only the lever arm pivots when it is struck by the bolt carrier group after a round is fired. When returning to the in-battery position, the safety selector (the alleged "body portion") remains static due to the detent pin and does not pivot or otherwise move together with the lever arm from the claimed first position to the claimed second position.*

11.3.7.2  *Thus, if Plaintiffs identify the locking member as the lever arm/safety selector combination of the Atrius FRS, the accused "locking member" is not "movable between" the claimed first and second positions and is not caused by the bolt carrier group contact to move from one position to the other, as claim 1 requires.*

---

[35] U.S. Patent 12,031,784 5:14-17, 6:3-6

[36] U.S. Patent 12,031,784 3:30-34

[37] U.S. Patent 12,031,784 3:53-60

[38] Declaration of Brian Luettke in Support of Plaintiffs' Motion for Preliminary Relief, dated May 28, 2026, ¶ 25, Ex. J, at 7-8, 13

[39] Declaration of Brian Luettke in Support of Plaintiffs' Motion for Preliminary Relief, dated May 28, 2026, Ex. J, at 6-18

[40] U.S. Patent 12,031,784 6:3-6



11.3.8  Plaintiffs also blend the two distinct movements described by the '784 Patent.

11.3.8.1  *In the '784 Patent, the separate movement of the deflectable extension is the one-way folding movement that permits the bolt carrier to pass during rearward cycling without moving the locking member body or changing the locking status[41].*

11.3.8.2  *The locking member whole-unit movement, by contrast, is the movement that releases the trigger when the bolt carrier returns toward battery[42]. Plaintiffs' infringement theory uses the pivot of the Atrius FRS's lever arm as the alleged separate movement of the deflectable portion while also relying on that same pivoting cam to provide the locking/unlocking movement and leaves no accused structure that corresponds to the claimed locking member moving as a whole.*

11.3.9  For the same reasons, the limitations of the asserted dependent claims 3 and 4 are not met.

11.3.9.1  *Claim 3 requires that "the locking member body portion pivots between the first and second positions.[43]" However, under Plaintiffs' infringement theory, the accused body portion is the Atrius FRS's safety switch, and that body portion does not pivot between the first and second positions during operation.*

11.3.9.2  *Claim 4 likewise depends on claim 1 and requires the claimed locking member/deflectable portion relationship that Plaintiffs cannot establish without improperly combining the Atrius FRS's stationary safety switch with its pivoting cam (44).*

11.3.9.3  *Accordingly, the Atrius FRS does not infringe claims 1, 3, or 4 of the '784 Patent. Primarily, the Atrius FRS does not contain a "locking member" at all because it has, at best, an upwardly extending deflectable portion but no separate "body portion" to combine with it to form the claimed locking member.*

11.3.10    In the alternative, even if the safety selector were treated as the "body portion," Plaintiffs still have not identified an accused locking member that both (1) moves as the claimed locking member from the first position to the second position in response to bolt-carrier contact and (2) has a separately movable upwardly extending deflectable portion relative to the locking member body.

11.3.11  Plaintiffs' infringement theory proves the opposite: the alleged deflectable portion moves without the alleged body portion moving. That is not the whole-unit movement required by the claim and specification.

11.3.12    Consequently, for at least the above reasons, the Atrius FRS does not meet the limitations of the Asserted Claims 1, 3, and 4 of the '784 Patent and therefore does not infringe.

---

[41] U.S. Patent 12,031,784 3:53-60
[42] U.S. Patent 12,031,784 4:8-20
[43] U.S. Patent 12,031,784 6:10-11
[44] U.S. Patent 12,031,784 6:12-13



**GENESIS DESIGN ENGINEERING LLC**

11.4  U.S. Patent No. 12,636,403 has twenty-one (21) independent and thirty-four (34) dependent claims.

11.4.1  Claims 14, 15, 17, 29, 30, 32, 38 and 39 of the '403 Patent are being asserted.

11.4.2  Claim 14 of the '403 Patent reads as follows:

11.4.2.1  *A trigger mechanism for a firearm operable in at least a standard semi-automatic mode and a forced reset semi-automatic mode, comprising:*

11.4.2.2  *a hammer having a hammer sear catch and a hammer hook and adapted to pivot on a transverse hammer pivot axis between a set position and a released position, the hammer adapted to be pivoted rearward by rearward movement of a bolt means;*

11.4.2.3  *a trigger member having a trigger member sear and adapted to move between a set position and a released position,* **the trigger member being forced to the set position as a result of cycling action of the bolt means***, such that the trigger member sear and the hammer sear catch are in engagement in the set position of the hammer and the set position of the trigger member and are out of engagement in the released position of the hammer and the released position of the trigger member;*

11.4.2.4  *wherein the trigger member sear and the hammer sear catch are in engagement in the set position of the hammer and the set position of the trigger member and are out of engagement in the released position of the hammer and the released position of the trigger member,*

11.4.2.5  *a disconnector having a disconnector hook for engaging the hammer hook and adapted to pivot on a transverse disconnector pivot axis; and*

11.4.2.6  *a locking member adapted to be movably mounted, the locking member being movable between a first position at which* **the locking member mechanically blocks the trigger member from moving to the released position** *and a second position at which the locking member does not mechanically block the trigger member allowing the trigger member to be moved to the released position and adapted to be moved to the second position by forward movement of the bolt means,*

11.4.2.7  *wherein in the standard semi-automatic mode, rearward movement of the bolt means causes rearward pivoting of the hammer such that the disconnector hook holds the hammer hook, at which time a user must manually reduce pressure on the trigger member to free the hammer from the disconnector to permit the hammer and the trigger member to pivot to the set positions so that the user can pull the trigger member to fire the firearm again; and*

11.4.2.8  *wherein in the forced reset semi-automatic mode, rearward movement of the bolt means causes the trigger member to be forced to the set position, and the disconnector hook is prevented from holding the hammer hook, and thereafter when the bolt means reaches a substantially in-battery position or an in-battery position the user can actuate the trigger member to fire the firearm again.*[45]

11.4.3  Each of the eight (8) asserted claims of the '403 Patent recites a "trigger member[46]."

11.4.4  There is a mechanical distinction between "trigger member" as applied in the '403 Patent and the use of the term "trigger" as applied to firearms in general; a "trigger member" is specifically configured to accomplish an additional function - the mechanical trigger reset.

---

[45] U.S. Patent 12,636,403 13:9-63 (emphasis added)
[46] U.S. Patent 12,636,403 13:18-21, 14:55-58, 16:2-4, 17:34, 17:50



**GENESIS DESIGN ENGINEERING LLC**

11.4.4.1  *Properly construed in light of the specifications, "trigger member" = the configured trigger structure (trigger member 38 with convex contact surface (58) cooperating with the hammer's concave surface (51), plus a further contact surface (69))[47] through which the disclosed forced-reset operation is carried out — not any generic AR-pattern trigger.  The disclosed reset is hammer-driven: "surface (51) contacts surface (58) of trigger member (38) forcing trigger member (38) to pivot[48]" to its set position.*

11.4.4.2  *The Atrius FRS uses a conventional mil-spec trigger and is compatible with multiple aftermarket trigger assemblies with conventional trigger tail geometries[49] that lack the configured contact surfaces (58) and (69) of trigger member (38). In the FRS, rotating the selector to the forced-reset position shifts the lever arm transversely into alignment with the trigger (see to 9.4 - .9.5, 9.5.3), and it is the bolt carrier acting on that lever arm during cycling that forces the trigger toward reset, as described in 9.7. The FRS thus does not reset the trigger through the configured hammer-to-surface-(58) interaction the '403 Patent discloses, and the "trigger member" limitation is absent from every asserted claim.*

11.4.5  Claims 14, 15, 17, 29, 30, 32 each also require a "locking member" which mechanically blocks the trigger member from moving to the released position.[50]

11.4.6  The Atrius FRS does not have a "locking member", for the following 2 reasons:

11.4.6.1  *Reason 1 (independent of separateness): The claimed locking member must "mechanically block the trigger member from moving to the released position." "The trigger member" takes its antecedent from the configured "trigger member" construed above in 11.4.4; the specification confirms surface (80) of locking member (72) bears against surface (69) of trigger member (38)[51]. The FRS's conventional trigger lacks surface (69), so there is no configured "trigger member" for any locking member to block. This reaches all six of these claims.*

11.4.6.2  *Reason 2 (separateness — applies to the claims that also recite a safety selector: 15, 29, 30, 32): The Atrius FRS contains no discrete locking member. As described in 9.3, the FRS is composed only of a detent shaft, spring, lever arm, selector, and screw; none of these is a locking member of the kind the '403 Patent discloses (locking member (72), a discrete component whose surface (80) bears against surface (69) of the trigger member[52]). The only FRS structure that interacts with the bolt carrier during cycling is the lever arm, and—as explained in 11.3.7.1 - 11.3.7.2 in connection with the '784 Patent—the lever arm pivots when struck by the bolt carrier while the selector remains static, held by the detent pin. Accordingly, to the extent Plaintiffs contend that some FRS structure performs a "locking" function, that structure is the same lever-arm/selector assembly Plaintiffs identify as the safety selector[53]. A single structure cannot simultaneously satisfy the separately recited "locking member" and "safety selector" limitations of claims 15, 29, 30, and 32.*

11.4.7  For at least the above reasons, the Atrius FRS does not meet the limitations of the Asserted Claims 14, 15, 17, 29, 30, 32, 38 and 39 of the '403 Patent and therefore does not infringe.

.

---

[47] U.S. Patent 12,636,403 8:19-23

[48] U.S. Patent 12,636,403 10:20-24

[49] Refer to Figure 12

[50] U.S. Patent 12,636,403 13:38-41, 14:23-25, 14:59-63, 16:6-10

[51] U.S. Patent 12,636,403 8:37-43

[52] U.S. Patent 12,636,403 8:37-43

[53] Declaration of Brian Luettke in Support of Plaintiffs' Motion for Preliminary Relief, dated May 28, 2026, Exhibit J, pgs. 7-8, 13



## 12 Invalidity

### 12.1 The '247 Patent

12.1.1 Claim 15 of U.S. Patent No. 12,038,247 is being asserted and reads as follows:

12.1.1.1 *A firearm trigger mechanism comprising:*

12.1.1.2 *a hammer having a sear catch and a hook for engaging a disconnector and adapted to be mounted in a fire control mechanism pocket of a receiver to pivot on a transverse hammer pivot axis between set and released positions, said hammer adapted to be pivoted rearward by rearward movement of a bolt carrier,*

12.1.1.3 *a trigger member having a sear and adapted to be mounted in the fire control mechanism pocket to pivot on a transverse trigger member pivot axis between set and released positions,*

12.1.1.4 *wherein said sear and sear catch are in engagement in said set positions of said hammer and trigger member and are out of engagement in said released positions of said hammer and trigger member,*

12.1.1.5 *said disconnector having a hook for engaging said hammer and adapted to be mounted in the fire control mechanism pocket to pivot on a transverse disconnector pivot axis, and*

12.1.1.6 *a cam having a cam lobe and adapted to be movably mounted in the fire control mechanism pocket, said cam being movable between a first position and a second position, in said second position said cam lobe forces said trigger member towards said set position,*

12.1.1.7 *whereupon in a standard semi-automatic mode, said cam is in said first position, rearward movement of the bolt carrier causes rearward pivoting of said hammer such that said disconnector hook catches said hammer hook, and thereafter the bolt carrier moves forward into battery, at which time a user must manually release said trigger member to free said hammer from said disconnector to permit said hammer and trigger member to pivot to said set positions so that the user can pull said trigger member to fire the firearm, and*

12.1.1.8 *whereupon in a forced reset semi-automatic mode, said cam is in said second position, rearward movement of the bolt carrier causes rearward pivoting of said hammer such that said disconnector hook is prevented from catching said hammer hook, and thereafter the bolt carrier moves forward into battery, at which time the user can pull said trigger member to fire the firearm.* [54]

12.1.2 The Asserted Claim 15 of the '247 Patent is anticipated or otherwise obvious over U.S. Patent 7,398,723 issued July 15, 2008, to Brian Blakley ("Blakley '723") in view of the Tommy Triggers FRT-15-3MD.

12.1.3 I am not a lawyer and am not offering a legal opinion; however, based on counsel's explanation, I understand that both Blakley '723 and the FRT-15-3MD are prior art to the '247 Patent, as follows:

12.1.3.1 *Blakley '723 issued to Brian A. Blakley on July 15, 2008 (Blakley '723 at INID 45), more than fourteen years before the '247 Patent's earliest possible priority date—September 8, 2022, the date of its provisional application[55].*

12.1.3.1.1 Because the '247 Patent was examined under the AIA's first-to-file provisions, Blakley '723 qualifies as prior art under 35 U.S.C. § 102(a)(1) as a patent that was publicly available before the '247 Patent's asserted priority date[56].

12.1.3.1.2 My understanding is that common ownership by ABC IP does not cure this status: the AIA's common-ownership exception does not apply to a reference, like Blakley '723, that became publicly available through issuance years before the later patent's priority date[57].

---

[54] U.S. Patent 12,038,247 14:30-15:3



**GENESIS DESIGN ENGINEERING LLC**

12.1.3.1.3   The § 102(b)(1) 1-year grace period is likewise unavailable because Blakley '723 issued far outside the one-year window, so the shared inventorship cannot exclude it[58].

12.1.3.1.4   Finally, Blakley '723 and the '247 Patent are in different patent families without a continuous chain of prosecution between them.

*12.1.3.2   I further understand from counsel that the FRT-15-3MD also qualifies as 35 U.S.C. § 102(a)(1) prior art since it was on sale well before the '247 Patent's alleged priority date—something even Rare Breed acknowledges in its Complaint[59] against Tommy Trigger filed in February 2022 (ergo, before the '247 Patent's alleged priority date).*

12.1.3.2.1   As with Blakley '723, none of the prior-art exceptions apply. The § 102(b)(1) grace period is unavailable because the FRT-15-3MD was independently disclosed to the public by Strbac whereas Blakley is the sole named inventor of the '247 Patent; in other words, there is no common inventorship as is required under this exception[60].

12.1.3.2.2   Further, § 102(b)(2) does nothing to diminish the FRT-15-3MD as § 102(a)(1) prior art since, as discussed above, these exceptions only apply to § 102(a)(2) prior art[61].

12.1.4   Because the '159 Patent is a continuation of the '247 Patent, Blakley '723 and the FRT-15-3MD are prior art to it as well.

12.1.5   Blakley '723 and the FRT-15-3MD disclose each limitation of claim 15, as detailed in the corresponding attached chart.  Refer to Exhibit 1 for further details.

12.1.6   Further, a POSITA would have a motivation to combine these references. Specifically, Blakley '723 appears to have a 2-position safety selector switch (i.e.: safe and forced reset mode) and would not have a semi-automatic mode which is standard on AR-15s and M-16s. However, the specification suggests that Blakley '723 contemplated a three-position safety selector enabling a semi-automatic mode, though the figures and the specification do not clearly support this contention.

*12.1.6.1   While the specification does not specifically describe what Blakley had in mind, it does provide motivation to add a 3-position selector switch: "It is intended that the effect of the disclosed invention be able to be optionally selected or deselected by operating the selector-cam and by configuring the trigger extension to be able to move forward and rearward within/upon the rear of the trigger by means of a spring bias that competes with engagement surfaces machined into the selector-cam. Moving the trigger-extension forward or rearward would allow or prevent the cam from contacting the top/bearing surface of the trigger-extension by having the top/bearing surface of the trigger extension crafted so that it has a lower and higher part, and such that when the lower part is beneath the cam the cam does not make contact with the top/bearing surface of the trigger extension as the cam moves through its range of motion, thereby allowing or preventing the cam from resetting the trigger.[62]"*

---

[55] U.S. Patent 12,038,247 INID 60

[56] 35 U.S.C. § 102(a)(1)

[57] 35 U.S.C. § 102(b)(2)(C)

[58] 35 U.S.C. § 102(b)(1)

[59] Rare Breed Triggers, LLC et al v. Mladen Thomas Strbac, Case No. 1:22-cv-280, N.D. Ohio, at Dkt. No. 1 (Complaint), ¶¶19, 43-44, 76-77; see also https://web.archive.org/web/20220130085201/https://tommytriggers.com/ (Wayback Machine archive snapshot of Tommy Triggers website on January 30, 2022, showing the FRT-15-3MD for sale).

[60] 35 U.S.C. § 102(b)(1)

[61] 35 U.S.C. § 102(b)(2)

[62] U.S. Patent 7,398,723 11:11-25



12.1.7 Combining the Tommy Triggers FRT-15-3MD with Blakley '723 achieves this three-position safety wherein there is a standard semi-automatic mode (and which, consequently, discloses all the limitations missing from Blakley '723 standing alone).

12.1.8 As discussed above, it is standard on AR-15 and M-16 platforms—as well as the vast majority of firearms capable of simulated (e.g.: FRT) or actual (e.g.: machinegun) automatic fire—to have a three-position fire selector, with the positions corresponding to safe, semi-automatic, and forced-reset/full-auto.

12.1.9 From a shooter's perspective, such a three-position selector is advantageous because semi-automatic fire allows for more precise and less ammo-consumptive shooting, while forced-reset/full-auto mode allows a much greater volume of fire; hence, the popularity of such selectors. Therefore, a POSITA would have ample motivation to combine the two references.



**GENESIS DESIGN ENGINEERING LLC**

## 12.2  Claim 15 of the '247 Patent is Unenforceable due to Rare Breed's Inequitable Conduct

### 12.2.1  The Record Supports a Strong Inference of Specific Intent to Deceive the PTO

12.2.1.1  *I am not a lawyer and am not offering a legal opinion; however, I was informed by counsel and I understand that inequitable conduct requires clear and convincing evidence that the applicant misrepresented or omitted material information with the specific intent to deceive the PTO.*

12.2.1.2  *For a nondisclosure theory, the accused infringer must show that the applicant knew of the reference, knew it was material, and deliberately decided to withhold it.*

12.2.1.3  *The following are the circumstances as I understand them, as related by counsel:*

12.2.1.3.1  During the prosecution of the patent application that would ultimately become Blakley '247, the applicant provided an Information Disclosure Statement on August 31, 2023 which included Strbac '003[63], but cited this reference as being under common ownership[64], thus excluding it from consideration as material prior art.

12.2.1.3.2  The Information Disclosure Statement of August 31, 2023, did not include the Tommy Trigger FRT-15-3MD device, the technology ultimately covered in the Strbac '003 utility patent[65].

12.2.1.3.3  In addition, because of the September 8, 2022, priority date[66] of the '247 Patent, the only information from Strbac '003 that is applicable to the '247 application is the Provisional Application of January 10, 2022[67], not the full utility patent.

12.2.1.3.4  On May 22, 2024, the Examiner allowed the '247 Patent after identifying Blakley '723 as the closest prior art and expressly finding that Blakley lacked the following limitations[68]:

(1) a three-position selector with safe, standard semi-automatic, and forced-reset semi-automatic positions;

(2) standard semi-automatic operation in which the disconnector catches the hammer and the user must manually release the trigger; and

(3) forced-reset operation in which the selector prevents the disconnector from catching the hammer.

12.2.1.4  *The Tommy Triggers FRT-15-3MD device includes each of the three (3) limitations considered by the Examiner to be missing from, what was considered to be, the closest prior art – the Blakley '723 Patent.*

12.2.1.5  *The missing limitations are in the FRT-15-3MD device, as disclosed in the full '003 utility patent, as follows:*

*(1) a 'three-position' safety selector having safe, standard semi-automatic, and forced reset semi-automatic positions[69];*

*(2) standard semi-automatic operation in which the disconnector catches the hammer and the user must manually release the trigger[70]; and*

*(3) forced-reset operation in which the selector prevents the disconnector from catching the hammer[71].*

---

[63] File History of U.S. Patent 12,038,247 at 43 (Information Disclosure Statement dated August 31, 2023)
[64] U.S. Patent 12,038,247 1:64-2:1
[65] U.S. Patent 11,724,003
[66] U.S. Patent 12,038,247 INID 60
[67] U.S. Patent 11,724,003 INID 60
[68] File History of U.S. Patent 12,038,247 at 23-28 (Notice of Allowance)
[69] U.S. Patent 11,724,003 INID 57; see also 2:35-37, 3:2-5, 11:30-33, 12:31-34, 13:38-41, 14:58-61
[70] U.S. Patent 11,724,003 INID 57; see also 3:5-9, 11:34-42, 12:35-42, 13:42-49, 14:62-15:2
[71] U.S. Patent 11,724,003 INID 57; see also 3:11-17, 11:43-48, 12:44-49, 13:51-56, 14:15:4-9



**GENESIS DESIGN ENGINEERING LLC**

12.2.1.6   *I have reviewed the Strbac '003 provisional application material which included only a few photographs and a limited description of the intent, almost none of which is substantive in the '003 Patent as issued[72].*

12.2.1.7   *This provisional application also did not contain much of the technology ultimately included in the '003 Patent's claims as issued, which must have been added in subsequent submission(s) to the PTO.*

12.2.1.8   *Specifically, the Strbac '003 provisional application did not include any disclosure regarding the operation of the disconnect [otherwise referred to as a "disconnector" in this report] in the semi-automatic firing mode, nor its inoperability in a forced reset firing mode.*

*If the examiner did consider Strbac '003 it would be limited to the provisional that doesn't provide the relevant disclosure for the missing limitations, therefore it is not a cumulative reference disclosed by the applicant.*

12.2.2   The Omitted Tommy Trigger Device was But-For Material

12.2.2.1   *My understanding from counsel is that undisclosed prior art satisfies but-for materiality if the PTO would not have allowed a claim had it been aware of the undisclosed prior art.*

12.2.2.2   *The Examiner allowed the '247 Patent claims only because Blakley '723 allegedly lacked the three-position selector and dual standard/forced-reset operating modes*

12.2.2.3   *As noted in 12.2.1.5 above, the omitted Tommy Trigger FRT-15-3MD device included the same three-position selector—safe, standard semi-automatic, and forced-reset semi-automatic—as well as the disconnector functionality and disabling noted by the Examiner as missing from Blakley '723.  In my opinion, if, at least, the Tommy Trigger FRT-15-3MD device had been disclosed, the Examiner would not have issued the patent, given its materiality to patentability.  Refer to items 12.2.1.3.4, 0, and 12.2.1.6 above and the accompanying invalidity charts demonstrating materiality.*

## 12.3   The '159 Patent

12.3.1   The Claims of the '159 Patent are Unenforceable due to Rare Breed's Inequitable Conduct

12.3.1.1   *Based on my understanding from counsel, the same inequitable conduct that renders the '247 Patent unenforceable also defeats preliminary relief based on the related '159 Patent, as the '159 Patent is a continuation of the '247 Patent. Refer to 12.2.*

12.3.2   Claims 1, 3, 6, 7, 9, 10, 11, 14, 15, 16 and 17 of U.S. Patent No. 12,578,159 are being asserted.

12.3.3   All asserted claims of the '159 Patent are anticipated or otherwise obvious over U.S. Patent 7,398,723 issued July 15, 2008, to Brian Blakley in view of the Tommy Triggers FRT-15-3MD.

12.3.4   I understand from counsel that both Blakley '723 and the FRT-15-3MD are prior art to the '159 Patent, as described in 12.1.3 above.

12.3.5   Blakley '723 and the FRT-15-3MD disclose each limitation of claims 1, 3, 6, 7, 9, 10, 11, 14, 15, 16, and 17, as detailed in the corresponding attached chart.  Refer to Exhibit 2 for additional details.

12.3.6   Further, as described above in 12.1.5 thru 12.1.9, a POSITA would have motivation to combine these references.

---

[72] U.S. Provisional Application 63/297,884



**GENESIS DESIGN ENGINEERING LLC**

## 12.4 The '784 Patent

12.4.1  All asserted claims of the '784 Patent are anticipated by U.S. Patent 7,398,723 issued July 15, 2008, to Brian Blakley.

12.4.2  I understand from counsel that Blakely '723 is prior art to the '784 Patent, as described in 12.1.3.

12.4.3  Blakely '723 discloses each limitation of claims 1, 3, and 4, as detailed in the corresponding attached chart. Refer to Exhibit 3 for additional details.



**GENESIS DESIGN ENGINEERING LLC**

## 12.5  The '403 Patent

### 12.5.1  Written Description and Enablement

12.5.1.1  *I have been asked to address, from a technical perspective, what the '403 specification discloses regarding (i) the structure of the trigger member, (ii) the means by which the trigger member is forced to reset, and (iii) the structure that prevents "hammer follow" when the firearm is operated in the forced-reset mode.*

12.5.1.2  *The '403 specification discloses a single trigger-member structure[73]: trigger member (38), configured with a convex contact surface (58) that cooperates with the hammer's concave surface (51), and a further contact surface (69). The specification discloses no other trigger-member structure.*

12.5.1.3  *The '403 specification discloses a single means of forcing that trigger member to its set (reset) position: during cycling, the rearward-pivoting hammer brings surface (51) into contact with surface (58) of trigger member (38), "forcing trigger member (38) to pivot[74]" to its set position. I am aware of no other structure or mechanism disclosed in the '403 specification for forcing the trigger member to reset.*

12.5.1.4  *In the forced-reset mode disclosed by the '403 Patent, the disconnector is disabled: a narrow portion of the safety selector prevents the disconnector from pivoting with the trigger member, so the disconnector hook cannot catch the hammer hook during cycling[75]. Because the disconnector is disabled in that mode, the disconnector does not and cannot perform the function of holding the hammer or preventing premature release of the hammer ("hammer follow") in forced-reset operation.*

12.5.1.5  *In the disclosed forced-reset mode, the only structure the '403 specification identifies as holding the trigger member in its set position and precluding hammer follow as the bolt carrier returns to battery is the locking member (locking member 72). The specification discloses no other structure performing that anti-hammer-follow function in forced-reset mode.*

### 12.5.2  The Locking Member Is Necessary to Safe Forced-Reset Operation as Disclosed

12.5.2.1  *As explained in 12.5.1.4 – 12.5.1.5, in the '403 Patent's disclosed forced-reset mode the disconnector is disabled, and the locking member is the only disclosed structure that holds the trigger member in its set position and prevents hammer follow as the bolt carrier returns to battery.*

12.5.2.2  *Preventing hammer follow in this mode is a safety-critical function. If, after a round is fired and the trigger has been forced to reset, the trigger could be released or the hammer could follow the bolt carrier forward before the bolt is fully closed and locked, the hammer could contact the firing pin before the action is in battery. The locking member, by holding the trigger in its set position until the bolt carrier reaches the substantially in-battery position, is the structure the '403 specification relies upon to prevent that outcome in forced-reset mode.*

12.5.2.3  *A "forced reset trigger mechanism" that omits the locking member—while retaining only a hammer, disconnector, trigger member, and safety selector—would not, as disclosed in the '403 Patent, prevent hammer follow in the forced-reset mode, because the disconnector is disabled in that mode and no other disclosed structure performs that function.*

12.5.2.4  *The '403 specification provides no teaching, structure, or guidance for achieving safe forced-reset operation without the locking member. In my opinion, a person of ordinary skill in the art seeking to make and use a forced-reset trigger mechanism that omits the locking member, and that nonetheless operates safely, could not do so based on the '403 disclosure without substantial experimentation and independent design work beyond anything the specification provides.*

---

[73] U.S. Patent 12,636,403 8:19-23
[74] U.S. Patent 12,636,403 10:19-21
[75] U.S. Patent 12,636,403 9:30-34



**GENESIS DESIGN ENGINEERING LLC**

12.5.3   All Asserted Claims of the '403 Patent are obvious over U.S. Patent 3,045,555 issued July 24, 1962, to E.M. Stoner ("Stoner '555") in view of U.S. Patent 10,514,223 issued December 24, 2019, to Jeffrey Rounds ("Rounds '223").

12.5.4   I am not a lawyer and am not offering a legal opinion; however, based on counsel's explanation, I understand that both Stoner '555 and Rounds '223 are prior art to the '403 Patent, as follows:

12.5.4.1   *Stoner '555 was patented to Eugene M. Stoner on July 24, 1962, more than six decades before the '403 Patent's earliest possible priority date.*

12.5.4.2   *Because the '403 Patent was examined under the AIA's first-to-file provisions, Stoner '555 qualifies as prior art under 35 U.S.C. § 102(a)(1) as a patent that was publicly available before the '403 Patent's asserted priority date.*

12.5.4.3   *I further understand from counsel that Rounds '223 also qualifies as 35 U.S.C. § 102(a)(1) prior art since it issued on December 24, 2019, before the '403 Patent's alleged priority date, and thereby became publicly available as an issued United States patent.*

12.5.5   Stoner '555 and Rounds '223 disclose each limitation of each asserted claim, as detailed in the corresponding attached chart.  Refer to Exhibit 4 for further details.

12.5.6   Further, a POSITA would have a motivation to combine these references. Specifically, Rounds '223 appears to employ only a two-position safety selector switch (i.e.: safe and fire), and in its disclosed "fire" position the trigger operates exclusively in a forced-reset mode—it does not provide a distinct, standard semi-automatic mode of the type that is standard on AR-15s and M-16s. However, the specification suggests that Rounds '223 nonetheless contemplated compatibility with select-fire architecture enabling such an added mode.

12.5.6.1   *While the specification does not specifically describe a three-position selector, it does provide motivation to add one. The specification invites such modification, stating: "Furthermore, the described features, structures, and characteristics may be combined in any suitable manner in one or more embodiments," and that "modifications and variations thereto are possible, all of which fall within the true spirit and scope of the invention . . . [and] all suitable modifications and equivalents may be included and considered to fall within the scope of the invention".[76]*

12.5.7   Combining Stoner '555 with Rounds '223 achieves this three-position selector wherein there is a standard semi-automatic mode (and which, consequently, discloses all the limitations missing from Rounds '223 standing alone). Stoner '555 discloses "a single control member which, by its position, determines whether the gun is maintained in safety condition, in semi-automatic fire condition or automatic fire condition," accomplished "[b]y rotation of the control cam . . . into one of three positions, [so that] it is possible to place the rifle in safety, semi-automatic or automatic condition".[77]

---

[76] U.S. Patent 10,514,223 3:12-15, 6:13-24
[77] U.S. Patent 3,045,555 1:28-36, 5:19-22



12.5.8  As discussed above, it is standard on AR-15 and M-16 platforms—as well as the vast majority of firearms capable of simulated (e.g.: FRT) or actual (e.g.: machinegun) automatic fire—to have a three-position fire selector, with the positions corresponding to safe, semi-automatic, and forced-reset/full-auto. Stoner '555 supplies precisely this architecture, using a rotatable control cam having "a plurality of cam surfaces thereupon engageable with adjacent extremities of the trigger, the intermediate sear and the automatic sear," such that "by manipulation of the single control member the weapon can be placed in any desired condition of operation or non-operation".[78] Applied to the forced-reset device of Rounds '223, that selector yields the conventional safe, semi-automatic, and forced-reset positions.

12.5.9  From a shooter's perspective, such a three-position selector is advantageous because semi-automatic fire allows for more precise and less ammo-consumptive shooting, while forced-reset/full-auto mode allows a much greater volume of fire; hence, the popularity of such selectors. This advantage is reinforced by Rounds '223's own recognition that "shooters desire to increase the rate of semiautomatic fire," while retaining the standard semiautomatic action for ordinary shooting.[79] Therefore, a POSITA would have ample motivation to combine the two references.

12.5.10        The Stoner '555 and Rounds '223 references refer to some structures with interchangeable terminology. For example, Stoner's "intermediate sear abutment (76)" is the structure the '403 Patent calls a "hammer hook." Stoner's "sear abutment (64)" is the structure the '403 Patent calls a "hammer sear catch." Both serve to engage the disconnector/intermediate sear and the trigger sear, respectively, to hold the hammer during cycling.

12.5.11        The method disclosed in Stoner '555 for disabling the disconnector in the third selector position would predictably and reliably function in the same manner if applied to disable a disconnector mounted in the third selector position of the mechanism described in Rounds '223.

12.5.11.1 *In Stoner '555, when the rotatable control member is moved to its third position, the control cam locks the intermediate sear (which serves as the disconnector) against movement, holding it clear of the hammer so that its hook cannot catch the corresponding abutment, thereby permitting fully automatic fire.*

12.5.11.2 *The disconnector in the Rounds '223 mechanism performs the identical underlying function, holding the hammer cocked until the trigger is reset and preventing the hammer from following the bolt carrier, and it would be defeated in precisely the same way, by preventing the disconnector from catching the hammer hook.*

12.5.11.3 *Because the operative event in both designs is the same, a disconnector either catching or not catching a hook on the hammer, the mode of fire produced in the third selector position is immaterial, and a method effective to disable the disconnector in one mechanism would operate identically and with equal effect in the other.*

---

[78] U.S. Patent 3,045,555 1:47-56
[79] U.S. Patent 10,514,223 1:37-38



## 13 Conclusion

13.1  In conclusion, I do not agree with the Plaintiffs' expert that "the mechanical operation of the Atrius Selector is consistent with [an] analysis of how the device practices the asserted claims.[80]"

13.2  In fact, the opposite is true; I believe the Atrius FRS does not "practice the asserted claims."

13.3  This matter is in litigation and my investigation is ongoing.

13.4  The opinions expressed in this report are based on my investigation conducted to date of the information available.  I have also assumed that the information provided is correct.

13.5  Therefore, any new or corrected information that I receive, such as additional legal discovery, expert reports or depositions, etc. may produce information which is not presently available to me.

13.6  Should additional information/facts become available, I retain the right to modify, amend, add to, or subtract from the opinions expressed herein.

---

[80] Declaration of Brian Luettke in Support of Plaintiffs' Motion for Preliminary Relief, dated May 28, 2026, pg. 6